UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
NANCY MUCCIARONE,  :
        Plaintiff,  :
        vs.  :
INITIATIVE, INC., INTERPUBLIC GROUP,  :
DR PEPPER SNAPPLE GROUP, INC., and
JUSTIN WHITEHEAD  :
        Defendants.
------------------------------------- X

CASE NO.

**COMPLAINT FOR SEXUAL ASSAULT, BATTERY, RETALIATION ET AL.**

DEMAND FOR JURY TRIAL

Plaintiff Nancy Mucciarone ("Mucciarone" or "Plaintiff"), by and through her attorneys, Rafkin Esq., PLLC, as and for her complaint against Initiative, Inc. ("Initiative"), Interpublic Group, ("IPG" or "Interpublic"), Dr Pepper Snapple Group Inc. ("Dr Pepper"), and Justin Whitehead ("Whitehead") alleges as follows:

NATURE OF THE ACTION

1. Plaintiff brings this action against Initiative, IPG, Dr Pepper and Whitehead for sexual harassment and retaliation pursuant to Title VII (42 U.S.C. 2000e *et seq*.), the New York State Human Rights Law (N.Y. Executive Law § 290 *et seq*.) ("NYSHRL") and the New York City Human Rights Law (Administrative Code § 8-107 *et seq*.) ("NYCHRL"), intentional infliction of emotional distress, assault, battery and negligent supervision and retention pursuant to New York law.

2. Initiative was Plaintiff's employer. Initiative is an advertising agency, led by Kris Magel, its President. Among its biggest accounts is Dr Pepper. IPG is a holding company and the parent organization of Initiative and was Plaintiff's co-employer. Defendant Whitehead is a Media Manager for Dr Pepper. Plaintiff was assigned to the Dr Pepper account at Initiative and it was

the only account she worked on for Initiative.  Blaise D'Sylva is Dr Pepper's Vice President of Media and is the senior executive responsible for Dr Pepper's relationship with Initiative.

3.   On August 29, 2017, Whitehead and other Dr Pepper managers met with Initiative personnel, including Plaintiff, in New York City to discuss business between the two companies. Following the meeting, Whitehead, other Dr Pepper managers and Initiative managers and employees, including Plaintiff, went out for a pre-arranged happy hour.

4.   Whitehead repeatedly made sexual overtures to Plaintiff.  He sat down next to her and put his arm around her.  He told her that she was beautiful and that he liked her.  He told her that he was in an "open" marriage.  Initiative management and the Dr Pepper managers were present while Whitehead engaged in this conduct.

5.   Plaintiff was visibly upset at Whitehead's behavior.  She left and went to the bathroom to call her now fiancée in distress.  She felt trapped as both Initiative and Dr Pepper management were present but did nothing to stop Whitehead from continuing to harass Plaintiff.

6.   Plaintiff returned from the bathroom and explicitly told Whitehead that she was in a relationship and was not interested in him.  She hoped that would be the end of it.  It was not.

7.   Undeterred, Whitehead continued to pursue Plaintiff.  He followed Plaintiff and the Initiative group to another mid-town bar (Pig & Whistle) even though he was not invited.  At Pig & Whistle, Whitehead purported to apologize to Plaintiff for his earlier behavior and lured Plaintiff outside the bar under the pretense of needing directions to his hotel.  Once there, he sexually assaulted her.

8.   Whitehead grabbed Plaintiff and tried to kiss her.  She turned her head so as to avoid his mouth and he kissed her neck.  Whitehead pulled Plaintiff's shirt open and groped her breast.  Plaintiff repeatedly told him "no" and pushed against his chest to get away from him.

9. Whitehead would not let go of Plaintiff. He continued to grab her. He pulled her body against his and thrust his hand up her leg, grabbing her buttocks while trying to kiss her. Finally, Plaintiff was finally able to get away from his grasp and ran back inside the bar.

10. On information and belief, this was not the first time Whitehead had engaged in harassing conduct, a fact of which Dr Pepper was well aware.

11. When Plaintiff told Initiative management inside the bar about the attack, they minimized it and advised her not to go to HR right away. When Plaintiff did so anyway, Plaintiff's supervisor and the person responsible for the Dr Pepper account, one of Initiative's biggest clients, launched a campaign against Plaintiff to drum up a false record of poor performance and get her off the account and out of Initiative. She succeeded.

12. This occurred in a matter of a few short weeks after Magel, President of Initiative, was notified directly both about the attack and the fact that Plaintiff was considering a claim against Whitehead and Dr Pepper. Magel and other members of Initiative management were also aware that Plaintiff's counsel had contacted Blaise D'Sylva, Vice President of Media for Dr Pepper and the executive to whom Initiative reported at Dr Pepper, to ensure that Dr Pepper preserved relevant evidence.

13. Within a matter of weeks, Initiative's Chief Communications Design Officer, David Stopforth, called Plaintiff into an unplanned meeting to "see what we can do with you." He went on to tell her that she could not continue to work on the Dr Pepper account, Initiative's largest account and the one she had worked on her entire tenure at Initiative.

14. Faced with an environment where her report of a sexual assault by a Dr Pepper manager was met with the rankest form of retaliation, Plaintiff had no choice but to resign her employment.

PARTIES

15. Plaintiff is in her twenties and engaged to be married. She began working for Initiative in December of 2016 and was hired full time as an Associate Director in January of 2017. She is a resident of New York City and worked out of Initiative's New York City headquarters.

16. Defendant Initiative is a global communications network within IPG Mediabrands, a media services entity and part of Defendant IPG, a publically traded company. Initiative is a corporation headquartered in the City and County of New York at 100 West 33rd St, New York, NY 10001. Initiative employs more than 3,200 employees in 94 offices in 80 countries. It manages approximately $16 billion in billings annually. During all relevant times, Initiative was Plaintiff's employer within the meaning of all applicable statutes.

17. Defendant IPG is a global marketing company of which Initiative is a wholly owned subsidiary. IPG is headquartered in the City and County of New York City at 909 Third Avenue, 24th Floor New York, NY 10022 and was a co-employer of Plaintiff.

18. Dr Pepper is incorporated in Delaware and headquartered in Plano, Texas.

19. Justin Whitehead is a citizen of Texas.

JURISDICTION AND VENUE

20. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

21. This court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff's federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

22. The events giving rise to the claims herein occurred in New York City.

23. Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

ADMINISTRATIVE PROCEDURES

24. Plaintiff has filed a charge with the Equal Employment Opportunity Commission ("EEOC") for harassment and retaliation.

25. Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

26. Any and all other prerequisites to the filing of this suit have been met.

FACTS COMMON TO ALL COUNTS

27. Following the relentless harassment and the physical assault and battery upon Plaintiff (as detailed above in paragraphs 3-9, which are incorporated by reference herein), Plaintiff was visibly distraught. She immediately informed the Initiative managers at the bar about what happened. In response, they minimized the attack, saying it was "not a big deal" or words to that effect. The next day, Plaintiff was beside herself. When Plaintiff brought the assault up again to her manager and advised that she wanted to report it to Human Resources, her manager advised her not to say anything until he "got his ducks in a row" given how important Dr Pepper was to Initiative.

28. Plaintiff did report the incident to Human Resources, but the minimizing continued. The Company's HR representative advised Plaintiff that she was sorry if Plaintiff was "made uncomfortable" by Mr. Whitehead's behavior. Plaintiff was not "made uncomfortable" – she was distraught after being physically and sexually assaulted and battered. Plaintiff informed the

Company that she would need some time off to process what had happened and reflect on whether she could be made to feel safe in Initiative's workplace again.

29. Initiative advised that it would support Plaintiff and do everything it could to create a safe work environment for her and one free of retaliation. Plaintiff took Initiative at its word and returned to work.

30. Dr Pepper is one of Initiative's largest clients and the account on which Plaintiff worked her entire tenure at Initiative. Initiative and IPG knew that Plaintiff was considering legal action against Dr Pepper and Whitehead and that her counsel would be in contact with Dr Pepper. Her attorneys contacted Dr Pepper in mid-September 2017.

31. Almost immediately, Initiative management turned on Plaintiff. Executive Vice President and Managing Director Linda Cronin, who prior to the assault regularly praised Plaintiff's work product and ethic, became suddenly critical of Plaintiff at almost every turn.

32. For example, Ms. Cronin criticized Plaintiff for not preparing a portion of a presentation Ms. Cronin had clearly communicated would be handled by Ms. Cronin herself. She abruptly began to impose unreasonable deadlines on Plaintiff, whose team was already understaffed, something well known to Ms. Cronin. For example, she sent an email to Plaintiff at 12:30 a.m. on Sunday morning demanding that an inordinate amount of work be completed by early Monday morning.

33. After Plaintiff alerted Dr Pepper to her potential legal claims, Ms. Cronin thereafter treated her with a condescending and confrontational attitude. Her email to Plaintiff on October 5, 2017 provides a prime example. When Plaintiff simply reminded Ms. Cronin that her understanding was that Cronin (not Plaintiff) was responsible for a portion of a presentation, Cronin lashed out with language clearly intended to put Plaintiff in her place:

> <u>Plaintiff</u>: "We were under the impression that you and Brad were handling the upfront portion (Gate 1 and 2 recaps), as it was communicated to us that that was the process for the other brands.
>
> I will do my best to update in advance of our 11, but as I'm currently a team of one, an hour might not give me enough time to complete."
>
> <u>Cronin Response</u>: "Let me be really clear, my job is not to put presentations together. For the other brands I have helped to create a flow and template as the organization hasn't landed on anything yet.  … you have a format and this is a comms design deck, therefore the accountability of comms design to create… I am not a deck creator…"

34.     The next week, on Friday, October 13, 2017, David Stopforth, Chief Communications Design Officer, unilaterally put a meeting on Plaintiff's calendar for 5pm that day to "Catch up."  Plaintiff had already left for a pre-planned trip with her fiancée.  Later that day, Plaintiff's direct boss was fired.  No one followed up to tell her about it or how the team (already understaffed) was supposed to manage without a leader and with one less member.

35.     Having had enough of this treatment, on October 16, 2017, Plaintiff again contacted Human Resources.  Plaintiff met with Daniele Dorter to discuss her concerns about Ms. Cronin's retaliation against her.  When Ms. Dorter reviewed samples of Cronin's communications, she was appalled and told Plaintiff she would look into the matter.  After Plaintiff met with Ms. Dorter, Mr. Stopforth again emerged and placed another meeting on Plaintiff's calendar for 4pm on October 17, 2017.  She heard nothing further from HR.

36.     Plaintiff met with Mr. Stopforth having no idea what was about to transpire.  The point of the meeting, according to Mr. Stopforth, was "to see what we can do with you."  Mr. Stopforth told her in no uncertain terms that she could not continue on her current team – the Dr Pepper account.  He said he was willing to see if he could transfer her to another department or another IPG company.  Plaintiff reiterated that she did not want to leave her team.  Rather, her issue was with the way she was being treated, principally by Ms. Cronin.  She asked Mr. Stopforth point blank: "If I want to stay on my current team, can I?"  Mr. Stopforth told her: "I don't think

you want to do that." Startled, she asked her question again, and was met with the same response, verbatim. Mr. Stopforth then abruptly ended the meeting telling her to think about it and that they would reconnect on Thursday.

37. Mr. Stopforth then sent Plaintiff an email after 10pm on the same night. This time he told her:

> As discussed, I understand your frustration about this situation, and reservations you may have about continuing in your current role. I would like to try and improve the situation, *ideally by looking at a different assignment* for you at Initiative if you are open to it. That said*, I need to know from you if you want to stay here* before I can do anything so *please think it over*.

38. The message was clear. Plaintiff complained to HR about retaliatory treatment and the company's response was to remove *her* from the Company's biggest account and the team to which she had dedicated all of her working time at Initiative. This came in concert with Mr. Stopforth pushing her to pledge her commitment: "I need to know if you want to stay here."

39. Initiative's actions were grossly unfair to Plaintiff and were well within the control of Initiative management. Plaintiff informed the company that it had put her in an intolerable situation and she had no choice but to refuse to continue working at Initiative in such an environment.

## COUNT I
### [AGAINST INITIATIVE AND IPG]
### SEXUAL HARASSMENT PURSUANT TO TITLE VII, THE NEW YORK STATE HUMAN RIGHTS LAW, AND THE NEW YORK CITY HUMAN RIGHTS LAW

40. Plaintiff hereby incorporates by reference paragraphs 1 through 39 as though fully set forth herein.

41. Plaintiff is a female.

42. Plaintiff was sexually harassed and then physically, sexually assaulted and battered by Whitehead at a work event. Whitehead's conduct was unwelcome and based on sex.

43. Whitehead's sexual harassment and assault of Plaintiff was severe and altered the terms and conditions of Plaintiff's employment.

44. Plaintiff perceived her working environment to be hostile or abusive. A reasonable person would consider Plaintiff's working environment to be hostile or abusive.

45. Initiative and IPG are liable for Whitehead's harassment because it knew or should have known of Whitehead's harassment of Plaintiff and failed to take remedial action. Initiative supervisors watched Whitehead put his arm around Plaintiff, heard him tell her she was beautiful, that she liked him, and that he was in an open marriage. They witnessed her obvious discomfort and minimized it. They failed to take any preventative and corrective measures to address Whitehead's sexual harassment of Plaintiff. Whitehead's harassment of Plaintiff continued, and thereafter Whitehead physically, sexually assaulted and battered Plaintiff.

46. Initiative and IPG's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

47. As a result of Initiative and IPG's conduct, Plaintiff has suffered and is entitled to recover damages, including lost back wages and benefits, lost future earnings and benefits, medical expenses, compensatory damages for emotional distress, punitive damages, and attorneys' fees and costs.

### COUNT II
### [AGAINST INITIATIVE AND IPG]
### RETALIATION IN VIOLATION OF TITLE VII, THE NEW YORK HUMAN RIGHTS LAW, AND THE NEW YORK CITY HUMAN RIGHTS LAW

48. Plaintiff hereby incorporates by reference paragraphs 1 through 47 as though fully set forth herein.

49. Plaintiff engaged in protected activity by, inter alia, complaining to Initiative Human Resources about Whitehead's sexual harassment, advising Initiative of potential legal

claims against Dr Pepper, Initiative's largest client, and complaining to Human Resources about Ms. Cronin's retaliatory treatment of Plaintiff as set forth above.

50. Initiative and IPG were aware of such protected activity because Plaintiff directly complained to Initiative Human Resources more than once and advised Initiative management via letter from her attorney regarding claims against Dr Pepper and Whitehead.

51. Because of Plaintiff's protected activity, Initiative and IPG took adverse employment actions against her, including a campaign by Ms. Cronin to berate Plaintiff, attempt to create a false record of Plaintiff's poor performance, and forcing Plaintiff out of her position on the Dr Pepper account.

52. Plaintiff suffered emotional distress and humiliation as a result of Defendants' conduct. Initiative and IPG's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

53. As a result of Initiative and IPG's conduct, Plaintiff has suffered and is entitled to recover damages, including lost back wages and benefits, lost future earnings and benefits, medical expenses, compensatory damages for emotional distress, punitive damages, and attorneys' fees and costs.

### COUNT III
### [AGAINST DR PEPPER AND WHITEHEAD]
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54. Plaintiff hereby incorporates by reference paragraphs 1 through 53 as though fully set forth herein.

55. Whitehead's conduct as described herein was extreme and outrageous.

56. Whitehead intended to cause, or at a minimum disregarded a substantial probability of causing, severe emotional distress to Plaintiff.

57. Plaintiff suffered severe emotional distress, including anxiety, panic attacks, difficulty sleeping, embarrassment and illness. She has had to seek treatment as a result of Defendants' conduct.

58. A causal connection exists between Whitehead's conduct and Plaintiff's severe emotional distress.

59. Dr Pepper is liable for Whitehead's extreme and outrageous conduct under to respondeat superior. Whitehead, as the Dr Pepper's Brand Manager and representative for Initiative on the relevant night, acted at the direction of or instigation of Dr Pepper. Further, Dr Pepper was aware, on information and belief, that Whitehead had been alleged to have engaged in similar conduct on other occasions.

60. As a result of Whitehead and Dr Pepper's conduct, Plaintiff has suffered damages and is entitled to recover compensatory damages as well as punitive damages.

## COUNT IV
### [AGAINST DR PEPPER AND WHITEHEAD]
### BATTERY

61. Plaintiff hereby incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

62. Whitehead repeatedly and purposefully touched Plaintiff's body, including thrusting his body into hers, grabbing her buttocks, forcing his hand underneath her shirt and touching her breast, and trying to kiss Plaintiff's mouth but ultimately kissing her neck.

63. Whitehead's touching of Plaintiff's body was against Plaintiff's consent and was offensive and harmful to Plaintiff.

64. Dr Pepper is also liable for Whitehead's battery of Plaintiff under respondeat superior. Whitehead, as the Dr Pepper's Brand Manager and representative for Initiative on the relevant night, acted at the direction of or instigation of Dr Pepper. Further, Dr Pepper was aware,

on information and belief, that Whitehead had been alleged to have engaged in similar conduct on other occasions.

65. As a result of Defendants' conduct, Plaintiff has suffered damages and is entitled to recover compensatory damages as well as punitive damages.

### COUNT V
### [AGAINST DR PEPPER AND WHITEHEAD]
### ASSAULT

66. Plaintiff hereby incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

67. Whitehead's actions and words put Plaintiff in imminent apprehension of harmful or offensive contact. This includes trying to kiss Plaintiff's mouth over Plaintiff's protest and forcefully kissing her neck, and grabbing at Plaintiff and shoving his hand underneath her shirt and touching her breast, and grabbing her rear end.

68. Plaintiff's apprehension was reasonable as evidenced by, among other things, that Whitehead attempted to and succeeded in getting Plaintiff in place where she was alone with Whitehead outside of the bar and his repeated grabbing of Plaintiff and touching of Plaintiff without her consent.

69. Dr Pepper is also liable for Whitehead's assault of Plaintiff under respondeat superior. Whitehead, as the Company's Brand Manager and representative for Initiative on the relevant night, acted at the direction of or instigation of Dr Pepper. Further, Dr Pepper was aware, on information and belief, that Whitehead had been alleged to have engaged in similar conduct on other occasions.

70. As a result of Whitehead and Dr Pepper's conduct, Plaintiff has suffered damages and is entitled to recover compensatory damages as well as punitive damages.

## COUNT VI
### [AGAINST DR PEPPER]
#### NEGLIGENT SUPERVISION AND RETENTION

71. Plaintiff hereby incorporates by reference paragraphs 1 through 70 as though fully set forth herein.

72. Prior to the attack on Plaintiff as alleged herein, and upon information and belief, Dr Pepper was aware of prior improper conduct engaged in by or alleged to have been engaged by Whitehead.  This conduct included unwelcomed advances on women occurring while Whitehead was ostensibly performing work for Dr Pepper.

73. Despite this knowledge, Dr Pepper failed to take meaningful action to prevent similar conduct from occurring in the future.  Dr Pepper continued to allow Whitehead to utilize his employment position with Dr Pepper to be in a position to make unwanted advances on women.

74. Dr Pepper's conduct in this regard was a proximate cause of the damages endured by Plaintiff as alleged hereinabove.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby prays for judgment against Defendants on all causes of action and for recovery as follows:

    a. Economic damages for past lost wages and benefits (including equity) and future lost wages and benefits (including equity) in an amount to be proven at trial;

    b. Economic damages for medical expenses and related monetary losses;

    c. Liquidated damages pursuant to statute;

    d. Damages for emotional distress and humiliation in an amount to be proven at trial;

    e. Punitive damages in an amount to be proven at trial;

    f. Prejudgment interest;

    g. Attorneys' fees and costs pursuant to statute; and

    h. For such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury in this action.

Executed at Randolph, New Jersey.
Dated: January 23, 2018

RAFKIN ESQ.
1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ 07869

By: /s/ Seth R.

Seth A. Rafkin (5026554)

Attorneys for Plaintiff
Nancy Mucciarone