# Exhibit 2

Page 1

1

2   UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3   ————————————————————————————————————————

4   NANCY MUCCIARONE,

5                         Plaintiff,

6             -against-

7   INITIATIVE, INC., INTERPUBLIC GROUP, DR

PEPPER SNAPPLE GROUP, INC., and JUSTIN

8   WHITEHEAD,

9                         Defendants.

10  Civil Action No. 1:18-cv-00567 (PKC)

————————————————————————————————————————

11

12                        February 11, 2019

9:38 a.m.

13

14

15

16         DEPOSITION of NANCY MUCCIARONE,

17  taken by Defendants, pursuant to Notice,

18  held at the offices of SEYFARTH SHAW LLP,

19  620 Eighth Avenue, New York, New York

20  before Wayne Hock, a Notary Public of the

21  State of New York.

22

23

24

25

```
 1                    N. Mucciarone
 2        Q.    Other than what you've already
 3   said, did you do anything else to get
 4   ready for the deposition?
 5        A.    No.
 6        Q.    What is your birthday?
 7        A.    It's August 4, 1989.
 8        Q.    Where did you grow up?
 9        A.    In North Reading, Massachusetts.
10        Q.    Where do you live currently?
11        A.    Brooklyn.
12        Q.    How long have you lived there?
13        A.    I've lived in Brooklyn for four
14   years or so.  I've been in my current
15   condo for two years.
16        Q.    What's your current address?
17        A.    764 Metropolitan Avenue,
18   apartment 4A.
19              Do you need the rest of it?
20        Q.    No, that's okay.
21              And you said you've lived there
22   for how long?
23        A.    Two years in April.
24        Q.    Do you and your husband own that
25   residence?
```

```
 1                    N. Mucciarone
 2        A.     Correct.
 3        Q.     What company did you work for?
 4        A.     Initiative.
 5        Q.     Where did you report to work?
 6        A.     The address?
 7        Q.     Yes.
 8        A.     I don't think I know the address
 9   off the top of my head, I'm sorry.
10        Q.     Approximately where in the city
11   was it?
12        A.     It was in Herald Square in the
13   Manhattan Mall, above the Manhattan Mall.
14        Q.     What was your role at
15   Initiative?
16        A.     I was an associate director of
17   communications design.
18        Q.     Did you hold the same position
19   throughout your time at Initiative?
20        A.     So I initially was brought on as
21   a consultant.  I worked as a consultant
22   roughly from November of 2016 through
23   February or March of 2017.  My role was a
24   supervisor.  And then I was asked to come
25   on full time and I was given a promotion
```

```
 1                 N. Mucciarone
 2      Q.    Who told you that?
 3      A.    I believe it was Erin Rech.
 4      Q.    Do you recall any specifics
 5   about what Erin told you about working
 6   with Dr. Pepper Snapple Group?
 7      A.    No.
 8      Q.    Dr. Pepper Snapple Group was a
 9   client of Initiative; is that right?
10      A.    Correct.  But they were a client
11   in the LA office and at the time they were
12   beginning a transition to the New York
13   office.
14      Q.    Was there a team assigned to the
15   Dr. Pepper Snapple Group account when you
16   initially became associate director?
17      A.    It was the very beginning of a
18   team.  Kris Magel, who was the president,
19   was heading up staffing the team.  So at
20   that point the New York office had just
21   lost the Molson Coors account so Kris
22   Magel was selecting people from that group
23   to come on and be on Dr. Pepper and, as a
24   result, also selected me and also selected
25   Nick.
```

```
                                          Page 42
 1                   N.  Mucciarone

 2    Feather.

 3        Q.     I'm sorry, say that last name

 4    again?

 5        A.     Brad Feather.

 6               There may be more but I'm not

 7    sure.

 8        Q.     Okay.

 9               What was the work that --

10               MS. ALMON: Let me strike that.

11        Q.     Did this team have a name or a

12    label with Initiative?

13        A.     So with all of the people I just

14    named were on different teams within the

15    Dr. Pepper team.

16        Q.     Okay.

17        A.     So my particular team with Nick

18    Grainger and Sarah Stern, we were the

19    communications design group.

20        Q.     So just I want to understand if

21    I have this correct.

22               There's a Dr. Pepper team that

23    then has subteams?

24        A.     Correct.

25        Q.     Okay.
```

Page 43

```
 1                    N. Mucciarone
 2              And you were on the
 3   communications design subteam?
 4       A.      Correct.
 5       Q.      Out of the people you just
 6   listed, were any of them also on the
 7   communications design subteam?
 8       A.      Aside from Nick and Sarah, at
 9   the very beginning, no, it was just the
10   three of us.
11       Q.      So the initial communications
12   design team for Dr. Pepper was you, Sarah
13   Parker, and Nick Grainger?
14       A.      Sorry, no, Sarah Stern.
15       Q.      Let me try that again.
16              The initial communications
17   design team assigned to the Dr. Pepper
18   account was Sarah Stern, Nick Grainger,
19   and you; correct?
20       A.      Correct.
21       Q.      What were the other subteams?
22   And I'm not asking who was assigned to
23   each one but just wondering what the other
24   ones were called.
25       A.      This was a digital partnership
```

```
                                      Page 45
 1               N. Mucciarone
 2   recollection.
 3       A.    May or June of that year.
 4       Q.    And what was Linda Cronin's
 5   role?
 6       A.    She was -- I don't know what her
 7   actual title was.  She was on a team
 8   called client advice but she also I think
 9   in theory oversaw all of the groups within
10   the Dr. Pepper team.
11       Q.    Could you describe generally the
12   work that you did for the Dr. Pepper
13   account during the time you were an
14   associate director?
15       A.    Every day was different.  I know
16   that's kind of a cliché thing to say.  We
17   handled all of the direct requests from
18   clients.  We would kind of field where
19   this would go and who would take over it.
20   We did some competitive things.  We
21   handled all of their billing.  We handled
22   all of their media plans and generally
23   were a resource for our clients.
24       Q.    Did you have direct client
25   contact in your role as associate
```

Page 46

```
 1                    N. Mucciarone
 2   director?
 3       A.    Yes.
 4       Q.    Who were your Dr. Pepper client
 5   contacts?
 6       A.    My direct contact was Elizabeth
 7   Eaton and occasionally I would have
 8   contact with -- why can't I remember his
 9   name?  Elizabeth Eaton's boss.  I'm
10   drawing a blank.  Eric Blackwood.
11       Q.    How often did you communicate
12   with Elizabeth Eaton?
13       A.    At least once a week we would
14   have status phone calls and any time she
15   had any kind of request, she would e-mail
16   me and Nick.
17       Q.    Did you e-mail on a near daily
18   basis with Elizabeth Eaton?
19       A.    It depended on what was going on
20   at the time.  Sometimes multiple times a
21   day, sometimes once a week.
22       Q.    Did you speak with Eric
23   Blackwood with that same frequency?
24       A.    No, much less frequent.
25       Q.    Other than Elizabeth Eaton and
```

```
 1                    N. Mucciarone
 2   Eric Blackwood, did you have contact with
 3   others at Dr. Pepper?
 4        A.    Blaise D'Silva.
 5        Q.    Anyone else?
 6        A.    No.
 7        Q.    Under what circumstances did you
 8   have communications with Blaise D'Silva?
 9        A.    That was quite rare.  I sent him
10   a few e-mails a few times but it was a
11   rare occurrence.  He was Eric Blackwood's
12   boss.
13        Q.    Was there anything about your
14   communications with Blaise D'Silva that
15   you thought was inappropriate in any way?
16        A.    No.
17        Q.    Was there anything about your
18   communications with Eric Blackwood that
19   you thought was inappropriate in any way?
20        A.    No.
21        Q.    What was your impression of
22   Elizabeth Eaton that you formed through
23   your communications with her?
24        A.    I thought she was smart,
25   personable, friendly, and a kind client.
```

```
                                    Page 48
 1                  N. Mucciarone
 2      Q.     Would you say that you and
 3   Elizabeth had a good working relationship?
 4      A.     Yes, but it stopped there.   Our
 5   communications were purely professional.
 6      Q.     Did you --
 7             MS. ALMON: Let me try to phrase
 8        it a different way.
 9      Q.     Did you and Elizabeth Eaton have
10   a positive, professional relationship?
11      A.     Yes.
12      Q.     And you mentioned that you
13   thought she was kind in her interactions
14   with you?
15      A.     I did.
16      Q.     Did you feel that Elizabeth
17   Eaton was fair in her interactions with
18   you?
19      A.     Yes.
20      Q.     Did you have the impression that
21   Elizabeth Eaton was honest in her
22   professional dealings with you?
23      A.     Yes.
24      Q.     What -- when you first started
25   doing work with Dr. Pepper, your
```

```
 1                    N. Mucciarone
 2  impression of Dr. Pepper as a company?
 3       A.    I thought there was some
 4  disorganization but I thought overall they
 5  were a good company to work with.
 6       Q.    What led you to conclude they
 7  were a good company to work with?
 8       A.    All of my interactions with the
 9  clients were positive.  I've worked on a
10  variety of different brands.  I've had a
11  variety of different clients over my
12  career and having a good client is few and
13  far between and I thought overall working
14  with Dr. Pepper was enjoyable.
15       Q.    Did you ever have in-person
16  meetings with the client?
17       A.    Yes.
18       Q.    How frequently did that occur?
19       A.    Again, it would depend on what
20  was going on at the time.  Maybe a total
21  of four or five times.
22       Q.    Where did those in-person
23  meetings take place?
24       A.    There was one in Dallas and the
25  rest of them were at Initiative.
```

```
 1                    N. Mucciarone
 2    say for sure.  There's not one meeting
 3    that particularly sticks out in my mind.
 4         Q.    Okay.
 5                At any point between the May
 6    meeting in Texas and August 29, 2017, did
 7    you have any in-person interactions with
 8    Justin Whitehead?
 9         A.    Not that I can recall.
10         Q.    Between May of 2017 and
11    August 29, 2017, did you talk to Justin
12    Whitehead on a telephone?
13         A.    Not that I can recall.
14         Q.    Prior to August 29, 2017, was
15    there any interaction you had with Justin
16    Whitehead that you thought was
17    inappropriate in any way?
18         A.    Not that I can recall.
19         Q.    When you spoke with Elizabeth
20    Eaton between May, 2017 and August 29,
21    2017, did you ever discuss Justin
22    Whitehead?
23         A.    No.
24         Q.    Prior to August 29, 2017, did
25    you have any conversation that you can
```

Page 72

1                    N. Mucciarone
2    August 29, 2017?
3        A.    Did we have the conversation
4    prior to that; is that what you're asking?
5        Q.    At any time prior to August 29,
6    2017, did Aggie Haney say anything about
7    Justin Whitehead behaving
8    unprofessionally?
9        A.    No.
10       Q.    Other than Aggie Haney, did
11   anyone else talk to you about Justin
12   Whitehead at any point prior to August 29,
13   2017?
14       A.    Not that I can recall.
15       Q.    Do you recall having any kind of
16   written communication about Justin
17   Whitehead prior to August 29, 2017 with
18   anybody else?
19       A.    Not that I can recall.
20       Q.    Prior to August 29, 2017, did
21   you have any particular impression of
22   Justin Whitehead?
23       A.    Not particularly.  I met him
24   once or twice and I thought he was nice.
25       Q.    There was a meeting between

```
 1                    N. Mucciarone
 2   Initiative and some Dr. Pepper people in
 3   late August, 2017; correct?
 4        A.     Correct.
 5        Q.     What was the purpose of that
 6   meeting?
 7        A.     The purpose was a partnership
 8   day.  The Dr. Pepper clients were flying
 9   in to meet with a variety of different
10   media partners, sort of a brainstorm get
11   to know you, get to know our product type
12   of thing.
13        Q.     Were the meetings all with
14   Initiative people or other companies as
15   well?
16        A.     Other companies as well.
17        Q.     Did you have any
18   responsibilities relating to that?
19        A.     I was in the meeting but it was
20   purely to listen, take notes.
21        Q.     Did you have work that you
22   needed to do to prepare for the
23   partnership day?
24        A.     Not that I can recall.
25               (Whereupon, an e-mail dated
```

Page 76

```
 1              N. Mucciarone
 2  communications design approach to the 2018
 3  7Up advertising campaign.
 4       Q.    When were you scheduled to meet
 5  with Elizabeth about that topic?
 6       A.    After partner day on Tuesday,
 7  August 28 -- sorry, twenty-ninth.
 8       Q.    So how did the partner day
 9  meeting structure work?  Could you just
10  explain that?
11       A.    If I remember correctly, members
12  of the strategy team, so for my team it
13  was Brad Feather, presented his strategy
14  for 7Up, the Dr. Pepper brands, and A&W
15  and Bai, I think, which were also our
16  brands.
17              After that, we would have a big
18  brainstorming conversation about how these
19  different partners such as ESPN or Spotify
20  could help bring these ideas to life.  So
21  it was more of a brainstorming session and
22  to get those partners up to speed about
23  what we were thinking about for 2018.
24       Q.    And was that scheduled to take
25  up the whole day on August 29, 2017 or
```

```
                                        Page 82
 1                    N. Mucciarone
 2    bleacher seats.
 3         Q.    Is that an auditorium?
 4         A.    Smaller than an auditorium, but
 5    yes, in Initiative.  And my group was in a
 6    conference room.
 7         Q.    Were you divided in that manner
 8    for the full partner day?
 9         A.    Yes.
10         Q.    Who was in your conference room?
11         A.    It was Elizabeth, Brad Feather,
12    Nick Grainger.
13                For the rest of the Initiative
14    people, I'm not -- I can't recall how it
15    was divided.  And then there was one or
16    two representatives from a variety of
17    media companies.
18         Q.    Was Anastasia Russ in the
19    conference room with you?
20         A.    She was not in our group.
21         Q.    Was Justin Whitehead in your
22    group?
23         A.    No.
24         Q.    Do you remember which media
25    companies were in attendance with you?
```

```
                                    Page 83
 1                  N. Mucciarone
 2      A.     The same ones that I had
 3   mentioned previously, yeah.
 4      Q.     So the third-party partners sent
 5   representatives to the grandstand and to
 6   the conference room?
 7      A.     Correct.
 8      Q.     What was your working group in
 9   the conference room charged with doing?
10      A.     For me personally, listening.
11      Q.     Other than Elizabeth Eaton, was
12   any other representative of Dr. Pepper
13   Snapple Group in the conference room
14   working group?
15      A.     I don't believe so.
16      Q.     Do you remember approximately
17   what time the partner day portion of the
18   day ended?
19      A.     It likely was early afternoon.
20      Q.     Did you immediately go to the
21   7Up presentation part of your day?
22      A.     Yes.
23      Q.     Where did that take place?
24      A.     In another conference room.
25      Q.     Who was in attendance there?
```

Page 84

1                    N. Mucciarone

2      A.    It was Elizabeth Eaton, Nick

3   Grainger, and myself.

4      Q.    Was anyone else participating by

5   telephone?

6      A.    No.

7      Q.    Or videoconference?

8      A.    No.

9      Q.    Approximately how long did the

10   7Up presentation component of the day

11   last?

12      A.    Probably around forty-five

13   minutes.

14      Q.    Do you know what time of day

15   roughly that was when that ended?

16      A.    Likely early afternoon.

17      Q.    Did you have any other

18   interactions with anybody from Dr. Pepper

19   Snapple Group between the time that the

20   7Up meeting ended and when you left

21   Initiative for the day?

22      A.    Yes.

23      Q.    Who else?

24      A.    Elizabeth.  Nick, Elizabeth, and

25   I went to lunch.

```
 1                    N. Mucciarone

 2       Q.      Where did you go to lunch?

 3       A.      The Smith.

 4       Q.      I believe The Smith has more

 5   than one location in the city, so where

 6   was this one?

 7       A.      It was the one closest to

 8   Initiative.  I believe it's on like 28th

 9   or so.

10       Q.      Okay.

11               And you went to the restaurant

12   there?

13       A.      Yes.

14       Q.      And what was the topic of your

15   conversation, if you can recall, at that

16   lunch?

17       A.      We talked about work.  We talked

18   about what we had just presented to

19   Elizabeth.  We talked about the team, the

20   structure of the team.  It was pretty

21   professional, I would say.

22       Q.      When you say you talked about

23   the team, do you mean the Initiative team

24   or something else?

25       A.      The Initiative team.
```

```
 1                    N. Mucciarone
 2        Q.     Did you raise any concerns with
 3   Elizabeth Eaton during that lunch?
 4        A.     No.
 5        Q.     Did Nick?
 6        A.     Not that I can recall.
 7        Q.     Did you discuss Justin Whitehead
 8   at all during that lunch?
 9        A.     No.
10        Q.     Did you discuss Anastasia Russ
11   during that lunch?
12        A.     No.
13        Q.     Did you drink any alcohol during
14   that lunch?
15        A.     Yes.
16        Q.     What did you have to drink?
17        A.     I had one Aperol spritz.
18        Q.     Did the other attendees have
19   anything to drink?
20        A.     Yes.
21        Q.     What did they have to drink?
22        A.     I can't recall.
23        Q.     Was -- was Elizabeth Eaton
24   impaired during that lunch, to your
25   knowledge?
```

```
                                    Page 87
 1                N. Mucciarone
 2       A.    I can't say.
 3       Q.    Was there anything Elizabeth
 4   Eaton did during that lunch that led you
 5   to believe that she was impaired?
 6       A.    No.
 7       Q.    Was there anything that Nick
 8   Grainger did during that lunch that led
 9   you to believe that he was impaired?
10       A.    No.
11       Q.    Were you impaired?
12       A.    No.
13       Q.    Did you return to lunch --
14             MS. ALMON: Sorry, try that
15       again.
16       Q.    Did you return to work after
17   lunch?
18       A.    Yes.
19       Q.    What did you do?
20       A.    I can't recall for sure.  I
21   believe I checked some e-mails, caught up
22   on a couple of things.  And at that point
23   it was pretty close to 5:00 p.m. and the
24   clients were kind of itching to get out of
25   the office.
```

```
                                          Page 88

 1                    N. Mucciarone

 2        Q.     Do you remember who paid for the

 3   lunch?

 4        A.     Nick.

 5        Q.     On Defendant's Exhibit 3,

 6   there's reference to a happy hour with

 7   Channel Factory, Initiative, and DPSG.

 8               Do you see that?

 9        A.     Yes.

10        Q.     What is Channel Factory?

11        A.     Channel Factory is a subset of

12   YouTube.

13        Q.     Do you know who arranged this

14   happy hour?

15        A.     I don't know for sure but it

16   likely was a member of the digital

17   partnerships team.

18        Q.     And that's a part of the

19   Initiative team?

20        A.     Correct.

21        Q.     Was Initiative the sponsor of

22   the happy hour?

23        A.     No.

24        Q.     Do you know who was?

25        A.     Channel Factory.
```

```
 1                    N. Mucciarone
 2        A.     No.
 3        Q.     Did Elizabeth Eaton say or do
 4   anything unprofessional at the David Chang
 5   happy hour?
 6        A.     No.
 7        Q.     Other than the David Chang happy
 8   hour and the Channel Factory happy hour,
 9   did you ever attend another happy hour
10   with Dr. Pepper Snapple Group and your
11   team prior to August 29, 2017?
12        A.     Not that I can recall.
13        Q.     Did you attend the Channel
14   Factory happy hour?
15        A.     Yes.
16        Q.     Do you know what time you went
17   to the happy hour?
18        A.     I don't.
19        Q.     The happy hour started at 5:00
20   p.m., according to this calendar invite;
21   is that right?
22        A.     Yes.
23        Q.     Were you there roughly around
24   the start time of the happy hour?
25        A.     I was a little bit late.
```

Page 93

```
 1                    N. Mucciarone

 2       Q.    Do you remember how late?

 3       A.    Maybe twenty or thirty minutes.

 4   I can't say for sure.

 5       Q.    Is it fair to say you were in

 6   attendance for the bulk of the happy hour?

 7       A.    Yes.

 8       Q.    Prior to the time you arrived at

 9   the Channel Factory happy hour, did you

10   have any interactions with anybody from

11   Dr. Pepper Snapple Group who you haven't

12   already described?

13       A.    Yes.

14       Q.    Who was that?

15       A.    Sorry if I'm misunderstanding

16   your question.  It's the same people but

17   we went somewhere else prior to this

18   particular happy hour.

19       Q.    So who did you --

20            MS. ALMON: I'll start over.

21       Q.    Where did you go prior to

22   Channel Factory?

23       A.    It was a bar close by.  I don't

24   know the name of it.

25       Q.    Was that a formally organized
```

```
                                    Page 94
 1                  N. Mucciarone
 2   event or something more spontaneous?
 3        A.     It was more spontaneous.  The
 4   clients were ready to get out of the
 5   office, so a smaller group of Initiative
 6   employees agreed to take them somewhere
 7   prior to this Rock and Reilly's happy
 8   hour.
 9        Q.     You don't know the name of the
10   bar?
11        A.     I don't know.
12        Q.     Can you describe it?
13        A.     It was -- we were in a basement.
14   It was kind of a divey bar.  We were there
15   maybe for twenty minutes tops.
16        Q.     Who attended the event at the
17   basement bar?
18        A.     I actually don't know for sure.
19   I know that Elizabeth, Tas, Anastasia, and
20   Justin Whitehead were there.  Nick
21   Grainger was there.  And a few are other
22   Initiative employees that are on the DPSG
23   team but I can't say for sure.
24        Q.     You said that you were there
25   about twenty minutes in the basement bar?
```

Page 95

```
 1                N. Mucciarone
 2       A.    Give or take, yeah.
 3       Q.    To your knowledge, is that
 4   roughly about the same amount of time the
 5   others were in the bar?
 6       A.    Yes.  We came together and we
 7   left together.
 8       Q.    Did you have a drink at that
 9   bar?
10       A.    I did.
11       Q.    To your knowledge, did others
12   have a drink at that bar?
13       A.    Yes.
14       Q.    Did anyone have more than one
15   drink at that bar?
16       A.    Perhaps but I can't say for
17   sure.
18       Q.    As you sit here now, do you know
19   of anyone who had more than one drink for
20   certain?
21       A.    I don't.
22       Q.    While you were at the basement
23   bar, did you have any interactions with
24   Justin Whitehead?
25       A.    Yes.
```

```
                                          Page 97
 1                  N. Mucciarone
 2    It wasn't a serious conversation.
 3        Q.    Did you think there was anything
 4    inappropriate about the conversation?
 5        A.    No.
 6        Q.    What did Justin say during that
 7    conversation?
 8        A.    I can't recall exactly but he
 9    was part of the conversation because he
10    also knows Alex, but it wasn't -- he
11    wasn't a main speaker in the conversation.
12        Q.    During the time you were in the
13    basement bar, did Justin say anything that
14    you thought was inappropriate?
15        A.    No.
16        Q.    During the time you were in the
17    basement bar, did Justin do anything that
18    you thought was inappropriate?
19        A.    No.
20        Q.    Was it your impression that
21    anyone was impaired due to alcohol during
22    the time you were in the basement bar?
23        A.    Do you mind giving me a
24    definition of impaired?
25        Q.    I'm asking you based on your
```

```
                                          Page 98
 1                    N. Mucciarone
 2     impression.
 3              Did you look at anyone when you
 4     were in the basement bar and thought they
 5     had too much to drink?
 6         A.    Too much to drink, no.
 7         Q.    Did Elizabeth Eaton leave the
 8     basement bar for a period of time to take
 9     a phone call, to your knowledge?
10         A.    Not to my knowledge.
11         Q.    Do you know for certain one way
12     or the other whether she left to take a
13     phone call?
14         A.    I don't recall that one way or
15     another.
16         Q.    After you left the basement bar,
17     did you go directly to the Channel Factory
18     happy hour?
19         A.    Yes.
20         Q.    And that was at a bar called
21     Rock and Reilly's; correct?
22         A.    Yes, correct.
23         Q.    When you arrived at Rock and
24     Reilly's?
25              MR. WARSHAWSKY: The Channel
```

```
                                          Page 101

  1                   N. Mucciarone
  2    Rock and Reilly's that struck you as
  3    inappropriate?
  4        A.    Not that I can recall, no.
  5        Q.    As you were going to Rock and
  6    Reilly's, did you have any concerns that
  7    Justin Whitehead was going to say or do
  8    anything sexually harassing?
  9        A.    No.
 10        Q.    To your knowledge, was there any
 11    reason that a reasonable person would
 12    believe Justin Whitehead was going to
 13    harass or assault someone at the Rock and
 14    Reilly's happy hour?
 15        A.    Not to my knowledge.
 16        Q.    Was there any signs that you saw
 17    based on his prior behavior that would
 18    lead you to believe he was going to harass
 19    or assault someone at Rock and Reilly's?
 20        A.    No.
 21        Q.    When you got to Rock and
 22    Reilly's, did they have food set out for
 23    all of you?
 24        A.    Yes.
 25        Q.    Can you describe how that was
```

Page 104

```
 1                  N. Mucciarone
 2   within my immediate range it was Nick on
 3   my left side and Justin on my right side.
 4        Q.    Were you sitting on a banquette?
 5        A.    Essentially, yes.
 6        Q.    Okay.
 7              So you're sharing the same seat?
 8        A.    Correct.
 9        Q.    I see.  Okay.
10              And I'm sorry, you said Justin
11   was on your left or right?
12        A.    Justin was on my right; Nick was
13   on my left.
14        Q.    Do you know roughly how long you
15   had been at the happy hour before you sat
16   down to eat?
17        A.    Maybe forty minutes or so.
18        Q.    Prior to your sitting down to
19   have something to eat, did you have any
20   interactions with Justin at Rock and
21   Reilly's?
22        A.    Yes.
23        Q.    What was the first interaction
24   you had with him at Rock and Reilly?
25        A.    Immediately when we got there.
```

```
                                        Page 105

 1                    N. Mucciarone

 2       Q.     At that point you're standing up

 3   talking?

 4       A.     Correct.

 5       Q.     Who else was there?

 6       A.     Nick.  I can't say for sure who

 7   else was there.

 8       Q.     So at the outset of the happy

 9   hour, Nick Grainger, Justin Whitehead, and

10   you were standing up talking?

11       A.     I believe there were other

12   people there but I don't know for sure who

13   was there.

14       Q.     Do you know if they worked for

15   Channel Factory?

16       A.     No.

17       Q.     Do you know if they worked for

18   Initiative?

19       A.     Likely, yes.

20       Q.     Was Elizabeth Eaton in that

21   initial conversation?

22       A.     She was around the general area.

23   We would kind of turn and talk to her, but

24   she wasn't within our immediate circle.

25       Q.     Was Anastasia Russ within your
```

```
                                              Page 106
 1                  N. Mucciarone
 2   immediate circle at that point?
 3        A.    No, she was a similar situation
 4   to Elizabeth.
 5        Q.    What, if anything, do you recall
 6   about that initial conversation where
 7   you're standing in an immediate circle
 8   with Justin Whitehead and Nick Grainger?
 9        A.    I recall that Justin began
10   getting overly friendly.  I kind of
11   figured, you know, he had a couple of
12   drinks, he was loosening up a little bit.
13   I didn't feel that it was anything
14   inappropriate but it was getting into more
15   personal conversation.  And I could feel
16   his eyes on me.  So even when I was turned
17   and speaking to Nick or even when Nick was
18   speaking to me, I could feel Justin's eyes
19   fixated on me.
20        Q.    Do you remember specifically
21   anything he said?
22        A.    He -- he asked me a lot about my
23   boyfriend at the time.  We spoke about his
24   wife and how they potentially wanted to
25   have children.  We talked about vacations.
```

```
 1              N. Mucciarone
 2   He and his wife were talking about
 3   planning a trip to Italy and I was giving
 4   some recommendations because my boyfriend
 5   and I had come back from there recently.
 6      Q.    Your boyfriend at the time is
 7   your current husband?
 8      A.    Correct.
 9      Q.    And you said during that initial
10   conversation, although the conversations
11   were more personal in nature, you didn't
12   think they crossed the line into being
13   inappropriate?
14      A.    No, I thought it was -- a happy
15   hour like that in our industry is to get
16   to know, form better relationships with
17   your clients and that's what I felt was
18   going on.
19      Q.    You said you felt his eyes on
20   you.
21            What do you mean by that?
22      A.    Even when I wasn't the one
23   speaking, I could see that his head was
24   turned toward me the whole time.
25      Q.    Did you think that was
```

```
                                    Page 109
 1              N. Mucciarone
 2        A.     Yes.  But as I said, you know,
 3   it wasn't just the three of us.  We would
 4   kind of turn around and talk to Elizabeth
 5   or talk to whoever else was around.
 6        Q.     So that conversation would kind
 7   of come and go depending on other people
 8   entering into the dialogue?
 9        A.     Correct.
10        Q.     So you went and sat down at the
11   table to have some food; correct?
12        A.     Correct.
13        Q.     When you sat down, what
14   conversation, if any, did you have?
15        A.     At that point the conversation
16   with Justin turned extremely
17   inappropriate.  He started complimenting
18   me in a way that I felt was extremely
19   inappropriate for A, a work situation and
20   B, a situation where I just described a
21   wonderful trip that I got back from with
22   my boyfriend at the time.  I made it very
23   clear that I was in a happy relationship
24   and I was not looking for anything else.
25   That continued for maybe twenty or so
```

```
                                      Page 110
 1                    N. Mucciarone
 2    minutes.
 3            Then he started putting his hand
 4    on my leg.  He started saying that he
 5    likes me so much.  He thinks that I'm so
 6    beautiful, so pretty, like I wish I could
 7    be with a girl like you.  And I would turn
 8    to Nick on my left and say are you hearing
 9    this and Nick would say yeah, like this is
10    kind of crazy, like just go with it, it's
11    fine.
12        Q.    So going back to when you're
13    sitting down but before Justin touches
14    your leg, you said that lasted about
15    twenty minutes?
16        A.    Yes.
17        Q.    During that twenty minutes, what
18    specific words did Justin Whitehead use,
19    to the best you can recall?
20        A.    You're so beautiful; I wish I
21    could be with someone like you.  Those are
22    the main ones that I recall.
23        Q.    And Nick Grainger was on the
24    other side of you; correct?
25        A.    Correct.
```

```
 1                    N. Mucciarone
 2       Q.     And at this point is the happy
 3  hour still relatively crowded?
 4       A.     Yes.
 5       Q.     What was the noise level?
 6       A.     I would say it was loud.
 7       Q.     Rock and Reilly's a pretty big
 8  open space; right?
 9       A.     Correct.
10       Q.     Was the room itself fairly loud?
11       A.     Yes.
12       Q.     To your knowledge, could anyone
13  else besides potentially Nick Grainger
14  hear that conversation occurring at that
15  moment?
16       A.     Not to my knowledge, no.
17       Q.     What did you say in response to
18  Justin Whitehead's compliments?
19       A.     Frankly, I felt uncomfortable
20  and I didn't know how to handle the
21  situation.  You know, we're in client
22  services so it's a fine line sometimes.
23              I wouldn't say I was blowing him
24  off but I wouldn't say that I was
25  encouraging his behavior.  I don't
```

Page 113

```
 1                  N. Mucciarone
 2   remember exactly what I said but knowing
 3   myself in a situation like that, what I
 4   normally do is uncomfortably laugh and
 5   kind of leave it at that.
 6       Q.    You mentioned knowing what you
 7   do in a situation like that.
 8            Has something like that occurred
 9   to you previously?
10       A.    Maybe personally, but that's in
11   a situation where you do feel comfortable
12   blowing someone off.  I think this was a
13   fine line that I didn't necessarily know.
14       Q.    So in other situations you'd be
15   referring to when you were in a social
16   setting and someone was making overtures
17   to you?
18       A.    Correct.
19       Q.    When Justin Whitehead put his
20   hand on your leg, can you be specific
21   about what he did?
22       A.    He put his hand on my upper
23   thigh.
24       Q.    Did he rest it there or --
25       A.    Rested it.
```

```
                                        Page 114
 1                  N. Mucciarone
 2       Q.    What did you do?
 3       A.    I kind of like gave a look and
 4   pushed it off.
 5       Q.    Did he try to put his hand on
 6   your leg again?
 7       A.    Yes.
 8       Q.    What did you do the next time it
 9   happened?
10       A.    The same thing.
11       Q.    How many times did that occur?
12       A.    Twice.
13       Q.    You mentioned that you said
14   something to Nick Grainger.
15             At what point did you say
16   something to Nick about observing what's
17   going on?
18       A.    It was the beginning when he
19   started making comments about my
20   appearance.
21       Q.    And what was Nick's response?
22       A.    Just go with it.
23       Q.    What did you understand him to
24   mean by that?
25       A.    Justin's a client.  As I said,
```

```
 1                    N. Mucciarone
 2        Q.     After you've pushed Justin
 3   Whitehead's hand off your leg for the
 4   second time, what happens next?
 5        A.     I said aren't you married.
 6        Q.     What did he say?
 7        A.     He said my wife and I have an
 8   open relationship and I have a hotel room
 9   in New York tonight.
10        Q.     What did you say to that?
11        A.     I have a boyfriend and I'm
12   happy.
13        Q.     What happened next?
14        A.     I think at that point I got up
15   and I went to use the bathroom.  I called
16   my boyfriend at the time Andrew and I told
17   him what was going on and he suggested
18   that I leave.
19        Q.     When you got up to go to the
20   restroom, do you remember if -- you had
21   Justin on one side and Nick on the other
22   side; correct?
23        A.     Yes.
24        Q.     Do you remember which way you
25   went out?
```

Page 117

```
 1                    N. Mucciarone
 2      A.      To the left, toward Nick.
 3      Q.      So Nick had to get up for you to
 4  get out?
 5      A.      There was room for me to just
 6  kind of just slide through.
 7      Q.      Okay.
 8              So you were able to stand up and
 9  walk in between the table and the
10  banquette to get out?
11      A.      Correct.
12      Q.      When you went to the bathroom to
13  call your now husband, did anyone else
14  join you in the restroom?
15      A.      Not at that time, no.
16      Q.      When your boyfriend at the time
17  suggested that you leave, what was your
18  response to him?
19      A.      I expressed that I didn't feel
20  comfortable leaving.  Given that our
21  clients are from Texas, there's not a lot
22  of opportunity to bond with them or get to
23  know them or forge new relationships.  I
24  also expressed that all of the other
25  people from Initiative were still there,
```

```
 1                    N. Mucciarone
 2    mainly Linda who was the head of our team,
 3    Nick who was my direct boss, and a variety
 4    of other directors and associate
 5    directors.
 6         Q.    What else, if anything, did your
 7    now husband say to you on that call?
 8         A.    Nothing else that I can recall.
 9         Q.    Is there anything else you
10    recall that you said during that phone
11    conversation?
12         A.    No, there's not.
13         Q.    And you said that was in the
14    ladies' room?
15         A.    Correct.
16         Q.    Was there anyone else present in
17    the ladies' room who you knew?
18         A.    Perhaps but I was in a stall so
19    I was by myself.
20         Q.    Was there anybody else who was a
21    party to the conversation?
22         A.    No.
23         Q.    When you left the ladies' room,
24    what happened next?
25         A.    At that point I came out of the
```

```
 1                    N. Mucciarone
 2    ladies' room and Nick was no longer
 3    sitting down.  Justin, I don't know where
 4    he had gone.  But Nick and I started
 5    talking.  Elizabeth was there.  Tas was
 6    there.  There was a few other Initiative
 7    people that were there.  We were kind of
 8    just having a normal conversation about
 9    something.
10        Q.    Were you back at that seating
11    area or somewhere else?
12        A.    At that point we had stood up in
13    the more open area.
14        Q.    Were there other people in the
15    same vicinity as well?
16        A.    Likely but I don't recall
17    specifics.
18        Q.    Okay.
19              So Nick, Tas, Elizabeth, and you
20    are standing up having a conversation?
21        A.    Uh-huh.
22        Q.    Sorry, you have to say yes or
23    no.
24        A.    I'm sorry, yes.
25        Q.    The happy hour is still fairly
```

```
 1                    N. Mucciarone
 2   crowded?
 3        A.     Yes.
 4        Q.     Is it still loud?
 5        A.     Yes.
 6        Q.     Do you remember anything about
 7   that discussion that you characterized as
 8   a normal conversation?
 9        A.     No.
10        Q.     Did you discuss Justin's conduct
11   during that conversation?
12        A.     Not at that time, no.
13        Q.     Do you know roughly how long
14   that conversation went on?
15        A.     Ten or fifteen minutes.
16        Q.     Do you know what time it was?
17        A.     I don't.
18        Q.     How does that conversation come
19   to an end?
20        A.     Justin comes up behind me and
21   puts his arm around my waist.
22        Q.     Was he standing on the side of
23   you with his arm around your waist?
24        A.     Correct.
25        Q.     Could you just describe, since
```

Page 121

```
 1                    N. Mucciarone
 2   we have a videographer, sort of
 3   demonstrate how he put his arm?
 4        A.    Like this, yeah (indicating).
 5        Q.    What, if anything, did he say
 6   when you did that?
 7        A.    I don't recall.  The thing that
 8   sticks out in my mind is the waist grab.
 9        Q.    What specific part of your body
10   was he touching with his hand?
11        A.    My hip.
12        Q.    And did he say anything to you
13   as he approached?
14        A.    Perhaps but I don't -- I don't
15   recall.  I was focused on the hand
16   placement.
17        Q.    What, if anything, did you say
18   to him?
19        A.    I don't recall.  I just -- I
20   know that I moved away so that I was no
21   longer in that situation.
22        Q.    Did you move so that someone
23   else was in between you and Justin?
24        A.    I don't recall.
25        Q.    What, if anything, did the other
```

```
                                        Page 122
 1                  N. Mucciarone
 2   people who were present say or do at that
 3   point?
 4       A.    At that point the conversation
 5   sort of broke up and it was me, Elizabeth,
 6   and Tas having a conversation.  I believe
 7   Nick poked in for a moment and talked a
 8   little bit, but it was mainly the three of
 9   us.
10       Q.    Okay.
11             So after Justin came up and put
12   his arm around you, you moved your body
13   away from that?
14       A.    Yes.
15       Q.    Approximately how long was his
16   arm around your waist?
17       A.    Three seconds.
18       Q.    Was it on top of your clothes?
19       A.    Yes.
20       Q.    Did you and Elizabeth and Tas
21   move away from Justin and Nick?
22       A.    Yes.
23       Q.    Where did you go?
24       A.    Five feet away, yeah.
25       Q.    Did he Justin try to follow you
```

```
 1                 N. Mucciarone
 2  as you moved away?
 3       A.    Not that I can recall.  I think
 4  he was distracted by talking to Nick.
 5       Q.    What, if anything, do you recall
 6  about the conversation that you had with
 7  Elizabeth and Tas at that time?
 8       A.    I filled them in on what had
 9  been happening the entire night.
10       Q.    What did you say specifically?
11       A.    I recounted the conversation
12  that Justin and I had when we were sitting
13  down.  I pointed out the waist grab that
14  they had just seen.  And I -- we had a
15  longer conversation about the open
16  marriage that he had brought up.
17       Q.    When you say you had a longer
18  conversation about the open marriage, do
19  you mean you talked about his comment or
20  the concept in general or something else?
21       A.    The comment.  Elizabeth and Tas
22  both said that that wasn't true.
23       Q.    That it was not true that he had
24  an open marriage?
25       A.    Correct.
```

```
                                    Page 125
  1                 N. Mucciarone
  2       Q.     Is there anything else you
  3   recall about that conversation, that
  4   specific conversation between you and
  5   Elizabeth and Tas immediately following
  6   the arm around the waist incident?
  7       A.     I had told them that my
  8   boyfriend wanted me to come home.
  9       Q.     What did they say to that, if
 10   anything?
 11       A.     Don't come home; we want to hang
 12   out with you; we never see you; we'll take
 13   care of it; Justin's harmless; he's just
 14   being gross tonight.
 15       Q.     What happened after that
 16   conversation ends?
 17       A.     Justin wouldn't leave my side
 18   after that.  Everywhere I went he would
 19   be.  He continued the compliments and the
 20   conversations about how much he liked me
 21   and he mentioned one more time the thing
 22   about his hotel room.  So that went on for
 23   I would say the majority of the rest of
 24   our time at Rock and Reilly's.
 25       Q.     Do you know what time the happy
```

```
                                        Page 127
 1                    N. Mucciarone
 2   event for Channel Factory?
 3        A.    I believe the main person was
 4   Philip Vonthron that's on this invite.
 5        Q.    To your knowledge, did he stay
 6   the whole time?
 7        A.    Yes.
 8        Q.    Do you know Philip?
 9        A.    That was the first night I had
10   met him.
11        Q.    Did you have any conversations
12   with him about Justin Whitehead's conduct?
13        A.    No.
14        Q.    Do you know if he observed it?
15        A.    I don't know for sure.
16        Q.    You said he was there until the
17   end of the evening?
18        A.    Correct.
19        Q.    During the time that Justin
20   returned repeatedly to you after your
21   conversation with Tas and Elizabeth, did
22   he touch you again?
23        A.    Yes.
24        Q.    What happened?
25        A.    He would just periodically put
```

```
                                            Page 128
 1                  N. Mucciarone

 2    his hand on my lower back.

 3        Q.    Did he do that on top of your

 4    clothes?

 5        A.    Yes.

 6        Q.    What did you do when he touched

 7    your lower back?

 8        A.    The same thing, moved away.

 9        Q.    Did you say anything further to

10    anyone from Dr. Pepper Snapple Group about

11    Justin while you were still at Rock and

12    Reilly's?

13        A.    Yes.

14        Q.    What did you say?

15              MS. ALMON: Well, let me back up.

16        Q.    With whom did you have a

17    conversation?

18        A.    Elizabeth and Tas.

19        Q.    And what did you say to them?

20        A.    It was -- they would observe his

21    behavior and we would kind of make eyes at

22    each other.

23              Do you know what I mean?

24              At one point I went in the

25    bathroom, in the ladies' room again.
```

Page 129

```
 1                   N. Mucciarone
 2   Elizabeth and Tas came with me, because I
 3   told them that my boyfriend had wanted me
 4   to come home and they had said stay out.
 5   I went in the bathroom and I called him
 6   and I talked to him and I said I'm still
 7   out, Nick is still here, Elizabeth is
 8   still here, they want us to stay out, and
 9   then at that point Elizabeth took the
10   phone and spoke with my now husband.
11       Q.    Could you hear her side of that
12   conversation?
13       A.    Yes.
14       Q.    What did you hear her say?
15       A.    She said he's harmless; we'll
16   take care of her; we want to hang out with
17   letter.  Like she's fine, don't worry
18   about it.
19       Q.    Could you hear your husband's
20   side of the conversation?
21       A.    No.
22       Q.    Did he ever tell you later what
23   he said back to her?
24       A.    Actually, no.
25       Q.    Were you communicating with your
```

```
 1                    N. Mucciarone
 2   husband by text that night as well?
 3        A.    Yes.
 4              (Whereupon, a two-page document
 5        was marked Defendant's Exhibit 4
 6        for identification.)
 7        Q.    You have in front of you a
 8   document marked as Defendant's Exhibit 4
 9   bearing Mucciarone Bates number 325
10   and 326.
11        A.    Uh-huh.
12        Q.    Yes?
13        A.    Yes.
14        Q.    Do you recognize this?
15        A.    I do.
16        Q.    What is this?
17        A.    This is a text message
18   conversation between me and my now
19   husband.
20        Q.    Some of the text is in a colored
21   bubble and some of it is in what's
22   probably a white bubble?
23        A.    Correct.
24        Q.    Can you identify the colored
25   bubble as your husband's side of the
```

```
 1                    N. Mucciarone
 2   exchange?
 3        A.    Yes.
 4        Q.    That's on the right-hand side of
 5   the document?
 6        A.    Yes.
 7        Q.    And on the left-hand side of the
 8   document, those comments are from you?
 9        A.    Yes.
10        Q.    It shows that this text exchange
11   is starting at 10:40 p.m.; is that
12   correct?
13        A.    Yes.
14        Q.    And that's on August 29, 2017?
15        A.    Correct.
16        Q.    So that's at the time when you
17   were at Rock and Reilly's; is that right?
18        A.    I believe so.
19        Q.    Or would you have already left
20   that event?  Do you know?
21        A.    I don't know for sure.  It look
22   like was between the time when we were
23   there and deciding where we were going
24   next.
25        Q.    So in the second text bubble
```

```
 1                    N. Mucciarone
 2   your husband writes, "I was about to text
 3   Nick to go over and hang out with you but
 4   I keep stopping because I don't want you
 5   to get mad and don't know what to do."
 6             Do you see that?
 7       A.    Yes.
 8       Q.    And then you respond, "okay.  He
 9   left."
10       A.    Uh-huh.  Yes.
11       Q.    When you say, "he left," who
12   were you referring to?
13       A.    Justin.
14       Q.    Justin left the Rock and Reilly
15   happy hour?
16       A.    By that I meant he left my side.
17       Q.    Okay.
18             So at the time you're having
19   this text exchange with your husband at
20   10:40 p.m., Justin had, at least for the
21   time being, left you alone?
22       A.    Yes.
23       Q.    And this continues on to a
24   second page the same evening but now it's
25   August 30; correct?
```

```
 1                    N. Mucciarone
 2      A.     That same evening, yes.
 3      Q.     At 12:15 a.m.?
 4      A.     Correct.
 5      Q.     And Kev, that's your dog?
 6      A.     Correct.
 7      Q.     And at the point that you're
 8   having the exchange that happens at 12:15
 9   a.m., at that point you're no longer at
10   Rock and Reilly's, is that right, or you
11   are?
12      A.     I believe, yeah, we are.
13      Q.     Okay.
14             You state in response to your
15   husband's comment, "hi lady, we tried to
16   stay up but can't keep our eyes open," you
17   respond, "go to sleep, Elizabeth is still
18   out with us;" is that right?
19      A.     Correct.
20      Q.     Does that refresh your
21   recollection of whether you're still at
22   Rock and Reilly's?
23      A.     It does.  At this point we are
24   still at Rock and Reilly's.
25      Q.     And do you know that because
```

Page 134

1                    N. Mucciarone

2    Elizabeth went home after Rock and

3    Reilly's?

4        A.    Yes.  Elizabeth walked to the

5    next bar with us, was going to come in and

6    decided, when we got there, she was not

7    coming in.

8        Q.    And when I said go home, I

9    should be more clear, did Elizabeth go

10   back to her hotel room?

11       A.    I assume so, yes.

12       Q.    To your knowledge?

13       A.    To my knowledge.

14       Q.    Because home is in Texas; right?

15       A.    Correct.

16             MS. ALMON: Okay.

17             You can set that aside.

18       Q.    So based on looking at

19   Defendant's Exhibit 4, does that refresh

20   your recollection that the Rock and Reilly

21   happy hour went until at least a little

22   bit after 12:00?

23       A.    I don't know if officially it

24   did.  Clearly the tab got cut off at some

25   point.  I wasn't drinking anymore at that

1                    N. Mucciarone

2    point here so I would say it was an

3    unofficial happy hour at that point.

4        Q.    A group of Initiative, DPSG, and

5    perhaps other people stayed at Rock and

6    Reilly until 12:15 on August 30?

7        A.    Correct.

8        Q.    Other than what you've

9    described, did anything else happen at

10   Rock and Reilly's between you and Justin

11   Whitehead?

12       A.    It was more of the same.  Other

13   than what I've described, there was

14   nothing else additional, but the behavior

15   continued throughout the night.

16       Q.    What, if anything, did you say

17   to anyone at Initiative about what was

18   happening with Justin Whitehead?

19       A.    I really only talked to Nick

20   about it and it was more of the same

21   conversation; how weird is this, what is

22   he doing, he's so drunk, get him away from

23   me, things of that nature.

24       Q.    It was your impression that Nick

25   Grainger was trying to divert Justin

Page 136

```
1                    N. Mucciarone
2   Whitehead away from you?
3        A.    Yes.
4        Q.    Did Elizabeth Eaton try to
5   divert Justin Whitehead away from you?
6        A.    Yes.
7        Q.    And did Anastasia Russ try to
8   divert Justin Whitehead away from you?
9        A.    Not that I can recall.
10       Q.    Did anyone from Initiative in
11  any way try to encourage what Justin
12  Whitehead was doing?
13       A.    No.
14       Q.    Did Elizabeth Eaton in any way
15  try to encourage what Justin Whitehead was
16  doing?
17       A.    No.
18       Q.    Did Anastasia Russ try to
19  encourage what Justin Whitehead was doing?
20       A.    No.
21       Q.    Did Elizabeth Eaton suggest that
22  what Justin Whitehead was doing was
23  acceptable to her?
24       A.    No, I wouldn't say acceptable.
25       Q.    Did Anastasia Russ suggest to
```

Page 137

```
                        N. Mucciarone
 1
 2    you that she thought the way Justin
 3    Whitehead was behaving was acceptable?
 4        A.    No.
 5        Q.    Did Nick Grainger suggest that
 6    he thought Justin Whitehead's behavior was
 7    acceptable?
 8        A.    No.
 9        Q.    You had mentioned that you had
10    some other contacts at Dr. Pepper Snapple
11    Group with whom you interacted from time
12    to time, including Eric Blackwood and
13    Blaise D'Silva.
14              Were they present at this happy
15    hour?
16        A.    No.
17        Q.    Was there anyone else from Dr.
18    Pepper Snapple Group present at the
19    Channel Factory happy hour?
20        A.    No.
21        Q.    During the time you were at Rock
22    and Reilly, did you reach out to anyone
23    who was not present besides your husband?
24        A.    No.
25        Q.    So at some point you leave Rock
```

Page 138

```
 1                    N. Mucciarone
 2    and Reilly; correct?
 3        A.    Correct.
 4        Q.    When you left, who left at the
 5    same time?
 6        A.    It was Elizabeth, Tas, Justin,
 7    myself, Nick, Tim Buckland, and Philip
 8    Vonthron from Channel Factory.
 9        Q.    And remind me, Tim Buckland's
10    role was what at Initiative?
11        A.    He's the associate director of
12    the video partnerships team.
13        Q.    When you left, was there any
14    discussion about what was going to happen
15    next?
16        A.    We left and we all decided we
17    would go to another bar nearby.
18        Q.    Do you know who raised that
19    idea?
20        A.    I don't.
21        Q.    Did you consider going home at
22    that point?
23        A.    I didn't mainly because we were
24    still out with Elizabeth and I was still
25    out with my boss.
```

```
 1                    N. Mucciarone
 2       Q.     Had Anastasia Russ planned to go
 3   to the next bar as well?
 4       A.     I believe so.
 5       Q.     The next bar was what?
 6       A.     The Pig 'N' Whistle.
 7       Q.     You mentioned earlier that
 8   Elizabeth Eaton walked to the Pig 'N'
 9   Whistle with you but didn't go in; right?
10       A.     Correct.
11       Q.     Did you all walk between Rock
12   and Reilly's and the Pig 'N' Whistle?
13       A.     Correct.
14       Q.     About how far is that?
15       A.     A couple of blocks.
16       Q.     Did everyone in the group you
17   just described walk together?
18       A.     Yes.
19       Q.     Did anything that you considered
20   unusual happen on the walk between Rock
21   and Reilly's and Pig 'N' Whistle?
22       A.     No.
23       Q.     At what point did Elizabeth tell
24   you that she wasn't going to go into the
25   Pig 'N' Whistle?
```

```
                                          Page 140
 1                    N. Mucciarone
 2        A.     When we were standing outside.
 3        Q.     Did she explain why she wasn't
 4   going to go in?
 5        A.     She had an early flight in the
 6   morning and wanted to go back to her
 7   hotel.
 8        Q.     Did Anastasia Russ also decide
 9   not to go into the Pig 'N' Whistle?
10        A.     Yes.
11        Q.     Did she walk to the bar as well?
12        A.     Yes.
13        Q.     Did she give an explanation as
14   to why she was going to leave?
15        A.     It was the same explanation as
16   Elizabeth.
17        Q.     Given that Elizabeth Eaton and
18   Anastasia Russ said that they were going
19   home after all, did that make you
20   reconsider staying at the Pig 'N' Whistle?
21        A.     So at that point Justin had also
22   said he wasn't coming, so no, I was
23   planning on staying out with Nick.  We had
24   had a pretty rough two weeks and wanted to
25   hang out and have a fun night.
```

```
1                    N. Mucciarone
2        Q.    How do you know that?
3        A.    Because they watched him do it.
4        Q.    At the time he walked into the
5   Pig 'N' Whistle, were you concerned that
6   he was going to do something inappropriate
7   to you?
8        A.    Yes.
9        Q.    What was your concern about what
10  he was going to do?
11       A.    It was the same.  I figured that
12  the same behavior that had been occurring
13  all night was going to continue to occur.
14       Q.    When you saw that he was going
15  into the Pig 'N' Whistle after all, did
16  you consider leaving?
17       A.    I didn't mainly because, as I
18  mentioned, I was out with my boss and
19  again, Justin is still a client.  If he
20  wants to go out, unfortunately the way
21  that the industry works the assumption is
22  you entertain your clients.
23       Q.    When you say the way the
24  industry works, what do you mean by that?
25       A.    A large portion of media is
```

Page 144

```
 1              N. Mucciarone
 2  entertaining your clients and keeping your
 3  clients happy.  It's a client service
 4  industry.
 5      Q.    Did you believe that the fact
 6  that Nick Grainger was present would
 7  prevent Justin Whitehead from doing
 8  anything more extreme than what he had
 9  already done?
10      A.    Yes.
11      Q.    Do you think it was reasonable
12  to believe that because Nick Grainger was
13  there, Justin Whitehead would not do
14  anything worse than what he had already
15  done?
16      A.    Yes.
17      Q.    Do you believe it was reasonable
18  for Elizabeth Eaton to draw that same
19  conclusion?
20      A.    I guess.  I can't -- I can't get
21  into her head but yes, I guess.
22      Q.    Do you believe it was reasonable
23  for Anastasia Russ to draw that same
24  conclusion?
25      A.    Yes.
```

```
                                      Page 146
 1                  N. Mucciarone
 2       A F T E R N O O N    S E S S I O N
 3                  February 11, 2019
 4                     1:16 p.m.
 5             THE VIDEOGRAPHER: The time is
 6       1:16 p.m. and this begins media unit
 7       number three.
 8   N A N C Y    M U C C I A R O N E, having
 9          been previously duly sworn by a
10          Notary Public of the State of
11          New York, upon being examined,
12          testified as follows:
13   EXAMINATION CONTINUED BY
14   MS. ALMON:
15       Q.    Good afternoon.
16             I think I forgot to ask you
17   earlier, Justin Whitehead's job title was
18   marketing media manager; is that right?
19       A.    I believe so.  If it's not that
20   exact title it's something along those
21   lines.
22       Q.    Justin Whitehead had the same
23   job tight as Elizabeth Eaton?
24       A.    As far as I know, yes.
25       Q.    Do you know what Anastasia Russ'
```

```
                                        Page 147
 1                 N. Mucciarone
 2   title is?
 3       A.    I believe it was the same as the
 4   other two.  They just -- just for
 5   clarification, they each covered different
 6   brands.
 7       Q.    Okay.
 8             We were talking about Elizabeth
 9   Eaton and Anastasia Russ leaving before
10   anyone entered the Pig 'N' Whistle; right?
11       A.    Correct, yes.
12       Q.    Did they leave together in the
13   same Uber?
14       A.    I'm not aware if they took an
15   Uber.  I do know they left together.
16       Q.    So at the time they left, it was
17   together, regardless of what the mode of
18   transportation was?
19       A.    Correct, yes.
20       Q.    Did you have an Uber account
21   that you used at that time?
22       A.    Yes.
23       Q.    Was your Uber account a
24   combination of travel that you did for
25   business and personal or did you separate
```

```
 1                    N. Mucciarone
 2   submitted any expenses for reimbursement
 3   for August 29 or August 30, 2017?
 4        A.    I know I submitted a cab receipt
 5   for that night.
 6        Q.    Was that cab receipt for your
 7   transportation home?
 8        A.    Yes.
 9        Q.    Do you know what time you went
10   home that night?
11        A.    Late.  It was around 4:30.
12        Q.    Was it a yellow cab?
13        A.    Yes.
14        Q.    Did you go anywhere other than
15   Pig 'N' Whistle after Rock and Reilly and
16   home?
17        A.    No.
18        Q.    Did you end up paying for any of
19   the food or drinks that evening?
20        A.    I don't believe so.
21        Q.    Do you know whether all the
22   drinks at Pig 'N' Whistle were put on one
23   tab or --
24        A.    I don't know.  I'm not sure.
25        Q.    Did you pay for any drinks that
```

```
 1                    N. Mucciarone
 2    there was a small table close by.
 3         Q.    Had you been in the Pig 'N'
 4    Whistle prior to that time?
 5         A.    No.
 6         Q.    Did you know the bartender?
 7         A.    No.
 8         Q.    So you had described earlier the
 9    group that walked over to the Pig 'N'
10    Whistle, but who actually went into the
11    Pig 'N' Whistle?
12         A.    That was Justin, myself, Nick,
13    Tim Buckland, and Philip, who was the
14    person from Channel Factory.
15         Q.    Have you talked to Philip since
16    that evening?
17         A.    No.
18         Q.    Have you had any communication
19    with him?
20         A.    No.
21         Q.    Roughly what time was it when
22    you went into Pig 'N' Whistle?
23         A.    So it was after 12:15, I know
24    that.  Likely closer to 12:45 or 1:00, I
25    would say.  It was late.
```

```
 1                  N. Mucciarone
 2       Q.     Prior to going into Pig 'N'
 3  Whistle, do you recall how many drinks you
 4  had had?
 5       A.     Over the course I'm going to say
 6  day because I did have a drink at lunch,
 7  probably like five or six.
 8       Q.     Do you have any idea how many
 9  drinks Nick Grainger had?
10       A.     No, I have no idea.
11       Q.     Do you have any idea how many
12  drinks Justin Whitehead had?
13       A.     No idea.
14       Q.     Any idea how many drinks Tim
15  Buckland had?
16       A.     I don't know.
17       Q.     Do you have any idea of how many
18  drinks Philip Vonthron had?
19       A.     No.
20       Q.     What happened first when you
21  went into the Pig 'N' Whistle?
22       A.     We went up to the bar and Nick
23  ordered drinks for everybody.
24              There was a moment when myself,
25  Nick, and Justin were all standing at the
```

```
 1              N. Mucciarone
 2   bar together and Nick sort of scolded
 3   Justin in a way, said, you know, you're
 4   really inappropriate, that wasn't cool,
 5   you know, kind of like do you know what
 6   I've been doing all night.  I can't
 7   remember if these are Nick's words that
 8   I'm taking or if these are my words but I
 9   recall him having a sobering moment, sort
10   of oh, my God, I didn't realize that it
11   was really bad, I'm so sorry, and his
12   behavior sort of instantly changed.  And
13   at that moment I felt a little bit more
14   comfortable.  It was almost like he had
15   realized that he had done the whole night
16   and I felt as if it wouldn't continue.
17       Q.    So I just want to make sure I'm
18   following.  I think I am.
19            So Nick and you and Justin are
20   at the bar in the Pig 'N' Whistle and Nick
21   reprimanded Justin for his prior behavior?
22       A.    Yes.
23       Q.    And in response to that, Justin
24   apologized?
25       A.    Yes.
```

```
                                          Page 159
 1                    N. Mucciarone
 2        Q.      And as a result of that, did you
 3    believe that Justin's bad behavior was
 4    going to stop?
 5        A.      I did.
 6        Q.      Did it stop for any period of
 7    time?
 8        A.      It did.
 9        Q.      Did you continue to talk to
10    Justin after that?
11        A.      Not one-on-one but it was a
12    smaller group, so we were all talking
13    together.
14        Q.      And while you were at the Pig
15    'N' Whistle inside the bar, did Justin
16    behave appropriately from that point
17    forward?
18        A.      I would say so, yes.  Again, we
19    had been drinking so it was -- I would say
20    he was a little bit loose but so was
21    everybody else.  His behavior was
22    different from when he's in an office.
23    But I didn't think that given the
24    circumstances he was behaving
25    inappropriately.
```

```
                                              Page 160
 1                    N. Mucciarone
 2       Q.      So while you were inside the Pig
 3   'N' Whistle, would you describe any of
 4   Justin Whitehead's behavior as sexual
 5   harassment?
 6       A.      Within the bar, no.
 7       Q.      At any point while you were
 8   inside the Pig 'N' Whistle, did Justin
 9   touch you?
10       A.      Not that I can recall, no.
11       Q.      Did at any point when you were
12   inside the Pig 'N' Whistle, did Justin
13   touch you inappropriately?
14       A.      I don't believe so, no.
15       Q.      Did you have any further
16   conversation while inside the Pig 'N'
17   Whistle about how Justin had previously
18   been acting?
19       A.      No.
20       Q.      Do you remember what you were
21   drinking that night?
22       A.      I had -- as I said, I had the
23   Aperol spritz and then at the next bar I
24   had a glass of wine but I didn't finish
25   it.  Rock and Reilly's I had wine.  And
```

```
                                        Page 161
 1                 N. Mucciarone
 2   then Nick had ordered me like a Bud Light
 3   or some sort of light beer at the Pig 'N'
 4   Whistle.
 5        Q.    While at the Pig 'N' Whistle, do
 6   you have any idea how many drinks Justin
 7   had?
 8        A.    I don't know.
 9        Q.    Do you know how many drinks
10   anybody else had during the time you were
11   at the Pig 'N' Whistle?
12        A.    I don't know.
13        Q.    Do you remember how many drinks
14   you had?
15        A.    One, maybe one or two.  If it
16   was two, I likely didn't finish it.
17        Q.    How did the night at the Pig 'N'
18   Whistle come to an end?
19        A.    So at a certain point Justin
20   said that he had to get back to his hotel,
21   he had an early flight.  He said good-bye
22   to everyone.  He asked me to point him in
23   the direction of his hotel.  I walked
24   outside with him and tried to show him
25   where to go, at which point the sexual
```

Page 162

```
 1                    N. Mucciarone
 2    assault occurred.
 3              After that, I went back inside,
 4    sort of in shock, hung out for a long
 5    time.  Nick left at one point, Philip left
 6    at one point, and the night ended with Tim
 7    and I leaving together.
 8        Q.    Do you know approximately what
 9    time it was when Justin said I have to
10    leave and made to leave the bar?
11        A.    I don't know.
12        Q.    Do you know roughly how long you
13    had been at the Pig 'N' Whistle at that
14    point?
15        A.    Probably about an hour.
16        Q.    And do you recall where he was
17    going, what hotel?
18        A.    I don't recall.
19        Q.    Did you plan to leave at the
20    same time as him?
21        A.    No.
22        Q.    What was the reason you were
23    walking out with him?
24        A.    He had asked me to show him how
25    to get to his hotel, what direction he
```

```
 1                  N. Mucciarone
 2    should be walking.
 3        Q.    Okay.
 4              Just to basically point him in
 5    that direction?
 6        A.    Correct.
 7        Q.    Did you plan to walk with him
 8    towards his hotel?
 9        A.    No.
10        Q.    Did he ask you to point him in
11    the right direction?
12        A.    Yes.
13        Q.    At that point were you concerned
14    that, by walking outside with him, you
15    were putting yourself at any kind of risk?
16        A.    At the time, no.
17        Q.    And did you feel comfortable
18    doing that because he had apologized and
19    behaved appropriately since the point when
20    he apologized?
21        A.    Yes.
22        Q.    Do you think it was reasonable
23    to believe that, following the apology,
24    Justin Whitehead understood what he had
25    been doing and was not going to misbehave
```

Page 164

```
 1                    N. Mucciarone
 2    again?
 3         A.     I think so, yes.
 4         Q.     Did you express any concern to
 5    any of the other people at the bar about
 6    walking outside with Justin Whitehead?
 7         A.     No.
 8         Q.     When you left the bar, how far
 9    outside the bar did you get?
10         A.     We walked out and we turned the
11    corner -- sorry, turned onto the sidewalk
12    of the bar probably like fifteen feet max.
13         Q.     Do you remember whether you
14    turned right or left when you walked out?
15         A.     I believe it was right.
16         Q.     On the way out of the bar, did
17    Justin say anything to you or did you say
18    anything to him?
19         A.     Not that I can recall.
20         Q.     So what happened when you got
21    onto the sidewalk?
22         A.     It happened so fast I frankly
23    can't even remember how it happened.  All
24    of a sudden he had his hand down my shirt
25    touching my boobs, he had his other hand
```

```
                                      Page 165
 1                 N. Mucciarone
 2    on my butt like pulling me closer to him
 3    and his head was on the side of my neck
 4    trying to kiss my neck and my hands were
 5    out like this trying to push him off of me
 6    (indicating).
 7         Q.    Were you successful in pushing
 8    him off you?
 9         A.    I would say I was successful in
10    not allowing his touch to touch my skin.
11    I wasn't successful at getting his hands
12    off of me, no.
13         Q.    How long were his hands on you
14    before you were able to get him away from
15    you?
16         A.    Honestly I can't say.  It felt
17    like five minutes but I doubt it was that
18    long.
19         Q.    What were you saying to him as
20    this happened?
21         A.    No, get off of me, things of
22    that nature.
23         Q.    Do you remember him saying
24    anything?
25         A.    No.
```

```
                                    Page 166
 1                N. Mucciarone
 2      Q.    Can you recall anything else
 3   that you said at that moment?
 4      A.    Not at the moment, no.
 5      Q.    Can you recall anything else
 6   that he said?
 7      A.    No.
 8      Q.    Other than the touching that
 9   you've just described, did he touch you
10   anywhere else?
11      A.    Not that I can recall, no.
12      Q.    You eventually were able to
13   shove him away?
14      A.    Correct.
15      Q.    What happened at that moment?
16      A.    I turned around and I went back
17   into the bar.
18      Q.    Did you walk or run?
19      A.    I think I maybe walked quickly,
20   yeah.
21      Q.    Did he call after you?
22      A.    Not that I remember, no.
23      Q.    Did you go immediately back
24   inside the bar?
25      A.    Yes.
```

```
 1                  N. Mucciarone
 2    his comments throughout the night could
 3    lead me to believe that was a potential,
 4    but at the moment that I walked outside,
 5    after the apology, that really wasn't that
 6    was on my mind.
 7        Q.    At the time you walked out you
 8    did not anticipate that was going to
 9    occur?
10        A.    I did not, no.
11        Q.    At the time you walked out of
12    the bar did you think there was a risk
13    that he was going to sexually assault you
14    when you walked out?
15        A.    No.
16        Q.    Had you believed that was a
17    risk, would you have walked out with him?
18        A.    No.
19        Q.    And you said you stayed for some
20    time and talked about what had occurred
21    with the other people?
22        A.    Yes.
23        Q.    And you mentioned also I think
24    that some people left prior to your
25    leaving?
```

Page 172

```
 1                    N. Mucciarone

 2        A.     I don't think so, no.

 3        Q.     Are there any other

 4   conversations you had that evening that

 5   you can recall now?

 6        A.     No.

 7        Q.     Did you talk to your then

 8   boyfriend, now husband at the time when

 9   you got home?

10        A.     Yes.

11        Q.     Was he sleeping when you got

12   home?

13        A.     Yes.

14        Q.     Did you wake him up?

15        A.     Yes.

16        Q.     And what conversation did you

17   have?

18        A.     I told him what happened.  And I

19   cried and he cried and it was -- he was

20   mad and he was sad and there was a lot of

21   emotions.

22        Q.     Did you ever consider asking him

23   to come and join you at either Rock and

24   Reilly or Pig 'N' Whistle?

25        A.     No.
```

```
 1                    N. Mucciarone
 2       Q.    He offered to do that in one of
 3  his text messages; right?
 4       A.    Yes.
 5       Q.    Why did you not take him up on
 6  that?
 7       A.    He's very protective of me.
 8  He's always the person that will say like
 9  where are you, I don't want you to take a
10  cab home alone, I'm going to come there
11  and come home with you.  Like it's very
12  sweet but it's a little bit overbearing at
13  times, as I'm sure you can imagine.  And
14  it was a client event.  I'm an adult.  I
15  don't need my boyfriend to come pick me up
16  from a client event.
17       Q.    And at the time that your
18  boyfriend made the offer to come and get
19  you, did you believe you were at risk of
20  being sexually assaulted?
21       A.    No, I thought it was harassment
22  that I could handle.
23       Q.    Do you know what time you went
24  to sleep that night?
25       A.    Probably close to like 5:00 or
```

Page 174

```
 1                    N. Mucciarone

 2    5:30.

 3        Q.     Did you go to work the next day?

 4        A.     I did not.

 5        Q.     Had you been planning on taking

 6    the day off anyhow?

 7        A.     I had told Nick after the

 8    assault happened that I wasn't coming in

 9    the next day and he said that was fine.

10        Q.     Do you remember what time you

11    got up?

12        A.     Probably like 8:00, around 8:00.

13        Q.     Did you have any communication

14    with anyone from Initiative when you woke

15    up?

16        A.     Not immediately, no.

17        Q.     Did you have any communication

18    with anybody from Dr. Pepper Snapple Group

19    when you woke up?

20        A.     Yes.

21        Q.     What was that first

22    communication?

23        A.     Elizabeth had texted me.

24        Q.     What did she say in that text?

25        A.     Sort of hey, girl, how are you
```

```
                                        Page 175
 1                   N. Mucciarone
 2    doing, how was the rest of your night,
 3    like -- I think she said was Justin -- did
 4    Justin continue to be weird or something
 5    along those lines.
 6         Q.    What did you -- did you respond
 7    to her?
 8         A.    I did.  I told her what had
 9    happened, that my night ended with me
10    basically stiff-arming Justin to get him
11    away from me.
12         Q.    What was her response, if any?
13         A.    Something along the lines of oh,
14    my God, I'm so sorry, that sounds awful.
15         Q.    At that point did you ask
16    Elizabeth to take any action in response
17    to Justin's conduct?
18         A.    I did not.
19         Q.    What was the next communication
20    you had with anybody from Dr. Pepper
21    Snapple Group that day?
22         A.    I think the only person I had
23    talks to that day was Elizabeth from DPSG.
24         Q.    Did you communicate through text
25    exclusively or did you also speak to her?
```

Page 187

```
 1                N. Mucciarone
 2           What conversation did you have?
 3      A.    I told him I was feeling anxious
 4  and uncomfortable and not -- I just felt
 5  gross about the whole situation.  And
 6  after talking to Andrew, my husband, and
 7  my dad, I had decided that I wanted to go
 8  to HR.
 9      Q.    Did you go to work on
10  September 5?
11      A.    The Tuesday?  Yes.
12      Q.    We established September 4 is
13  Labor Day; right?
14      A.    Yeah.
15      Q.    Did you go to work on
16  September 5, 2017?
17      A.    Yes.
18      Q.    What, if anything, did you do as
19  relates to concerns you had about Justin
20  Whitehead?
21      A.    I sent an e-mail to HR and said
22  I wanted to speak to someone.
23      Q.    Prior to sending that e-mail,
24  did you make any requests to talk to
25  anybody at Dr. Pepper Snapple Group about
```

```
 1                    N. Mucciarone
 2    Whitehead's employment?
 3        A.    I don't recall.
 4        Q.    Did you understand that his
 5    employment had been terminated based on
 6    his conduct on August 29 and 30 towards
 7    you?
 8        A.    That's what I gathered, yes.
 9        Q.    And do you know the date he was
10    fired?
11        A.    I don't.
12        Q.    Do you believe that Dr. Pepper
13    Snapple Group did the right thing in
14    firing Justin Whitehead for his conduct?
15        A.    I do.
16        Q.    Do you believe that Dr. Pepper
17    Snapple Group acted promptly to terminate
18    Justin Whitehead's employment after the
19    events of August 29 and 30, 2017?
20        A.    I guess it depends on what you
21    mean by Dr. Pepper Snapple Group.  If you
22    mean HR after learning about it, yes.
23        Q.    Well, Dr. Pepper Snapple Group
24    was Justin Whitehead's employer; right?
25        A.    Correct.
```

Page 197

1                   N. Mucciarone

2              MR. RAFKIN: Objection to the

3        extent that it calls for a legal

4        conclusion.

5              You can answer.

6        Q.    You can answer.

7        A.    No.

8        Q.    Do you have any reason to

9    believe that Dr. Pepper Snapple Group

10   wanted Justin Whitehead to sexually

11   assault you?

12       A.    No.

13       Q.    Do you have any reason to

14   believe that Dr. Pepper Snapple Group knew

15   that Justin Whitehead might have a

16   propensity to harass or assault someone?

17       A.    I don't know one way or the

18   other.

19       Q.    Had you ever heard that Justin

20   Whitehead had sexually harassed someone in

21   the past?

22       A.    No.

23       Q.    Did you ever hear that Justin

24   Whitehead had sexually assaulted someone

25   in the past?

1                   N. Mucciarone

2       A.     No.

3       Q.     Are you aware of Justin

4  Whitehead having any kind of a criminal

5  record?

6       A.     Not that I'm aware of.

7       Q.     Before the evening of August 29

8  and 30, 2017, had you ever raised any

9  concerns about Justin Whitehead to anybody

10  at Dr. Pepper Snapple Group?

11      A.     No.

12      Q.     Did you have any concerns about

13  him prior to that evening?

14      A.     I didn't know him so no.

15      Q.     Following September 4, 2017, did

16  you continue to work on the Dr. Pepper

17  Snapple Group account?

18      A.     Yes.

19      Q.     For how long did that continue?

20      A.     About a month and a half.

21      Q.     During that period of time, did

22  you have any work-related conversations or

23  communications with Justin Whitehead?

24      A.     No.

25      Q.     During that month and a half or

Page 209

1                    N. Mucciarone

2       Q.      When you wrote your text, you

3   said, "literally do not know what I would

4   have done if you and Tas weren't there

5   last night."

6              What did you mean by that?

7       A.      I meant that I was thankful that

8   I had people to talk to at the event.

9   They were expressing that his behavior was

10  inappropriate and I sort of felt like I

11  had girlfriends with me, in a sense.

12      Q.      Looking a little further into

13  the document there's a page that has

14  DPS Bates number 14 on it.

15             Do you see that?

16      A.      Yes.

17      Q.      At the top third or so of the

18  page there's a statement from Elizabeth

19  Eaton that says, "honestly though I'm here

20  for you and will always have your back, so

21  if you feel uncomfortable or like it needs

22  to be addressed further for any reason,

23  please tell me.  Just want you to know I

24  don't want to minimize it at all.  Just

25  want to support you in any way I can."

Page 210

                      N. Mucciarone

1

2            What was your reaction to that

3    statement?

4       A.    Honestly, at this point I still

5    was trying to process what happened.

6    Elizabeth and I had a professional

7    relationship.  We were not close.  This is

8    the only time that we had ever texted.  I

9    felt glad that she supported me but also

10   felt awkward and uncomfortable about the

11   entire situation, so that was mostly my

12   reaction.

13      Q.    Looking at the next page bearing

14   Bates number DPS 15, near the bottom of

15   the page you say, "I don't think I want to

16   address it further.  I just want to sort

17   of make sure I never have to be in a

18   situation where I have to have meetings

19   with him or work with him in any way so

20   might just talk to Linda about that," and

21   that statement goes from page fifteen to

22   sixteen.

23            Do you see that?

24      A.    I do.

25      Q.    At that point were you of the

Page 211

```
 1                    N. Mucciarone
 2   mindset that you did not want Dr. Pepper
 3   to do anything further relating to Justin?
 4       A.    At that moment again I was still
 5   processing.  I still was in a little bit
 6   of shock about what happened.  I didn't
 7   know what to do.  I felt uncomfortable.
 8   As I said earlier, I liked my team, I
 9   liked the situation that we had on the
10   team, I liked my clients, for the most
11   part, and I just -- I kind of felt a
12   little lost, to be honest.
13       Q.    So at that point you were
14   communicating to Elizabeth Eaton that you
15   did not want her to do anything further
16   about it?
17       A.    Correct.
18       Q.    And the next exchange or rather
19   the next text is from Elizabeth to you;
20   right?
21       A.    Yes.
22       Q.    And in that exchange Elizabeth
23   offers to talk to Eric but only if you
24   want me to.
25              Do you see that?
```

Page 212

1                    N. Mucciarone

2        A.     I do.

3        Q.     Did you want her to report what

4    had occurred to her boss at that point?

5        A.     At the time I didn't know what I

6    wanted.  I again just felt confused and

7    lost and part of me just wanted somebody

8    to do the right thing without me having to

9    tell them to do the right thing.

10       Q.     So do you know when she first

11   attempted to talk to Eric about the

12   situation?

13       A.     I don't know.

14       Q.     Do you know if she --

15              MS. ALMON: Well, let me strike

16       that.

17       Q.     Did you ever say please talk to

18   your boss about this?

19       A.     I did not.

20       Q.     Do you know if she did it

21   anyhow?

22       A.     I believe she had a conversation

23   with him.  I don't know what the

24   conversation was, I don't know what the

25   extent was, but I believe that she did

Page 230

                        N. Mucciarone

1

2       A.      Correct, yes.

3       Q.      Looking at page 278, there's a

4    question, "any word from Seth."

5               Is that from Aggie?

6       A.      Probably.

7       Q.      Well, were Aggie and Seth in

8    communication?

9       A.      No, so it was me.

10      Q.      And then the next -- well, "any

11   word from Seth" would have been a question

12   from Aggie to you?

13      A.      Correct.

14      Q.      And then the next line is a

15   response from you?

16      A.      Correct.

17      Q.      And it says, "yeah, he told me I

18   can tell Lupes," and then it goes on.

19              Who's Lupes?

20      A.      Guadalupe.  We called her Lupes

21   or G or anything but Guadalupe basically.

22              MR. RAFKIN: The part where she

23         says she hates my advice is probably

24         accurate.

25              MS. ALMON: I was going to leave

Page 275

```
 1                N. Mucciarone
 2        further questions.  Thank you.
 3              THE VIDEOGRAPHER: That's it?
 4              We are going off the record at
 5        4:15 p.m., and this concludes today's
 6        testimony given by Nancy Mucciarone
 7        taken -- the total number of media
 8        units used is four and it will be
 9        retained by Veritext.
10              (TIME NOTED:  4:15 p.m.)
11    _____  (Signature of witness)
12    Subscribed and sworn to
13    before me this_____
14    day of_____,
15    2019.
16    _____
17
18
19
20
21
22
23
24
25
```

Page 277

1

2                    CERTIFICATION BY REPORTER

3

4        I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6        That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9        That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this 18th day of February,

24   2019.

25

Ronald M. Green
Lauren Malanga Casey
Maxine A. Adams
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177
212-351-4500
RGreen@ebglaw.com
LMalanga@ebglaw.com
Madams@ebglaw.com
*Attorneys for Defendants Initiative, Inc. and*
*The Interpublic Group of Companies, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

NANCY MUCCIARONE,                              :

                         Plaintiff,            :        18-cv-00567 (PKC)

            v.                                 :

INITIATIVE, INC., INTERPUBLIC GROUP, DR        :
PEPPER SNAPPLE GROUP, INC. and JUSTIN          :
WHITEHEAD ,                                    :

                         Defendants.           :

-------------------------------------- X

## ERRATA SHEET

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 289 | 14 | "meet you here" | |
| 303 | 15 | cork to fork | |
| 312 | 18-19 | push to pushing; and to to | |
| 319 | 12 | Wednesday morning | |
| 334 | 21 | nothing to something | |
| 368 | 16-17 | big block of text on a slide that says Nancy's upda | |
| 369 | 24 | me to my | |
| 371 | 24 | me to my | |
| 382 | 15 | mive to Matt said something | |
| 397 | 25 | not to not do my work | |
| 420 | 5 | him to them | |
| 425 | 11 | about to above | |
| | | | |
| | | | |

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |

_Nancy Mucciarone_

Nancy Mucciarone

Sworn to before me this
__3__ day of __April, 2019__

_Ivette Wulff_
Notary Public

WULFF IVETTE
NOTARY PUBLIC, STATE OF NEW YORK
NO.: 01WU4973060
QUALIFIED IN STATE OF NEW YORK
COMMISSION EXPIRES 12/23/2022

2

Firm:47991244v1

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 56 | 20 | He to she | |
| 129 | 17 | ~~after~~ letter to her | |
| 158 | 6 | I've to you've | |
| 158 | 15 | that to what | |
| 165 | 10 | touch to tongue | |
| 168 | 5 | that to what | |
| 171 | 19 | change to changed | |
| 218 | 17 | are to with | |
| 269 | 11 | flame to name | |
| 270 | 25 | said to stayed | |
| 274 | 4 | Omit "Radio" | |

*Nancy Mucciarone* (signature)

Nancy Mucciarone

Sworn to before me this
3 day of April, 2019

*Ivette Wulff* (signature)
Notary Public

WULFF IVETTE
NOTARY PUBLIC, STATE OF NEW YORK
NO.: 01WU4973060
QUALIFIED IN STATE OF NEW YORK
COMMISSION EXPIRES 12/23/2022

Firm:47991244v1