UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

NANCY MUCCIARONE,                    :
                                                          :          Case No.  18-cv-00567 (PKC)
                       Plaintiff,          :
                                                          :
           -against-                          :
                                                          :
INITIATIVE, INC., INTERPUBLIC          :
GROUP, DR PEPPER SNAPPLE GROUP,   :
INC., and JUSTIN WHITEHEAD,          :
                                                          :
                       Defendants.        :
                                                          :
-------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DR PEPPER SNAPPLE GROUP, INC.'S MOTION FOR SUMMARY
## JUDGMENT

Dated:        New York, New York
                  June 11, 2019

*Of Counsel:*
Lorie E. Almon
Kaitlyn F. Whiteside

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
(212) 218-5500
*Attorneys for Defendant Dr Pepper Snapple Group, Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ......................................................................................................................... 9

    I.       SUMMARY JUDGMENT STANDARD ........................................................... 9

    II.      DR PEPPER IS ENTITLED TO SUMMARY JUDGMENT ON ALL
             OF PLAINTIFF'S LEGAL CLAIMS ............................................................. 10

          A.      Plaintiff's Attempts to Hold Dr Pepper Vicariously Liable for
                  Whitehead's Conduct Under the Doctrine of Respondeat Superior
                  Fail as a Matter of Law .............................................................................. 11

          B.      Plaintiff's Intentional Infliction of Emotional Distress Claim is
                  Duplicative ................................................................................................ 15

          C.      Plaintiff's Allegations Do Not Meet the Extremely High Bar For
                  Intentional Infliction of Emotional Distress Claims ................................. 16

          D.      Plaintiff's Claims for Negligent Supervision and Retention Should
                  be Dismissed as a Matter of Law ............................................................... 17

              i.      Dr Pepper Did Not Know, Nor Should it Have Known, of
                      Any Propensity for the Conduct Alleged ...................................... 18

              ii.      The Alleged Torts Were Not Committed on Dr Pepper's
                      Premises or with the Employer's Chattels .................................... 22

    III.      PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES .................... 23

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)....................................................................................................10

*Baliva v. State Farm Mut. Auto. Ins. Co.*,
  286 A.D.2d 953 (N.Y. App. Div. 4th Dep't 2001) ...................................................17

*Bouchard v. N.Y. Archdiocese*,
  719 F.Supp. 2d 255 (S.D.N.Y. 2010)........................................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................10

*Chau v. Donovan*,
  357 F. Supp. 3d 276 (S.D.N.Y. 2019)........................................................................12

*Coliniatis v. Dimas*,
  848 F. Supp. 462 (S.D.N.Y. 1994) .............................................................................16

*D'Amico v. Christie*,
  518 N.E.2d 896 (N.Y. 1987)......................................................................................22

*Davison v. Goodwill Industries of Greater N.Y. & N. N.J., Inc.*,
  No. 10-CV-2180 (DLI) (RLM), 2012 WL 1067955 (E.D.N.Y. Mar. 28, 2012) ....................12

*Dia CC. v. Ithaca City Sch. Dist.*,
  304 A.D.2d 955 (N.Y. App. Div. 3d Dep't 2003) ....................................................11

*Diaz v. NY Downtown Hosp.*,
  287 A.D.2d 357 (N.Y. App. Div. 1st Dep't 2001), *aff'd*, 784 N.E.2d 68 (N.Y.
  2002) ...........................................................................................................................19

*Doe v. Abdulaziz Bin Fahd Alsaud*,
  12 F. Supp. 3d 674 (S.D.N.Y. 2014)....................................................................12, 18

*Doe v. Montefiore Med. Ctr.*,
  598 F. App'x 42 (2d Cir. 2015), *aff'g* No. 12 Civ. 686 (CM), 2013 WL
  624688 (S.D.N.Y. Feb. 19, 2013) .........................................................................18, 21

*Doin v. Dame*,
  82 A.D.3d 1338 (N.Y. App. Div. 3d Dep't 2011) ....................................................15

*Ehrens v. Lutheran Church*,
  385 F.3d 232 (2d Cir. 2004)...........................................................................18, 21, 22

*Geller v. N. Shore Long Island Jewish Health Sys.*,
   No. 10-CV-0170(JS)(WDW), 2013 WL 5348313 (E.D.N.Y. Sept. 23, 2013) ........................17

*Granite v. Newman*,
   114 A.D.2d 1000 (N.Y. App. Div. 2d Dep't 1985) ...................................................................23

*Haybeck v. Prodigy Servs. Co.*,
   944 F.Supp 326 (S.D.N.Y. 1996) ...................................................................................12, 22

*Heindel v. Bowery Sav. Bank*,
   138 A.D.2d 787 (N.Y. App. Div. 3d Dep't 1988) ....................................................................11

*Howell v. N.Y. Post Co.*,
   612 N.E.2d 699 (N.Y.), *enforced*, 619 N.E.2d 650 (N.Y. 1993) ............................................16

*Jackson v. N.Y. Univ. Downtown Hosp.*,
   69 A.D.3d 801 (N.Y. App. Div. 2d Dep't 2010), *aff'g* No. 37050/02, 2007 WL
   4616377 (Sup. Ct. Kings Cnty. Oct. 24, 2007) .................................................................19, 21

*Joshua S. v. Casey*,
   615 N.Y.S.2d 200 (App. Div. 4th Dep't 1994) .......................................................................12

*Judith M. v. Sisters of Charity Hosp.*,
   715 N.E.2d 95 (N.Y. 1999) ......................................................................................................11

*Kovalchik v. City of New York*,
   No. 09-CV-4546 (RA), 2014 WL 4652478 (S.D.N.Y. Sept. 18, 2014) ...................................11

*Leibowitz v. Bank Leumi Tr. Co.*,
   152 A.D.2d 169 (N.Y. App. Div. 2d Dep't 1989) ...................................................................16

*Loughry v. Lincoln First Bank, N.A.*,
   494 N.E.2d 70 (N.Y. 1986) ......................................................................................................23

*Martin v. Citibank, N.A.*,
   762 F.2d 212 (2d Cir. 1985) .....................................................................................................16

*Mataxas v. North Shore Univ. Hosp.*,
   211 A.D.2d 762 (N.Y. App. Div. 2d Dep't 1995) ...................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................................................10

*Osvaldo D. v. Rector Church Wardens & Vestrymen of the Par. of Trinity Church
   of New York*,
   38 A.D.3d 480 (N.Y. App. Div. 1st Dep't 2007) ..............................................................20, 21

iii

*Paul J.H. v. Lum*,
  291 A.D.2d 894 (N.Y. App. Div. 4th Dep't 2002) ................................................................21

*Raedle v. Credit Agricole Indosuez*,
  No. 04 CIV. 2235 (TPG), 2010 WL 1506731 (S.D.N.Y. Apr. 14, 2010),
  *vacated on other grounds*, 670 F.3d 411 (2d Cir. 2012)........................................................23

*Richardson v. City of New York*,
  326 F. App'x 580 (2d Cir. 2009), *aff'g* 04 Civ. 05314 (THK), 2006 WL
  377115 (S.D.N.Y. Dec. 21, 2006).................................................................................11, 12

*Rodriquez v. United Transp. Co.*,
  246 A.D.2d 178 (N.Y. App. Div. 1st Dep't 1998) ................................................................21

*Taylor v. United Parcel Serv., Inc.*,
  72 A.D.3d 573 (N.Y. App. Div. 1st Dep't 2010)..................................................................20

*Thomas v. County of Putnam*,
  262 F. Supp. 2d 241 (S.D.N.Y. 2003)................................................................................15

*Thompson v. City of New York*,
  No. 71282011, 2012 WL 12508025 (N.Y. Sup. Ct. Queens Cnty. June 20,
  2012) ...............................................................................................................................11, 12

*W. World Ins. Co. v. Stack Oil, Inc.*,
  922 F.2d 118 (2d Cir. 1990)................................................................................................10

## Other Authorities

Fed. R. Civ. P. 56(c) ....................................................................................................................10

Restatement (Second) of Agency §§ 219(1), 228 (Am. Law Inst. 1958) ......................................11

Defendant Dr Pepper Snapple Group, Inc. ("Dr Pepper") respectfully submits this Memorandum of Law in Support of Its Motion for Summary Judgment dismissing Plaintiff Nancy Mucciarone's ("Plaintiff") Complaint in its entirety, with prejudice.

## PRELIMINARY STATEMENT

On August 29, 2017, after a happy hour on a business trip in New York City, Defendant Justin Whitehead ("Whitehead") elected to stay out and bar-hop on his own personal time. Whitehead went to a new bar and continued to drink there without any of his Dr Pepper co-workers who were also on the trip.  Hours later, before Plaintiff left that bar at approximately 4:30 am, Whitehead allegedly lured Plaintiff outside the bar and groped and kissed her without her consent. No other Dr Pepper employees had been with them for hours.  Dr Pepper terminated Whitehead's employment within hours of learning the details of his conduct.  Dr Pepper is not liable for Whitehead's purely personal bad acts that were committed off-site, at a bar, late at night.  It is undisputed that his alleged actions contravened Dr Pepper policies, upon which he had been trained and which he understood.

In her Complaint, Plaintiff alleged that Whitehead had a history of engaging in bad behavior of this sort.  Nothing could be further from the truth.  There was nothing in Whitehead's background, his performance reviews, his interactions with co-workers, or his prior interactions with Plaintiff herself, to suggest that he was capable of the conduct alleged.  He had never before harassed or assaulted anyone, nor had he ever been accused of such behavior.  Moreover, Plaintiff conceded under oath that she had no information to suggest a prior history of sexual misconduct. As a result, it is unsurprising that no one, not Whitehead's peers, the bartenders, Plaintiff's coworkers, or most importantly, Plaintiff herself, saw the alleged assault coming on the night of August 29, 2017.

In part because of this utter lack of prior warning, Plaintiff cannot successfully hold Dr Pepper vicariously liable for the bad personal acts of an employee. Controlling case law establishes that sexual acts committed by employees are always for personal reasons, not within the scope of their job duties. She simply cannot hold Dr Pepper responsible for alcohol-inspired private behavior under a theory of *respondeat superior*. Plaintiff's negligent retention and supervision claims similarly fail as a matter of law. Neither Dr Pepper nor Whitehead's supervisor, Eric Blackwood ("Blackwood"), failed their legal obligations in any way. Whitehead had never engaged in such behavior previously and Dr Pepper had absolutely no notice that it was likely to occur. The mere presence of two co-workers for an earlier portion of the night in question is of no merit, as they owed no duty to Plaintiff. And, in any event, Plaintiff cannot make out her *prima facie* case on the negligent retention and supervision claim because the alleged assault occurred off-site without any use of Dr Pepper property.

The claims by Plaintiff against Whitehead will proceed regardless of Dr Pepper's involvement in the case. But Dr Pepper is simply not responsible here, and cannot properly be held liable to Plaintiff.

## STATEMENT OF FACTS[1]

**Plaintiff and Her Background**:

Dr Pepper is the undisputed leader in flavored beverages in North America and the Caribbean with over 25,000 employees. (56.1 St. ¶ 4.) Plaintiff is a former employee of Initiative, Inc. ("Initiative"), a global media agency hired to grow brands and their relationships with consumers. (56.1 St. ¶¶ 1, 2.) Dr Pepper is a client of Initiative, and works with Initiative on

---

[1] For the purposes of summary judgment only, Dr Pepper presents these facts as "undisputed" and in the light most favorable to Plaintiff. Dr Pepper expressly reserves the right to challenge the veracity and relevance of each and every fact herein at trial or in any other proceeding.

2

media marketing programs.  (56.1 St. ¶ 5.)  Plaintiff served as Initiative's Associate Director of Communications Design, and was assigned to the Dr Pepper communications design sub-team. (56.1 St. ¶¶ 3, 6, 7.)

**Whitehead's Employment with Dr Pepper**:

Whitehead worked for Dr Pepper as a Media Marketing Manager from July 2016 through September 2017.  (56.1 St. ¶¶ 19, 20, 159 - 161.)  When Whitehead applied for this role in May 2016, he had a personal character reference from Anastasia Russ ("Russ").  (56.1 St. ¶ 15.) Whitehead interviewed with Dr Pepper and received a job offer that was contingent upon successful completion of a drug screen and background check.  (56.1 St. ¶¶ 16, 17.)  Whitehead passed both his drug screen and background check.  (56.1 St. ¶ 18.)  Throughout his time at Dr Pepper, Whitehead reported directly to Blackwood.  (56.1 St. ¶ 25.)  There were two other Media Marketing Managers at Dr Pepper at the time, Russ and Elizabeth Eaton ("Eaton"). (56.1 St. ¶¶ 20, 21.)  Whitehead never reported to either Eaton or Russ and in fact, the three had the same job title and performed the same duties.  (56.1 St. ¶¶ 22, 26.)

**Whitehead's Spotless Record**:

Prior to August 29, 2017, Whitehead was a strong employee with no negative performance history or indicators.  (56.1 St. ¶ 40.)  While working at Dr Pepper, Whitehead had only positive comments in his performance reviews regarding his interpersonal interactions.  (56.1 St. ¶ 58.) Prior to August 29, 2017, no co-worker, vendor, or anyone else levied any allegations of inappropriate conduct against him, either while at Dr Pepper or while working for any other employer.  (56.1 St. ¶¶ 41 - 43.)

Russ, who recommended Whitehead for employment with Dr Pepper after working with him at a prior employer, never had concerns about his behavior.  (56.1 St. ¶ 50.)  Russ had never

before heard or received information that anybody else had concerns about Whitehead's conduct. (56.1 St. ¶ 51.)  Russ conveyed her positive impressions about Whitehead to Blackwood while he was a candidate and before he was hired.  (56.1 St. ¶ 53.)  Similarly, Blackwood, Whitehead's direct supervisor, never witnessed Whitehead engage in inappropriate behavior.  (56.1 St. ¶ 54.) No one ever reported to Blackwood that Whitehead engaged in sexual behavior or made them feel uncomfortable. (56.1 St. ¶ 55.)

**Dr Pepper's Commitment to Non-Harassment and Other Policies**:

At all relevant times, Dr Pepper maintained a Non-Harassment policy, as well as a Code of Business Conduct and Ethics ("Code of Conduct").  (56.1 St. ¶ 28.)  Prior to beginning work with Dr Pepper, all prospective employees receive and are required to review and acknowledge copies of Dr Pepper's Non-Harassment Policy and Code of Conduct.  (56.1 St. ¶ 30.)  Whitehead received and reviewed these policies prior to joining Dr Pepper.  (56.1 St. ¶ 31.)  Whitehead understood that a condition of his continued employment with Dr Pepper was that he abide by Dr Pepper's policies.  (56.1 St. ¶ 32.)  Whitehead understood that the Code of Conduct expressly prohibited discrimination and harassment and that the Non-Harassment Policy expressly prohibited unwelcome conduct based on protected status or inappropriate physical conduct.  (56.1 St. ¶¶ 33, 36, 37.)  Specifically, the Non-Harassment Policy states that "Prohibited conduct includes…[u]nwanted, inappropriate, or offensive looks, touches, gestures, or other physical conduct."  (56.1 St. ¶ 37.)  During his employment with Dr Pepper, Whitehead was trained on Dr Pepper's Code of Conduct and Non-Harassment policies.  (56.1 St. ¶ 39.)

**Events of August 29, 2017**:

Russ, Whitehead, and Eaton traveled to New York for brand marketing meetings with Initiative scheduled on August 29, 2017.  (56.1 St. ¶ 60.)  The purpose of the trip was a partnership

4

day for Dr Pepper and Initiative to meet together, along with sales vendors, in order to prepare plans for the upcoming year with respect to media. (56.1 St. ¶ 61.) During the day, various teams presented their strategy plans for their respective brands and then members of the teams would brainstorm ideas. (56.1 St. ¶ 62.) Whitehead was not on Plaintiff's team and did not interact with her at all during partner day. (56.1 St. ¶¶ 63 - 67.) Partner day ended during the afternoon and then Plaintiff attended another presentation. (56.1 St. ¶ 65.) Whitehead was not present for this presentation either. (56.1 St. ¶ 66.) Whitehead's absence was typical as Plaintiff did not regularly interact directly with him for work. (56.1 St. ¶¶ 9, 10.) Rather, Plaintiff's direct client contact with Dr Pepper was Eaton. (56.1 St. ¶¶ 8, 9.)

Following the presentation, Plaintiff went to lunch with Eaton and Plaintiff's direct supervisor, Nicholas Grainger ("Grainger"), at The Smith located on 28th Street where she began drinking. (56.1 St. ¶¶ 67, 68.) Plaintiff returned to the office after lunch where she responded to emails. (56.1 St. ¶ 69.)

**Events of August 29, 2017 at Rock-and-Reilly's**:

After the day's meetings, Plaintiff, Eaton, Russ, Whitehead and others went to a spontaneous happy hour in a basement bar. (56.1 St. ¶ 70.) After the basement bar, the group went directly to a pre-arranged happy hour at a bar called Rock-and-Reilly's. (56.1 St. ¶ 73.) According to Plaintiff, she had no concerns that Whitehead was going to do or say anything sexually harassing at Rock-and-Reilly's. (56.1 St. ¶ 74.) At one point, Plaintiff sat down on a banquette bench with Whitehead on her right-hand side and Grainger on her left-hand side. (56.1 St. ¶¶ 82, 83.) While sitting on the banquette, Whitehead allegedly began to compliment Plaintiff. (56.1 St. ¶ 84.) He told her she was beautiful, and that he wished he could be with someone like her. (56.1 St. ¶ 85.) This conversation was "strictly between" Whitehead and Plaintiff and no

5

other Dr Pepper employees could hear the conversation.  (56.1 St. ¶ 86.)  Whitehead also allegedly twice rested his hand on Plaintiff's upper thigh.  (56.1 St. ¶ 87.)  Whitehead purportedly told Plaintiff "[M]y wife and I have an open relationship and I have a hotel room in New York tonight." (56.1 St. ¶ 88.)

Plaintiff did not overtly discourage Whitehead.  (56.1 St. ¶ 89.)  According to Plaintiff "I wouldn't say I was blowing him off but I wouldn't say that I was encouraging his behavior."  (*Id.*) Plaintiff stated that typically "[I]n a situation like that, what I normally do is uncomfortably laugh and kind of leave it at that."  (56.1 St. ¶ 90.)  Plaintiff excused herself and went to the restroom where she called her boyfriend, Andrew Dawson ("Dawson").  (56.1 St. ¶ 91.)  She told Dawson "what was going on" with Whitehead, and Dawson encouraged Plaintiff to leave.  (*Id.*)  At the time, Plaintiff lived in Brooklyn.  (56.1 St. ¶ 92.)  Plaintiff told Dawson that she did not yet want to leave.  (56.1 St. ¶ 93.)

Later in the evening, Whitehead came up behind Plaintiff and, while standing on the side of her, put his arm around her.  (56.1 St. ¶ 96.)  Plaintiff was able to move so that Whitehead was no longer touching her.  (56.1 St. ¶ 97.)  Plaintiff estimated that Whitehead's arm was around her for three seconds.  (56.1 St. ¶ 98.)

Plaintiff alleges that she subsequently "recounted the conversation" that she and Whitehead had while sitting on the banquette to Eaton and Russ, including Whitehead's comment that he and his wife had an open marriage.  (56.1 St. ¶¶ 99, 100.)  Eaton and Russ purportedly told Plaintiff that Whitehead was harmless and that they would "take care of it."  (56.1 St. ¶ 104.)  At one point, Plaintiff maintains she, Eaton, and Russ went into the women's bathroom and called Plaintiff's boyfriend.  (56.1 St. ¶ 105.)  Plaintiff further maintains that Eaton spoke to Plaintiff's boyfriend

6

and told him that Whitehead was harmless and that Eaton and Russ would take care of her.  (56.1 St. ¶ 106.)

While at Rock-and-Reilly's, Eaton attempted to divert Whitehead away from Plaintiff. (56.1 St. ¶ 110.)  Neither Eaton nor Russ encouraged Whitehead's behavior in any way.  (56.1 St. ¶ 111.)  Neither Eaton nor Russ suggested that Whitehead's behavior was acceptable.  (56.1 St. ¶ 112.)  Besides Eaton and Russ, who held the same job level and title as Whitehead, there were no other Dr Pepper employees present at Rock-and-Reilly's.  (56.1 St. ¶ 113.)

**Events of August 29, 2017 at Pig-N-Whistle**:

After 12:15 a.m., Eaton and Russ told Plaintiff that they had early flights the next morning and wanted to go back to the hotel.  (56.1 St. ¶ 114.)  Neither Russ nor Eaton went anywhere beyond Rock-and-Reilly's, and instead went straight back to their hotel.  (56.1 St. ¶ 115.)  Plaintiff left Rock-and-Reilly's and went to another bar called Pig-N-Whistle.  (56.1 St. ¶ 116.)  Neither Eaton nor Russ joined her.  (56.1 St. ¶ 117.)  According to Plaintiff, it was reasonable for Eaton and Russ to believe that Whitehead would not engage in any more serious behavior than what had already occurred.  (56.1 St. ¶¶ 118, 130.)

At the time that Plaintiff entered Pig-N-Whistle, she was only concerned that Whitehead would continue engaging in "the same behavior that had been occurring all night."  (56.1 St. ¶ 120.)  Shortly after entering Pig-N-Whistle, Grainger spoke to Whitehead about his behavior throughout the evening.  (56.1 St. ¶ 123.)  Whitehead had a "sobering" moment and "his behavior…instantly changed."  (*Id*.)  Whitehead apologized to Plaintiff.  (*Id*.)  At that time, Plaintiff believed Whitehead's inappropriate behavior would stop.  (56.1 St. ¶ 124.)  In fact, from that point on, while inside Pig-N-Whistle, Whitehead behaved appropriately.  (*Id*.)  Whitehead did not touch Plaintiff while inside Pig-N-Whistle.  (56.1 St. ¶ 125.)

Plaintiff remained at Pig-N-Whistle until approximately 4:30 a.m. on August 30, 2017. (56.1 St. ¶ 121.)  Approximately an hour after arriving at Pig-N-Whistle, Whitehead said that he had to get back to his hotel because he had an early flight.  (56.1 St. ¶ 126.)  Whitehead said goodbye to the group and asked Plaintiff to walk outside with him to point him in the direction of his hotel.  (56.1 St. ¶ 127.)  At the time Whitehead asked Plaintiff to walk outside with him, Plaintiff was not concerned about Whitehead.  (56.1 St. ¶ 128.)  Plaintiff did not believe she was putting herself at risk by walking outside with Whitehead and did not express any concern to anyone about walking outside the bar with Whitehead.  (56.1 St. ¶¶ 129, 132.)

According to Plaintiff, while outside the bar, "All of a sudden he had his hand down my shirt touching my boobs, he had his other hand on my butt like pulling me closer to him and his head was on the side of my neck trying to kiss my neck."  (56.1 St. ¶ 133.)  Plaintiff was able to successfully push him off of her and she walked quickly back into the bar.  (56.1 St. ¶ 135.)  At the time Plaintiff walked out of the bar, she did not anticipate or see any signs suggesting to her that a sexual assault was going to occur.  (56.1 St. ¶ 136.)  Had she believed that a sexual assault was possible, Plaintiff would not have walked out of the bar with Whitehead, but she did not derive concerns of that nature from his prior conduct.  (56.1 St. ¶¶ 120, 137, 138.)

**Dr Pepper's Investigation and Termination of Whitehead**:

Eaton, Russ, and Whitehead returned to Texas on Wednesday, August 30, 2017.  (56.1 St. ¶ 145.)  Mucciarone remained based in New York.  (56.1 St. ¶ 146.)  Eaton was out of the office starting on Friday, September 1, 2017 returning after Labor Day on Tuesday, September 5, 2017. (56.1 St. ¶ 147.)  On the morning of Tuesday, September 5, 2017, Eaton was able to speak to Blackwood alone and reported to Blackwood that Whitehead had acted inappropriately on the night of August 29, 2017.  (56.1 St. ¶ 148.)  Eaton specifically told Blackwood that she had seen

Whitehead put his arm around Plaintiff.  (56.1 St. ¶ 149.)  Blackwood communicated that Whitehead had been accused of acting inappropriately to a vendor to Lorie Christopher ("Christopher"), Director, Human Resources for Dr Pepper.  (56.1 St. ¶ 151.)  On Wednesday, September 6, 2017, Blackwood interviewed Whitehead.  (56.1 St. ¶ 152.)  During that interview, Whitehead stated that he did not remember much of what had happened that night, but that he did recall placing his arm around Plaintiff and that this was not welcomed by her.  (56.1 St. ¶ 153.)  Blackwood told Whitehead that his behavior was unacceptable, that advances toward either an employee or business contact are against Dr Pepper's Code of Conduct, that he should not have further contact with Mucciarone, and that he would be receiving a verbal warning pending Dr Pepper learning further information about the incident.  (56.1 St. ¶ 154.)  At that point, Christopher began preparations to investigate the allegations, and planned to seek an interview with Eaton to gather additional facts.  (56.1 St. ¶ 155.)  Before Christopher had the opportunity to speak with Eaton, however, Initiative sent Dr Pepper additional information.  (56.1 St. ¶ 156.)  Specifically, on September 7, 2017, Initiative shared text messages between Whitehead and Plaintiff regarding the alleged assault. (56.1 St. ¶ 157.)   This new information included details regarding specifics of the alleged assault, including a claim that Whitehead had grabbed Plaintiff's breasts.  (56.1 St. ¶ 158.)  Within hours, Christopher and Blackwood met with Whitehead on September 7, 2017, and inquired about these allegations.  (56.1 St. ¶ 159.)  When Whitehead said he could not deny the accuracy of the allegations, Dr Pepper terminated him effective immediately.  (56.1 St. ¶¶ 160, 161.)

## ARGUMENT

## I.     SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, affidavits, and other discovery establish that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial responsibility of identifying the bases for its motion and those portions of the record that demonstrate the absence of a genuine factual issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the movant satisfies this burden, the non-moving party must proffer admissible evidence demonstrating that a trial is required because disputed issues of material fact exist. *Liberty Lobby*, 477 U.S. at 249. For Plaintiff to survive summary judgment, she "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Plaintiff may not rely on evidence that is merely colorable, conclusory or speculative; rather, she must present "concrete evidence from which a reasonable [fact-finder] could return a verdict in his favor." *Liberty Lobby*, 477 U.S. at 256; *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (noting a nonmoving party "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture") (internal quotations and citations omitted).

In this case, Plaintiff's own deposition testimony and the remaining undisputed record evidence establish that Dr Pepper is entitled to summary judgment on Plaintiff's claims as a matter of law, and therefore, Dr Pepper respectfully requests that summary judgment be granted.

## II.   DR PEPPER IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S LEGAL CLAIMS

Dr Pepper is not vicariously liable for Whitehead's purely personal, unauthorized conduct under the doctrine of *respondeat superior* or any other theory. Further, Dr Pepper was not negligent in its supervision or retention of Whitehead.

### A.    Plaintiff's Attempts to Hold Dr Pepper Vicariously Liable for Whitehead's Conduct Under the Doctrine of *Respondeat Superior* Fail as a Matter of Law

Generally, employers are only legally responsible for the acts of employees committed within the course and scope of employment. *See* Restatement (Second) of Agency §§ 219(1), 228 (Am. Law Inst. 1958).  Under the doctrine of *respondeat superior*, an employer can be held liable only for the wrongs of an employee acting within the scope of the employee's duties and/or in furtherance of the employer's interests.  *Kovalchik v. City of New York*, No. 09-CV-4546 (RA), 2014 WL 4652478, at *10 (S.D.N.Y. Sept. 18, 2014).

It is well-settled that sexual advances and assaults are not within the scope of an employee's employment or in furtherance of an employer's interest.  The Second Circuit, and other New York courts, have almost universally held that sexual assaults, as a matter of law, are perpetrated entirely for personal motives.  *See Richardson v. City of New York*, 326 F. App'x 580, 582 (2d Cir. 2009), *aff'g* 04 Civ. 05314 (THK), 2006 WL 377115 (S.D.N.Y. Dec. 21, 2006); *see also Kovalchik*, 2014 WL 4652478, at *10 (granting summary judgment to City of New York on IIED claim following rape by Department of Juvenile Justice employee while on duty); *Judith M. v. Sisters of Charity Hosp.*, 715 N.E.2d 95, 95-96 (N.Y. 1999) (holding that a hospital orderly who was tasked with bathing the plaintiff was acting outside the scope of his duties when he sexually abused her while doing so); *Dia CC. v. Ithaca City Sch. Dist.*, 304 A.D.2d 955, 956 (N.Y. App. Div. 3d Dep't 2003) (upholding summary judgment and noting that "[a]n act of sexual assault by an employee is a clear departure from the scope of employment, committed solely for personal reasons, and unrelated to the furtherance of the employer's business"); *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 787-88 (N.Y. App. Div. 3d Dep't 1988) (holding that mall was not liable for rape of girl committed by mall security guard while on duty); *Thompson v. City of New York*, No. 71282011, 2012 WL

12508025, at *1-3 (N.Y. Sup. Ct. Queens Cnty. June 20, 2012) (granting summary judgment following sexual assault of student by teacher while at school).[2]

The Second Circuit's decision in *Richardson* illustrates the point.  In *Richardson*, a seventeen-year-old attempted to hold the City of New York vicariously liable in tort for assault and battery following sexual acts committed against him while he was under the supervision of a New York City Department of Probation officer.  Even though the Plaintiff was a minor who had no choice but to interact with the officer, and even though some of the sexual acts occurred during work hours and on the employer's premises, the court held that the employer was not responsible for its employee's personally motivated bad acts.

According to the district court, "no reasonable jury could conclude that Waite was acting within the scope of her employment when she allegedly coerced sexual acts from Plaintiff." *Richardson*, 2006 WL 3771115, at *13.  In a single sentence, the Court of Appeals affirmed the trial court's holding, noting,  "Richardson's state-law claim for vicarious liability also fails: Waite's actions were not within the scope of her employment."  *Richardson*, 326 F. App'x at 582.

The facts here demand the same result.  The record demonstrates that Whitehead committed a purely personal wrong exclusively for his own purposes.  His job duties as Dr Pepper Marketing Media Manager did not encompass harassment of others, but instead "focused on local media" and the national media for the Mott's and Schweppes brand teams.  (56.1 St. ¶¶ 23, 24.)  It was simply not Whitehead's duty to harass a vendor at a late night bar.

---

[2] Indeed, allegations of an employer's vicarious liability for an employee's sexual assault are routinely disposed of at the motion to dismiss stage for failing to state a claim.  *See, e.g., Chau v. Donovan*, 357 F. Supp. 3d 276, 290-92 (S.D.N.Y. 2019) (Castel, J.); *Doe v. Abdulaziz Bin Fahd Alsaud*, 12 F. Supp. 3d 674, 677-80 (S.D.N.Y. 2014); *Davison v. Goodwill Industries of  Greater N.Y. & N. N.J., Inc.*, No. 10-CV-2180 (DLI) (RLM), 2012 WL 1067955, at *5 (E.D.N.Y. Mar. 28, 2012); *Haybeck v. Prodigy Servs. Co.*, 944 F.Supp 326, 329-31 (S.D.N.Y. 1996); *Joshua S. v. Casey*, 615 N.Y.S.2d 200, 200 (App. Div. 4th Dep't 1994).

In fact, Dr Pepper's written policies and training practices make clear that employees *should not* engage in such bad acts. Dr Pepper has a zero tolerance policy with respect to sexual harassment. (56.1 St. ¶ 29.) Dr Pepper formalizes this zero tolerance policy in its Code of Conduct and Non-Harassment Policy. (56.1 St. ¶¶ 28, 34, 35, 37, 38.) Specifically, Dr Pepper's Code of Conduct states, "We're committed to diversity and equal opportunity and prohibit discrimination as well as unwelcome and discriminatory behavior. This includes conduct that creates an intimidating, offensive or hostile environment. This conduct can take many forms, including physical actions, spoken or written comments, and multimedia. Regardless of the form it takes, harassment negatively impacts individual work performance and our workplace as a whole, and will not be tolerated." (56.1 St. ¶ 34.)

Similarly, Dr Pepper's Non-Harassment Policy clearly states, "[H]arassment or unwelcome conduct that is based on an individual's…protected status as outlined above is forbidden. Prohibited conduct, whether verbal, physical, or visual, includes…any unwelcome conduct that is inflicted on someone because of that individual's protected status…Prohibited conduct includes…[u]nwanted, inappropriate, or offensive looks, touches, gestures, or other physical conduct." (56.1 St. ¶ 37.)

Dr Pepper also ensured that employees are aware that they lack agency to harass or assault others. Whitehead, like others, was required to acknowledge that he had received and reviewed Dr Pepper's Non-Harassment Policy and Code of Conduct before he started work. (56.1 St. ¶ 31.) Dr Pepper trained Whitehead on the Non-Harassment Policy and the Code of Conduct. (56.1 St. ¶ 39.) Whitehead confirmed then and now that he understood the bounds of acceptable behavior under both policies, and was aware that the wrongs alleged fell outside the scope of his employment and ran contrary to Dr Pepper's business. (56.1 St. ¶¶ 33, 36, 163.) It was in fact a

13

condition of his continued employment with Dr Pepper that he abide by Dr Pepper's policies, include the Non-Harassment policy and Code of Conduct.  (56.1 St. ¶¶ 32, 35, 38.)

Dr Pepper's actions subsequent to the alleged attack also evidence the fact that his actions were deemed to be inappropriate and outside his authority.  Eaton, the co-worker who had witnessed some, but not all of Whitehead's conduct on the night of August 29th, reported Whitehead's behavior to Blackwood within three (3) business days of being back in Texas, on Tuesday, September 5, 2017.[3]  (56.1 St. ¶ 148.)  Eaton reported Whitehead's behavior despite Plaintiff's statement that "I don't think I want to address it further."  (56.1 St. ¶ 144.)  Blackwood, Whitehead's supervisor, immediately contacted Human Resources, and then interviewed Whitehead the next day, Wednesday, September 6, 2017.  (56.1 St. ¶¶ 151, 152.)  Blackwood advised Whitehead that the behavior of which he was aware (which turned out to be only a small portion of the alleged bad acts) was unacceptable, and instructed him to cease further contact with Plaintiff.  (56.1 St. ¶ 154.)  The very next day, Dr Pepper learned additional information about the alleged assault from Initiative.  (56.1 St. ¶ 157.)  Within hours of receiving this additional information, Dr Pepper called Whitehead into the office from his off-site meeting and, when he could not deny the allegations, terminated his employment.  (56.1 St. ¶¶ 159 - 161.)  All in all, it took Dr Pepper a mere five (5) business days following the alleged assault to terminate Whitehead's employment.  (*Id.*)  The post-assault actions of Whitehead's supervisor and the Company evidence that it did not consider Whitehead to be acting within the scope of his job.

In this case, it is beyond doubt that Whitehead's alleged harassment, assault, and/or infliction of emotional harm upon Mucciarone was done - if at all - for purely personal reasons.

---

[3] Eaton returned to Texas on Wednesday, August 30, 2017.  (56.1 St. ¶ 145.)  She was out of the office from Friday, September 1, 2017 to Tuesday, September 5, 2017.  (56.1 St. ¶ 147.)  She reported the inappropriate behavior that she witnessed on the morning of Tuesday, September 5, 2017.  (56.1 St. ¶ 148.)

Whitehead acted without authority, beyond the scope of his job, and contrary to Dr Pepper's interests.[4]  Accordingly, Dr Pepper cannot be held vicariously liable for his alleged conduct under the theory of *respondeat superior*, and his claims of harassment, assault, and IIED fail on this ground alone.

### B.        Plaintiff's Intentional Infliction of Emotional Distress Claim is Duplicative

Even if she could overcome controlling *respondeat superior* case law, which she cannot, Plaintiff's IIED claim fails.  When reviewing an IIED claim, the alleged underlying assault and battery claims must be disregarded.  Under New York law, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability."  *Thomas v. County of Putnam*, 262 F. Supp. 2d 241, 251 (S.D.N.Y. 2003) (internal quotations omitted).  Thus, in *Thomas*, the Court dismissed an IIED claim because "the conduct complained of [was] encompassed in plaintiff's claims for malicious prosecution and false arrest and imprisonment."  *Id*.

Similarly in *Doin v. Dame*, 82 A.D.3d 1338, 1340-41 (N.Y. App. Div. 3d Dep't 2011), the court held that the trial court erred in denying defendant's motion for summary judgment in light of the fact that "the conduct complained of [t]here fell squarely within the bounds of . . . traditional torts."  *Id*.

Here, Mucciarone alleges that her IIED claim is based upon "severe emotional distress" that she purportedly suffered as a result of Whitehead's alleged "relentless harassment and the physical assault and battery upon" her.  (56.1 St. ¶ 168.)  At the same time, however, Mucciarone asserts independent claims for assault and battery.  (56.1 St. ¶ 167.)  As a basis for such independent claims, Mucciarone asserts that Whitehead's "actions and words put Plaintiff   in

---

[4] The fact that Dr Pepper faces litigation for Whitehead's personal wrongs is, in and of itself, proof that he acted against Dr Pepper's interests.

imminent apprehension of harmful or offensive contact," and that Whitehead "repeatedly and purposefully touched Plaintiff's body."  (56.1 St. ¶ 169.)  Accordingly, such conduct cannot also be asserted as a basis for Mucciarone's IIED claims.

### C.    Plaintiff's Allegations Do Not Meet the Extremely High Bar For Intentional Infliction of Emotional Distress Claims

Mucciarone's allegations do not suffice to state a claim for IIED.  To state an IIED claim, a plaintiff must present evidence showing:  "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 701-02, 701 n.1 (N.Y.) (affirming appellate court's dismissal against individual defendant's in IIED case because bankruptcy proceeding caused automatic stay as to corporate defendant), *enforced*, 619 N.E.2d 650 (N.Y. 1993) (affirming dismissal of IIED claims against corporate defendant upon lift of stay).  As to the first element, New York courts have held that "[l]iability can be found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 612 N.E.2d at 702.  "[T]he conduct alleged must consist of more than mere insults, indignities, and annoyances." *Leibowitz v. Bank Leumi Tr. Co.*, 152 A.D.2d 169, 182 (N.Y. App. Div. 2d Dep't 1989) (internal citations and quotations omitted). Instead, the actor must have behaved in an objectively extreme, abdominal manner.  Because this threshold is so high, whether conduct is extreme and outrageous "may be" – and frequently is – "determined as a matter of law." *See Coliniatis v. Dimas*, 848 F. Supp. 462, 471 (S.D.N.Y. 1994) (dismissing plaintiff's IIED claim); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) ("New York courts have been very strict in applying these principles.").

Dr Pepper does not opine here on how extreme or outrageous Whitehead's alleged harassment, assault, and battery may have been.  But when those duplicative facts are set aside, as they must be, *see supra* p. 15 - 16, there is no factual basis whatsoever to sustain an IIED claim. *See Baliva v. State Farm Mut. Auto. Ins. Co.*, 286 A.D.2d 953, 953-54 (N.Y. App. Div. 4th Dep't 2001) (finding touching of plaintiff's shoulders, and making inappropriate comments to plaintiff on several occasions "insufficient as a matter of law" for IIED and "*well within*" the ambit of other traditional tort liability) (emphasis in original).  At best, the facts that are not the foundation of the other tort claims (if any) amount to nothing more than annoying flirtation.  As Plaintiff testified, Whitehead complimented Plaintiff.  (56.1 St. ¶ 84.)  He told her that she was beautiful and that he wished he could be with someone like her.  (56.1 St. ¶ 85.)  He told her that he was in an 'open' marriage.  (56.1 St. ¶ 88.)  He put his arm around Plaintiff and, later, rested his hand on her upper thigh.  (56.1 St. ¶¶ 87, 96.)  While such comments and actions, if true, would be inappropriate, they simply do not rise to the extremely severe level required for an IIED claim under New York law.  *See, e.g., Geller v. N. Shore Long Island Jewish Health Sys.*, No. 10-CV-0170(JS)(WDW), 2013 WL 5348313, at *12, (E.D.N.Y. Sept. 23, 2013) (granting summary judgment in defendants' favor, and highlighting "New York courts are particularly reluctant to find that [] conduct is sufficiently extreme or outrageous to satisfy this demanding standard absent a deliberate and malicious campaign against the plaintiff.") (internal citations and quotations omitted).  In addition, Whitehead did not act with or intend to cause severe emotional distress.  (56.1 St. ¶ 164.)  Accordingly, Mucciarone's IIED claim should be dismissed on this ground as well.

### D. Plaintiff's Claims for Negligent Supervision and Retention Should be Dismissed as a Matter of Law

Finally, Plaintiff failed to develop facts sufficient to support her speculative claims that Dr Pepper negligently supervised and retained Whitehead.

17

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employer-employee relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotations omitted).[5]  Plaintiff's negligent retention and supervision claim fails at least two of these required prongs.

>    i.    Dr Pepper Did Not Know, Nor Should it Have Known, of Any Propensity for the Conduct Alleged

First, Plaintiff cannot demonstrate that Dr Pepper "knew or should have known of the propensity for the conduct which caused the injury."  *Id.* at 235 (citing *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161 (N.Y. App. Div. 2d Dep't 1997)).  To do so, a plaintiff must show both that the employee had a propensity for the conduct at issue and that the defendant was aware of this propensity prior to the alleged incident.  *E.g., Alsaud*, 12 F. Supp. 3d at 680.  "New York courts have held in employee sexual misconduct cases that an employer is only liable for negligent supervision or retention if it is aware of specific prior acts or allegations against the employee."  *Id.* at 680-81  ("The prior misconduct, moreover, must be of the same kind that caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient.").

---

[5] The Second Circuit has not ruled on whether a plaintiff is required to show that the employer knew or should have known of a specific propensity to engage in inappropriate sexual conduct or whether evidence of a propensity to engage in merely physical assault will suffice.  *See Doe v. Montefiore Med. Ctr.*, 598 F. App'x 42, 43 (2d Cir. 2015), *aff'g* No. 12 Civ. 686 (CM), 2013 WL 624688 (S.D.N.Y. Feb. 19, 2013).  This distinction is immaterial here, where Whitehead had neither propensity.  *Id.* (affirming summary judgment in favor of employer-defendants where "no reasonable jury could conclude that defendants knew or should have known of [the employee's] propensity to commit an assault--let alone a sexual assault").

18

Here, the undisputed evidence shows exactly the contrary, demonstrating that (i) contrary to the Complaint, this was in fact the first time that Whitehead had engaged in harassing conduct and (ii) that Dr Pepper had no notice of any allegations or reports of harassment by Whitehead prior to the alleged assault on August 29, 2017.  For example, Whitehead passed his background check prior to joining Dr Pepper and had a personal reference from a current Dr Pepper employee who had previously worked with Whitehead.  (56.1 St. ¶¶ 15, 18.)  These facts standing alone are fatal to Plaintiff's case.  *See, e.g., Jackson v. N.Y Univ. Downtown Hosp.*, 69 A.D.3d 801, 801-02 (N.Y. App. Div. 2d Dep't 2010) (upholding summary judgment where employee had two letters of recommendation and had never been convicted of any crime), *aff'g* No. 37050/02, 2007 WL 4616377 (Sup. Ct. Kings Cnty. Oct. 24, 2007); *Diaz v. NY Downtown Hosp.*, 287 A.D.2d 357, 357-59 (N.Y. App. Div. 1st Dep't 2001) (granting summary judgment and holding sexual assault was not reasonably foreseeable by independent contractor who had been background checked), *aff'd*, 784 N.E.2d 68 (N.Y. 2002).

The undisputed record also reveals that while employed by Dr Pepper, Whitehead had never before engaged in harassment, assault, or battery and had never even been accused of such behavior.  (56.1 St. ¶ 41.)  Whitehead had a spotless record, as evidenced by the fact that no complaints, concerns, or allegations of inappropriate conduct were ever raised about him during his employment with Dr Pepper, or with any other former employer.  (56.1 St. ¶¶ 42, 43.) Whitehead's former co-worker, Russ, testified at her deposition that she never had any concerns about Mr. Whitehead's conduct and that she had never heard or received information that anybody else had concerns about Whitehead's conduct.  (56.1 St. ¶¶ 50, 51.)  Russ also testified that she had been out drinking with Whitehead before, and that even under those circumstances, he did not harass or assault anyone.  (56.1 St. ¶ 52.)

19

Like Russ, Plaintiff had never before had an interaction with Whitehead that she thought was inappropriate. (56.1 St. ¶ 45.) Plaintiff had never been told by anyone that Whitehead acted inappropriately. (56.1 St. ¶ 46.) Plaintiff had no knowledge of Whitehead ever sexually harassing anyone or assaulting anyone, (56.1 St. ¶¶ 47, 48.), nor does she have reason to believe that he has a criminal record. (56.1 St. ¶ 49.) And, Whitehead does not, in fact, have a criminal record. (56.1 St. ¶ 18.)

Moreover, Dr Pepper took care to ensure that it was soliciting peer feedback to uncover any hidden problems. (56.1 St. ¶¶ 56, 57.) Yet Whitehead's performance reviews, completed by his peers as well as his supervisor reflect only positive notes about Whitehead's interpersonal skills and his interactions with teammates. (56.1 St. ¶ 58.) For example, Whitehead's peers had the following to say about him in his one-year performance review:

- "I have enjoyed working with Justin thus far."

- "Justin has been a good teammate on the Mott's business…Justin has a good attitude and is someone you truly enjoy working with."

- "Justin is a great partner…His even-kill [sic] manner make him easy to work with and when he has a contrary opinion it doesn't come across offensive or combative."

(56.1 St. ¶ 59.) Blackwood himself never saw Whitehead engage in inappropriate behavior, and neither Blackwood nor Human Resources received any complaints about him. (56.1 St. ¶¶ 44, 54, 55.)

Courts have routinely dismissed claims under similar facts. *See, e.g., Taylor v. United Parcel Serv., Inc.*, 72 A.D.3d 573, 574 (N.Y. App. Div. 1st Dep't 2010) (upholding dismissal of negligent retention and supervision claims where employee's employment records did not give notice of propensity for sexual misconduct or sexual assault); *Osvaldo D. v. Rector Church Wardens & Vestrymen of the Par. of Trinity Church of New York*, 38 A.D.3d 480, 480 (N.Y. App. Div. 1st Dep't 2007) (upholding summary judgment where employer had never received any

complaints about the employee and the employee had never been convicted of a crime); *Jackson*, 2007 WL 4616377, at \*2 (finding summary judgment proper where no indication of propensity for sexual misconduct in the employee's personnel file and where employee had undergone performance reviews and had no negative evaluations); *see also Ehrens*, 385 F.3d at 235 (upholding summary judgment where plaintiff did not provide "admissible evidence from which a reasonable juror could infer that the defendants, at any time prior to the relevant incident, know or should have known of Chapman's propensity to assault minors or otherwise engage in inappropriate sexual conduct"); *Montefiore Med. Ctr.*, 2013 WL 624688, at \*4 - 5 (affirming summary judgment on negligent supervision and retention claim where physician had a medical career free of complaints); *Bouchard v. N.Y. Archdiocese*, 719 F.Supp. 2d 255, 257 (S.D.N.Y. 2010) (granting summary judgment on plaintiff's negligent retention claim because there was no evidence that defendant was on notice of employee's alleged propensity to commit sexual abuse); *Paul J.H. v. Lum*, 291 A.D.2d 894, 895 (N.Y. App. Div. 4th Dep't 2002) (finding summary judgment appropriate where the defendants established that they lacked notice of the specific propensity that caused the plaintiff's injury); *Rodriguez v. United Transp. Co.*, 246 A.D.2d 178, 180-81 (N.Y. App. Div. 1st Dep't 1998) (entering summary judgment for defendant because plaintiff presented not "even a scintilla of evidence: of employee's "history of a propensity for violence or sexual misconduct"); *Mataxas v. North Shore Univ. Hosp.*, 211 A.D.2d 762, 763 (N.Y. App. Div. 2d Dep't 1995) (ordering summary judgment where no evidence to indicate that hospital had any knowledge of the technician's propensity to commit alleged acts).  Plaintiff's negligence claims must similarly fail due to the lack of notice of any kind.

ii.    The Alleged Torts Were Not Committed on Dr Pepper's Premises or with
the Employer's Chattels

Even if Plaintiff could show that (i) Whitehead had a propensity for assault and (ii) Dr

Pepper knew or should have known of such propensity (which she cannot), summary judgment

would nevertheless be appropriate as the evidence establishes that the alleged tort did not take

place on Dr Pepper's premises or with its chattels.

In *Ehrens*, the Second Circuit confirmed that under New York law, a viable negligent

supervision claim must state that the tort took place "on the employer's premises or with the

employer's chattels."  385 F.3d at 235 (citing *D'Amico v. Christie*, 518 N.E.2d 896, 901-02 (N.Y.

1987)); *accord Haybeck*, 944 F.Supp at 332.  In *Ehrens*, the plaintiff acknowledged that alleged

assaults took place at the plaintiff's home and at the home of the accused.  385 F.3d at 236 ("Given

this admission, Ehrens . . . cannot satisfy the third element of a negligent supervision cause of

action . . . .").  Indeed, in *D'Amico*, the Court of Appeals of New York was clear that the duty of

employers to control their employees, once outside the scope of employment, "is limited to torts

committed by employees on the employer's premises or with the employer's chattels."  518 N.E.2d

at 901-02.

Here, the alleged assault was not committed on Dr Pepper's premises or with its chattels.

All of the alleged conduct occurred in New York City on public streets or in bars.  It started first

at a happy hour sponsored by Channel Factory, a third-party vendor, at Rock-and-Reilly's, a bar.

(56.1 St. ¶ 76.)  Dr Pepper did not pay for the drinks or rent the space, let alone own the property.

The actual alleged assault took place outside a midtown bar called Pig-N-Whistle.  (56.1 St. ¶¶

119 - 138.)  On this basis alone, Plaintiff's negligent supervision and retention claim must be

dismissed.

### III.   PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES

As discussed above, summary judgment should be granted to Dr Pepper.  Even if the Court were to deny Defendant's motion for summary judgment as to liability on any one of Plaintiff's claims, however, Dr Pepper is nevertheless entitled to summary judgment on Mucciarone's punitive damages claims under state tort law.

New York courts have held that punitive damages may be awarded against an alleged tortfeasor "only where the actions of the alleged tort-feasor constitute gross recklessness or intentional, wanton or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives." *Granite v. Newman*, 114 A.D.2d 1000, 1002 (N.Y. App. Div. 2d Dep't 1985).  Importantly, a company may only be held liable for punitive damages as a result of acts of its employees "*only where* management has authorized, participated in, consented to or ratified the conduct giving rise to such damages." *Loughry v. Lincoln First Bank, N.A.*, 494 N.E.2d 70, 74-75 (N.Y. 1986).  In addition, the manager must be someone with "a high level of managerial authority in relation to the nature and operation of the employer's business such that his participation in the wrongdoing renders the employer blameworthy, and arouses the institutional conscience for corrective action."  *Raedle v. Credit Agricole Indosuez*, No. 04 CIV. 2235 (TPG), 2010 WL 1506731, at *2 (S.D.N.Y. Apr. 14, 2010) (internal citations and quotations omitted), *vacated on other grounds*, 670 F.3d 411 (2d Cir. 2012).

Nothing in the record supports that a high level manager with Dr Pepper acted to authorize, participate in, consent to, or ratify Whitehead's conduct.  Neither Russ nor Eaton had sufficient managerial authority to render Dr Pepper liable for punitive damages.  (56.1 St. ¶ 27.)  Both were Media Marketing Managers, not even at the Director level.

Assuming *arguendo*, that Eaton and Russ were high enough managers (they were not), the record does not support any finding that they acted with gross recklessness or intentional wanton

or malicious conduct.  While they were at the first bar, Rock-and-Reilly's, neither Eaton nor Russ participated in the conversations where Whitehead told Plaintiff that she was beautiful and that he wished he could be with someone like her.  (56.1 St. ¶ 86.)  Moreover, neither Eaton nor Russ attempted to encourage Whitehead's behavior nor suggested that Whitehead's behavior was appropriate.  (56.1 St. ¶¶ 111, 112.)  In fact, while at Rock-and-Reilly's, Eaton attempted to divert Whitehead away from Plaintiff.  (56.1 St. ¶ 110.)

The very next morning, Eaton texted Plaintiff to check in on her.  (56.1 St. ¶ 139.)  Later that same day, Eaton sent Plaintiff a text message stating "I'm here for you and will always have your back, so if you feel uncomfortable or like it needs to be addressed further for any reason, please tell me.  Just want you to know I don't want to minimize it at all.  Just want to support you in any way I can."  (56.1 St. ¶ 142.)  At no point in time did Plaintiff ever ask Eaton to take any action in response to Whitehead's conduct.  (56.1 St. ¶ 143.)  In fact, Plaintiff told Eaton, "I don't think I want to address it further."  (56.1 St. ¶ 144.)

Nevertheless, Eaton reported the incident to Dr Pepper on the morning of September 5, 2017, the exact same day that Plaintiff reported the incident to her own human resources department.  (56.1 St. ¶ 150.)  Dr Pepper began an investigation and interviewed Whitehead the very next day, September 6, 2017.  (56.1 St. ¶ 152.)  Dr Pepper told Whitehead that his behavior was unacceptable and that he would be receiving a verbal warning pending further information about the incident.  (56.1 St. ¶ 154.)  Less than 24 hours later, on September 7, 2017, Dr Pepper terminated Whitehead.  (56.1 St. ¶¶ 159 - 161.)

In the time between the incident and Whitehead's termination, neither Plaintiff, nor anyone else, was put in harm's way, and Dr Pepper in no way indicated that it approved or condoned

Whitehead's conduct.  Accordingly, Mucciarone's claims for punitive damages in connection with her state law tort claims should be dismissed.[6]

## **<u>CONCLUSION</u>**

For all the foregoing reasons, Defendant's motion for summary judgment should be granted and Plaintiff's claims in the Complaint should be dismissed in their entirety.

Dated: New York, New York        SEYFARTH SHAW LLP
      June 11, 2019

                                    By:  */s/ Lorie Almon*
                                       Lorie E. Almon
                                       Kaitlyn F. Whiteside
                                       620 Eighth Avenue
                                       New York, New York 10018
                                       Tel: (212) 218-5500

                                       *Attorneys for Defendant Dr Pepper*
                                     *Snapple Group, Inc.*

---

[6] To the extent that the Court considers Initiative's request for entry of default judgment against Plaintiff in light of her spoliation of evidence, Dr Pepper joins in that request and incorporates it herein by reference.

57062909v.8