Ronald M. Green
Lauren Malanga Casey
Maxine A. Adams
250 Park Avenue
New York, New York 10177
(212) 351-4500
(212) 878-8600 (Fax)
*Attorneys for Defendants Initiative, Inc.*
*and the Interpublic Group of Companies, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|   |   |
|---|---|
| NANCY MUCCIARONE, | : |
| | : |
| Plaintiff, | : **CASE NO. 1:18-cv-00567 (PKC)** |
| | : |
| vs. | : **ECF CASE** |
| | : |
| INITIATIVE, INC., INTERPUBLIC GROUP, DR | : |
| PEPPER SNAPPLE GROUP, INC., and JUSTIN | : |
| WHITEHEAD, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# DEFENDANTS INITIATIVE, INC.'S AND THE INTERPUBLIC GROUP OF COMPANIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

PRELIMINARY STATEMENT ............................................................................. 1

RELEVANT FACTS ........................................................................................... 3

   I.   Plaintiff's Employment ............................................................................ 3

   II.  Complaints About Cronin's Management ............................................... 4

   III.  Alleged Harassment by Non-Employee Whitehead at a Vendor Sponsored Event .......... 5

   IV.  Initiative's Immediate Investigation and Supportive Response ........................... 6

   V.  The Team's Failure to Prepare for a Critical DPSG
       Presentation to Take Place Mid-October ....................................................... 8

   VI.  Plaintiff's Meeting with David Stopforth ..................................................... 11

   VII.  Plaintiff Voluntarily Resigns ................................................................. 12

ARGUMENT ..................................................................................................... 13

   I.   Summary Judgment Should be Granted for the Initiative Defendants
      on Plaintiff's Hostile Work Environment Claims as There is No Way
      to Impute Liability to Them for Whitehead's Alleged Conduct ........................... 13

   II.  Plaintiff's Retaliation Claims Fail as a Matter of Law ..................................... 17

     a.  Plaintiff Did Not Suffer an Adverse Employment Action ............................... 18

     b.  There is No Causal Connection Between Plaintiff's
        Protected Activity and the Alleged Adverse Actions .................................... 20

     c.  Initiative Defendants had Legitimate Business Reasons
        for Their Actions and Plaintiff Cannot Establish Pretext. ............................. 22

   III.  Plaintiff's Spoliation of Evidence .......................................................... 23

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Bd. of Educ.*,
   107 F. Supp. 3d 323 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 118 (2d Cir. 2016)......................22

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002)..........................................................................................23

*Andrus v. Corning, Inc.*,
   No. 14-CV-6667, 2016 U.S. Dist. LEXIS 131413 (W.D.N.Y. Sept. 26, 2016) ............... 15-16

*Bailey v. Brooklyn Hosp. Ctr.*, Index No. 160752/2013,
   2017 N.Y. Misc. LEXIS 24 (N.Y. Sup. Ct. Ct. N.Y. Cty. Jan. 4, 2017) ...............................16

*Barounis v. N.Y.C. Police Dep't*, No. 10-civ-2631 (SAS),
   2012 U.S. Dist. LEXIS 176477 (S.D.N.Y. Dec. 12, 2012) ....................................................18

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006)..........................................................................................................19

*Burns v. City of Utica*,
   590 F. App'x 44 (2d Cir. 2014) ........................................................................................15

*Byrnie v. Town of Cromwell*,
   243 F.3d 93 (2d Cir. 2001)...............................................................................................24

*Cat3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016)................................................................................25

*Chen v. City Univ. of N.Y.*,
   805 F.3d 59 (2d Cir. 2015)..............................................................................................23

*Curry v. Koch Foods, Inc.*, No. 2:16-cv-02008-SGC,
   2019 U.S. Dist. LEXIS 45477 (D.C. Ala. Mar. 20, 2019)................................................ 16-17

*Delaney v. Bank of Am. Corp.*,
   766 F.3d 163 (2d Cir. 2014).............................................................................................23

*Duch v. Jakubek*,
   588 F.3d 757 (2d Cir. 2009)............................................................................................13

*Dymskaya v. Orem's Diner of Wilton, Inc.*, No. 3:12-cv-00288 (JAM),
   2015 U.S. Dist. LEXIS 28891 (D. Conn. Mar. 10, 2015)....................................................20

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
  247 F.3d 423 (2d Cir. 2001)...........................................................................24

*Fusco v. HSBC Bank USA, N.A.*, Index No. 160752/2013,
  2018 N.Y. Misc. LEXIS 3204 (N.Y. Sup. Ct. N.Y. Cty. July 23, 2018)................................20

*Gorman v. Covidien, LLC*,
  146 F. Supp. 3d 509 (S.D.N.Y. 2015)...........................................................18, 20

*Hill v. Frontier Tel. of Rochester, Inc.*, No. 15-CV-6212-FPG,
  2018 U.S. Dist. LEXIS 39940 (W.D.N.Y. Mar. 12, 2018)..............................................14, 15

*Hoag v. Fallsburg Cent. Sch. Dist.*,
  279 F. Supp. 3d 465 (S.D.N.Y. 2017).............................................................19

*Holmes v. Astor Servs. for Children & Families*, No. 16-CV-2260 (CS),
  2017 U.S. Dist. LEXIS 130799 (S.D.N.Y. Aug. 16, 2017)................................................20

*Hsueh v. N.Y. State Dep't of Fin. Servs.*,
  No. 15 Civ. 3401, 2017 U.S. Dist. LEXIS 135863 (S.D.N.Y. Aug. 24, 2017) ................13, 14

*Jaquez v. N.Y.C. Health & Hosps. Corp.*, No. 14-CV-3393 (AJN),
  2016 U.S. Dist. LEXIS 3897 (S.D.N.Y. Jan. 11, 2016)...................................................21

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
  716 F.3d 10 (2d Cir. 2013)............................................................................17

*Kulak v. City of New York*,
  88 F.3d 63 (2d Cir. 1996)..........................................................................13

*Matter of Med. Express Ambulance Corp. v. Kirkland*,
  79 A.D.3d 886 (2d Dep't 2010) .................................................................13

*Paul v. Postgraduate Ctr. for Mental Health*,
  97 F. Supp. 3d 141 (E.D.N.Y. 2015) ...........................................................18

*Polo v. Xerox Corp.*, No. 10-CV-6288-FPG,
  2014 U.S. Dist. LEXIS 129038 (W.D.N.Y. Jan. 28, 2014) ..........................................13

*Russell v. N.Y. Univ.*, No. 1:15-cv-2185–GHW, 2017 U.S. Dist. LEXIS 111209
  (S.D.N.Y. July 17, 2017), *aff'd*, 739 F. App'x 28 (2d Cir. 2019).....................................15, 17

*Summa v. Hofstra Univ.*,
  708 F.3d 115 (2d Cir. 2013).........................................................13, 14, 15, 16

*Tomizawa v. ADT LLC*, No. 13-cv-06366 (MKB)(LB),
  2015 U.S. Dist. LEXIS 133649 (E.D.N.Y. July 17, 2015)...............................................22

*Tyson v. Town of Ramapo*,
   No. 17-CV-4990, 2019 U.S. Dist. LEXIS 48875 (S.D.N.Y. Mar. 25, 2019) ........................19

*Vazquez v. Southside United Hous. Dev. Fund Corp.*,
   No. 06-CV-5997, 2009 U.S. Dist. LEXIS 74480 (E.D.N.Y. Aug. 18, 2009)........................19

*Vega v. Hempstead Union Free Sch. Dist.*,
   801 F.3d 72 (2d Cir. 2015)...................................................................................................17

*Volpe v. N.Y.C. Dep't of Educ.*,
   195 F. Supp. 3d 582 (S.D.N.Y. 2016).................................................................................18

*Weeks v. N.Y. State Div. of Parole*,
   273 F.3d 76 (2d Cir. 2001), *aff'd*, 78 F. App'x 764 (2d Cir. 2003).......................................18

*Yarde v. Good Samaritan Hosp.*,
   360 F. Supp. 2d 552 (S.D.N.Y. 2005)..................................................................................20

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) .........................................................................................25

**Rules and Statutes**

Fed. R. Civ. P. 56...................................................................................................................13

N.Y.C. Admin Code § 8-107(13)(b)(2) ......................................................................................14

## PRELIMINARY STATEMENT

Defendants Initiative, Inc. ("Initiative") and The Interpublic Group of Companies, Inc. ("IPG") (collectively referred to as the "Initiative Defendants") submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The undisputed facts make clear that: (a) when Plaintiff reported alleged harassment by non-employee Justin Whitehead ("Whitehead") (an employee of Initiative's client), Initiative took immediate, decisive and effective corrective action; and (b) Plaintiff was subject to no retaliation thereafter.  Despite the ability to remain on her existing account, move to a different account, or move to a sister agency, Plaintiff chose to resign.  Thus, the Initiative Defendants respectfully submit the Complaint must be dismissed and judgment entered in the Initiative Defendants' favor as a matter of law.

With respect to Plaintiff's claim for sexual harassment, liability for non-employee Whitehead's conduct is governed by a negligence standard and cannot be imputed to Initiative (or its parent company, IPG).  The issue is whether Initiative took prompt remedial action in response to the alleged harassment.  It did.  It completed its investigation less than two days after Plaintiff's complaint and four business days from the incident, despite an intervening holiday weekend.  Plaintiff was permitted to work remotely until she was comfortable returning to the office.  Initiative immediately ensured neither Plaintiff nor any Initiative employee would work with Whitehead again.  Initiative informed its client Dr Pepper Snapple Group ("DPSG") of the seriousness of the allegations, and DPSG terminated Whitehead within two days of her complaint.  Indeed, Plaintiff testified that Human Resources ("HR") could not have acted more appropriately and her indirect supervisor, Linda Cronin ("Cronin"), could not have been more supportive.  Courts routinely grant summary judgment in cases such as this.

Demonstrating how seriously it took Plaintiff's complaint, Initiative took further proactive steps to improve the workplace for all employees.  HR checked in with Plaintiff to ensure she was okay and held an extra anti-harassment training session specifically to remind employees of their reporting obligations, even when they are friends with the complainant.  Initiative issued a written warning to Plaintiff's direct supervisor, colleague and close friend for not himself immediately reporting the incident.  Courts have repeatedly held that these types of proactive steps are evidence of an employer's appropriate remedial action.

Plaintiff's retaliation claim fares no better.  As an initial matter, it is counter-intuitive that Initiative would retaliate against Plaintiff when it was so supportive of her complaint.  Her accusation against Cronin is particularly puzzling given that Cronin was completely supportive of her complaint and stated that she did not care if it was the most senior person at DPSG, she wanted to be notified immediately of any harassment.

In any event, there was no adverse treatment.  Cronin did constructively criticize Plaintiff's work product deservedly when she failed to timely submit a complete draft for a critical presentation.  Moreover, Cronin spoke to Plaintiff in a stern manner and was terse in an email.  Such conduct, while unpleasant to Plaintiff, was in response to Plaintiff's undisputed failure to provide deliverables and wholly unrelated to her complaint.  Plaintiff also has no evidence to show that Initiative's explanation for the work-related criticism is legally adverse, let alone pretextual.  Employees who did not engage in protected activity were treated more harshly than Plaintiff, and Plaintiff and others complained of the same treatment by Cronin long before she engaged in protected activity.  Cronin placed the same demands she placed on Plaintiff on a number of employees on a number of issues.

Plaintiff's retaliation claims against David Stopforth ("Stopforth"), to whom she did not report and who had no involvement with the underlying complaint against Whitehead, make even less sense. Stopforth met with Plaintiff on his own accord (Cronin was unaware) and told her he could help her switch accounts because he was aware of the discord on the team and HR had told him of Plaintiff's desire to do so. At no time did Stopforth insist that she move or actually transfer her. To the extent she tries to characterize his vague comment "I don't think you want to do that" (his interpretation of her preference) as a threat, it does not advance her case. Her claim is purely speculative and not legally adverse since Plaintiff has no evidence that any alleged transfer would have happened or, if it did, would have been to a lesser position.

The Initiative Defendants submit that this matter, with no disputed material facts, deserves summary dismissal.

## RELEVANT FACTS[1]

### I.  Plaintiff's Employment

Initiative helps its clients grow their business through its advertising and media placements. SOF ¶ 1.[2] Plaintiff was employed by Initiative as an Associate Director in Communications Design for approximately nine months. SOF ¶ 7, 184. During that time she worked primarily on the DPSG account. SOF ¶¶ 8. Plaintiff reported to Nick Grainger (Director, Communications Design) ("Grainger"), a close friend with whom she worked previously and who referred her to Initiative. SOF ¶¶ 3, 4. She and Grainger often socialized during and outside of work. SOF ¶¶ 10-11. Grainger had a dotted line report to Cronin, the DPSG Client Lead, with whom he worked with on a daily basis. SOF ¶¶ 15-16. While Grainger had a solid line report to Stopforth, the Chief

---

[1] For the purposes of summary judgment only, the Initiative Defendants present these facts as "undisputed" and in the light most favorable to Plaintiff. The Initiative Defendants expressly reserve the right to challenge the veracity of each and every fact herein at trial or in any other proceeding.

[2] Citation to the Initiative Defendants' Rule 56.1 Statement of Undisputed Facts are referred to as "SOF ¶__".

Communications Design Officer responsible for overseeing many accounts at Initiative's different offices, Grainger did not work with him regularly.  SOF ¶ 17.

## II.   Complaints About Cronin's Management

In May 2017, Initiative hired Cronin as the client lead for the DPSG account, which was moving to N.Y. from Initiative's L.A. offices for a "new edge" and to get a "fresh perspective[.]"  SOF ¶¶ 13, 20.   Plaintiff and other Initiative employees who serviced the DPSG account had frustrations with Cronin from the outset of her employment.  SOF ¶ 21.  They complained to each other in June and July 2017 that Cronin imposed unrealistic deadlines, waited until the last minute to review drafts, was unreliable in attending meetings with the group, disorganized, demanding, and critical.  SOF ¶¶ 22-28.  In fact, the team raised concerns to management about Cronin's style as early as July 2017.  SOF ¶ 31.  Stopforth attributed these concerns to the fact that Cronin had been the client for much of her career, as opposed to other managers who had always worked at an agency and were more hands-on.  SOF ¶ 32.  Grainger and Plaintiff were also unhappy with Cronin's decision, shortly after she joined the team, to hire Mark Thomas ("Thomas") for the Director of Communications Design position instead of promoting their friend, Agatha Haney ("Haney").  SOF ¶ 33.  In July and August 2017, Plaintiff and Grainger expressed concern to each other that Cronin was going to replace them.  SOF ¶¶ 34-35.

In July 2017, HR and senior management discussed the dynamics on the team, including Cronin's management style.  SOF ¶ 37.  To address these issues, Initiative planned a team building off-site to be held September 11, 2017.  SOF ¶ 38.  Even after this off-site event, however, Plaintiff and Haney complained to each other that Cronin continued to make unreasonable demands.  SOF ¶ 39.  Plaintiff and Haney also knew that Initiative was contemplating hiring a coach for Cronin in early October 2017, but they did not believe a coach would change Cronin's management style, and they, along with a number of their colleagues, continued to complain to each other about

Cronin.  SOF ¶¶ 39-45.[3]  For example, on September 29, 2017, Nicole Sirubi stated, and Plaintiff agreed, that Cronin "threw [Sirubi] under the bus" and that Cronin "doesn't read her emails and then pick[s] the first person she [could] blame."  SOF ¶ 41.

## III.   Alleged Harassment by Non-Employee Whitehead at a Vendor Sponsored Event

On August 29, 2017, during a happy hour, sponsored by a vendor, Channel Factory, at a bar selected by that vendor, with the vendor's clients and sales representatives present, Whitehead pursued Plaintiff romantically:  he told Plaintiff she was pretty, put his arm around her, allegedly put his hand on her upper thigh, and said that he was in an open marriage in front of Grainger.  SOF ¶¶ 49-51.  Grainger did not encourage Whitehead's conduct during the happy hour event but instead tried to divert Whitehead's attention away from Plaintiff.  SOF ¶ 52.  DPSG employees, Elizabeth Eaton ("Eaton") and Anastasia Russ, were also present and witnessed some of Whitehead's behavior, which they thought was out of character.[4]  SOF ¶ 53.

Sometime shortly after midnight, Plaintiff, Grainger, and their colleague, Timothy Buckland ("Buckland"), among others, went to another bar – Pig 'n Whistle.  SOF ¶ 54.  Whitehead tagged along uninvited.  SOF ¶ 55.  While there, Grainger confronted Whitehead regarding his earlier behavior toward Plaintiff.  SOF ¶ 56.  According to Plaintiff, Grainger "scolded" Whitehead stating things like "that wasn't cool."  SOF ¶ 57.  Whitehead then apologized to Plaintiff and did not engage in any inappropriate behavior at Pig 'n Whistle.  SOF ¶ 58.  In fact, Plaintiff testified that Whitehead seemed genuinely apologetic, that she felt "more comfortable" because his behavior "instantly changed" and she had no further concerns about him.  SOF ¶ 59.

---

[3] Ultimately, Initiative hired a coach to work with Cronin, which improved her relationship with the DPSG team.  SOF ¶ 46.

[4] Cronin also attended the happy hour event but only stayed for a short time and did not witness any alleged harassment.  SOF ¶ 48.

In the early morning hours of August 30, 2017, Whitehead asked Plaintiff to accompany him outside the bar to point him in the direction of his hotel and she went outside with him alone. SOF ¶ 60.  Whitehead allegedly tried to kiss her, and grabbed her breast and buttocks.  SOF ¶ 62.

When Plaintiff went back inside the bar, she told Grainger about Whitehead's behavior. SOF ¶ 64.  She remained at the bar after Grainger left, staying until after 4:00 a.m. on Wednesday, August 30, 2017.  SOF ¶ 65.  She left at around the same time as Buckland texting him "Love you lots" and "I appreciate you so much!"  SOF ¶ 66.

**IV.  Initiative's Immediate Investigation and Supportive Response**

With Grainger's permission, Plaintiff worked from home on August 30, 2017.  SOF ¶ 67. That night, Plaintiff left town for the Labor Day weekend.  SOF ¶ 68.  Initiative's offices were closed Friday through Monday for the Labor Day holiday.  SOF ¶ 69.  Plaintiff, therefore, had no contact at work with Whitehead following the incident.  SOF ¶ 70.  Grainger did not report the incident and, on August 31, 2017, sent Plaintiff a message that he, Plaintiff, and Eaton (of DPSG) should all coordinate reporting of the incident so they had their "ducks in a row."  SOF ¶ 71. Plaintiff returned to work after the holiday weekend on Tuesday, September 5, 2017 and reported the incident to HR that same day.  SOF ¶ 72.

HR immediately encouraged Plaintiff to work remotely and conducted an investigation. SOF ¶¶ 73-74.  Cronin learned of the incident from HR.  SOF ¶ 76.  According to Plaintiff, she was "very supportive" of Plaintiff," "really is great in situations like this" and "she was so motherly."  SOF ¶¶ 77-78.  Plaintiff testified that Cronin said that she did not care if it was her senior contact at DPSG, she would want any harassment reported directly to her immediately.  SOF ¶ 80.  She supported Plaintiff taking as much time off as she needed after the incident.  SOF ¶ 81. Cronin also immediately advised Plaintiff that while she could not guarantee that DPSG would fire Whitehead (as they in fact did), she could guarantee that he would no longer work with

6

Initiative.  SOF ¶ 82.  On September 6, 2017, the day after Plaintiff made her report, HR told her that Whitehead would have no further contact with her or any Initiative employees.  SOF ¶ 83.

On September 7, 2017, Cronin advised DPSG of Plaintiff's allegations and requested that Whitehead no longer work with any Initiative employees.  SOF ¶ 84.  On September 8, 2017, DPSG informed Cronin that they had terminated Whitehead's employment.  SOF ¶ 85.  HR informed Plaintiff that same day.  SOF ¶ 86.  HR also asked Plaintiff whether she would like to remain on the DPSG team and if she would like to continue working with Grainger.  SOF ¶ 87-88.  Plaintiff said yes to both.  SOF ¶ 89.  Plaintiff explained that she had met with Grainger and she "underst[ood] where he was coming from in not telling HR" and that she "truly believe[d] that he was trying to do right by [her]" in not reporting the incident immediately, despite his being misguided.  SOF ¶ 92.

Plaintiff stated that HR could not have done anything better or faster and thought that "they handled it well."  SOF ¶ 93.  More specifically, Plaintiff believed that Danielle Dorter (Mediabrands HR responsible for the investigation) ("Dorter") was "very supportive" and was "great[.]"[5]  SOF ¶ 94.  In fact, Plaintiff said the allegation in her complaint that HR minimized the incident was incorrect.  SOF ¶ 95.  Cronin was happy Plaintiff decided to remain on the DPSG team.  SOF ¶ 96.

Following the investigation, after Plaintiff notified HR she would like to continue working with Grainger, Grainger received a formal written warning for failing to report the incident, which included a requirement for additional training.  SOF ¶ 97.  HR continued to check in with Plaintiff periodically to make sure she was okay, which she said she was.  SOF ¶ 98.  HR also conducted an anti-harassment training session for all employees, particularly to remind them of reporting

---

[5] Initiative is a brand within Mediabrands and IPG is the parent company of Mediabrands.  SOF ¶ 6.

obligations even when friends with the complainant.  SOF ¶ 100.  Stopforth was not involved in the investigation.  SOF¶ 101.

## V.     The Team's Failure to Prepare for a Critical DPSG
##          Presentation to Take Place Mid-October

Beginning months earlier, the DPSG team was prepping for an important presentation that Cronin was scheduled to make to DPSG senior management in Dallas, Texas in October on the 2018 media plan.  SOF ¶ 103.  There was a lot of work to be done and, on October 3, 2017, Plaintiff told her then boyfriend Andrew Dawson ("Dawson") "I am so over this I don't want to do any of this anymore" and Dawson responded "I know, and you won't for long[.]"  SOF ¶ 104-105.  The next evening, October 4, 2017, Plaintiff sent a draft presentation to Cronin for a run-through with the client on Monday, October 9, 2017.  SOF ¶ 106.  The draft had incomplete sections that stated "Linda to fill out."  SOF ¶¶ 107.  Cronin emailed Plaintiff and Grainger the next day asking them to fill in the information.  SOF ¶ 108.  Because Grainger was on vacation, Plaintiff responded that she and Grainger were under the impression that Cronin was going to fill in the slides.  SOF ¶ 109.

Cronin sent an email in response (hereinafter the "October 5th Email") stating, in relevant part, that:

> Let me be really clear, my job is not to put presentations together . . . you
> have a format . . . .  If help is needed  . . .  by all means collaborate with
> Brad.  If you're struggling with flow, of course I'm here to help.  I am not
> a deck creator nor are you a coordinator.  You are an extremely talented
> person who has amazing capabilities and what is expected is for you to
> begin the process with your thinking so we can pull apart and recreate today.
> Pulling it together later today is fine.  Where is your team?

SOF ¶ 111.  Plaintiff was offended by the October 5th Email, which she found condescending. SOF ¶ 112.  Plaintiff shared the October 5th Email with Dawson, who noted that Cronin was "not responsible for decks" and that the email was not that bad.  SOF ¶ 114.  Plaintiff, however, was of the view that her supervisors were not allowed to give her constructive feedback, but instead should

be "on thin ice" because of Whitehead's conduct.  SOF ¶ 116.  When asked at her deposition what she meant when she told Dawson that she wanted to "stick it to [Cronin]" following the October 5th Email, she responded "Nick was out.  We were understaffed.  You know, I am sorry for saying this on camera but just fuck you.  Don't talk to me like that."  SOF ¶ 117.  Cronin did not receive the completed presentation from Plaintiff or Grainger in time for her Monday, October 9, 2017 call with the client and, as a result, she cancelled that call.  SOF ¶ 119-120.  Cronin blamed Grainger for the incomplete draft as it was ultimately his responsibility as the Director.  SOF ¶ 121.

Plaintiff claims that Cronin used an extremely stern tone with her in front of others on October 6, 2017, telling her that her work was deficient without providing any actionable feedback.  SOF ¶ 122.  It is undisputed that Cronin did not yell or use any foul language.  SOF ¶ 122.  Plaintiff alleges that on the same day, Cronin told Plaintiff that the client hated the 7-Up presentation that she and Grainger previously worked on.  SOF ¶ 123.  She also testified that her colleague told her that Cronin told her not to help Plaintiff with the deck.  SOF ¶ 124.  Plaintiff alleges no adverse actions prior to October 5th Email.  SOF ¶ 102.

On October 9, 2017, Cronin met with HR and management (Stopforth, Kris Magel (Initiative President East Coast), and Stephanie Solomon (Initiative HR), Dorter, and Jessica Torres-Soto ("Torres-Soto")) to discuss the issues on the DPSG team, including the unfinished deck.  SOF ¶ 126.  Cronin raised a significant budget mistake made by Thomas and Haney, which caused incorrect information to be provided to the client.  SOF ¶ 127.  Cronin, Dorter, and Stopforth decided that Haney and Thomas would receive formal written warnings as a result.  SOF ¶ 127.  Cronin also discussed Grainger's poor leadership and continued lack of respect for her authority, as illustrated by his failure to notify her of his vacation or provide a complete deck.  SOF ¶¶ 110, 128-129.  Because this was the culmination of months of friction between Cronin and

Grainger, and it now was affecting client deliverables, Magel and Stopforth decided to remove Grainger from the DPSG account.  SOF ¶¶ 130-131.  The meeting resulted in no adverse actions regarding Plaintiff.

On Friday, October 13, 2017, Stopforth told Grainger that he was removed from the DPSG team immediately and could stay to work on new business for two weeks to see if any opportunities on a different team arose.  SOF ¶¶ 134-35.  He chose to move to new business.  SOF ¶ 136. Grainger expressed his continued disappointment with Cronin, which had been ongoing since she joined.  SOF ¶ 137.

Immediately after Stopforth met with Grainger, he requested to meet with Plaintiff.  SOF ¶ 138.  He suspected she would be upset about Grainger's departure from the team given her close relationship with him.  *Id*.  Stopforth viewed Plaintiff as a valued employee who he wanted to retain, and he did not want any further upheaval on the DPSG account.  SOF ¶ 140.  Cronin learned about Stopforth's meeting with Plaintiff from HR.  SOF ¶ 141.  Stopforth had not been involved in the underlying Whitehead Complaint, and thus in October 2017, he knew only that there had been a complaint but did not know any specifics.  SOF ¶¶ 101, 142.  Plaintiff told Stopforth that she was out of the office on a pre-planned trip and would like to meet with HR before meeting with him.  SOF ¶ 143.  Stopforth respected her wishes.  SOF ¶ 144.  Because Plaintiff left early on October 13, 2017, she was not present for the team meeting when Grainger's departure was announced.  SOF ¶ 145.

On Saturday, October 14, 2017, the DPSG team was working to finish the deck for the in-person presentation that week.  SOF ¶ 146.  Lars Hyman (Head of Communication Design-East) ("Hyman") stepped in to fill the gap left by Grainger's departure.  SOF ¶ 147.  Hyman and Cronin worked throughout the weekend.  SOF ¶ 148.  Plaintiff alleges in her Complaint that Cronin made

unreasonable work demands on her at that time, but testified that she did not work that weekend, came in late on Monday, and was initially emailed by Hyman, not Cronin. SOF ¶¶ 149-51. At no point during that weekend was Plaintiff reprimanded by Cronin. SOF ¶ 152. Just the opposite – Cronin apologized to Plaintiff that she had not heard about Grainger's departure when it had been announced to the team. SOF ¶ 153.

On Monday, October 16, 2017, Plaintiff met with Dorter, who once again Plaintiff testified was incredibly supportive of her. SOF ¶ 155. Plaintiff talked about the issues she was having with Cronin, which were similar to the ongoing issues between Cronin and the entire team. SOF ¶¶ 156-57. Plaintiff never told Dorter that she believed that Cronin's conduct toward her had anything to do with her complaint about Whitehead. SOF ¶ 158. Plaintiff told Dorter that she, as well as others, could no longer work with Cronin and that she was interested in exploring other accounts. SOF ¶ 159. Following that meeting, Plaintiff emailed Dorter and Torres-Soto with her complaints against Cronin, including the fact that no one reached out to tell her about her close friend Grainger's removal. SOF ¶ 160. Dorter reminded her that she refused to meet with Stopforth until she met with HR, and Stopforth was waiting to discuss this very topic. SOF ¶ 162.

Dorter informed Stopforth about her meeting with Plaintiff and that Plaintiff asked Dorter to look into other opportunities because she did not want to continue working with Cronin. SOF ¶ 163.

## VI.   Plaintiff's Meeting with David Stopforth

Stopforth met with Plaintiff on October 17, 2017 because he did <u>not</u> want her to leave Initiative as a result of Grainger being removed from the team and told her "it would be a shame if you left because of this situation[.]" SOF ¶ 164. Stopforth did not discuss this meeting with Cronin who was in Dallas at the time for the DPSG presentation. SOF ¶ 165. Plaintiff told Stopforth that she was upset that Grainger had left and was angry about the team dynamic. SOF

¶ 166.  Stopforth and Plaintiff discussed other accounts with positions at Plaintiff's level.  SOF ¶¶ 167-68.  Plaintiff did not ask Stopforth if she could stay on the DPSG account, or say that she felt that she had been penalized for reporting harassment.  SOF ¶ 169.  Instead, Plaintiff asked a hypothetical question "What if I want to stay on the account," SOF ¶ 170, to which Stopforth responded in sum and substance "I don't think you want to do that" because he knew from Dorter that Plaintiff did not want to work with Cronin and therefore was interested in exploring other accounts.  SOF ¶¶ 171-72.  Plaintiff did not tell Stopforth that she wanted to remain on the DPSG account.  SOF ¶ 173.  At the end of that meeting, Stopforth and Plaintiff agreed to meet again to discuss the potential other accounts.  SOF ¶ 174.

In the evening of October 17, 2017, Stopforth sent Plaintiff a follow-up e-mail, asking to hear from her before he took any steps regarding other options.  SOF ¶ 177.  That same evening, Stopforth sent two emails to others requesting additional assistance for Plaintiff in her role on the DPSG account, as she had expressed that she was having difficulty with workload without Grainger.  SOF ¶ 176.

## VII.   Plaintiff Voluntarily Resigns

On October 18, 2017, Plaintiff did not go to work.  SOF ¶ 180.  Instead, at 11:36 a.m., her attorney sent a letter to the Initiative Defendants alleging retaliation for the first time and stating that Plaintiff understood that Stopforth's intention was to remove her from the DPSG team.  SOF ¶ 181.  Later that day, the Initiative Defendants explained to Plaintiff's lawyer that there was no retaliation, it was not Stopforth's intention to remove Plaintiff from the DPSG team, that Plaintiff still had a role at Initiative, either remaining on the DPSG team or moving to another account, and that the Initiative Defendants wanted her to remain on the account.  SOF ¶¶ 182-83.  IPG's counsel also offered to transfer her to another IPG agency.  *Id.*  Plaintiff rejected all of these options and said that she would not be returning to work at Initiative.  SOF ¶ 184.

**ARGUMENT**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To oppose summary judgment, the non-moving party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

**I.    Summary Judgment Should be Granted for the Initiative Defendants on Plaintiff's Hostile Work Environment Claims as There is No Way to Impute Liability to Them for Whitehead's Alleged Conduct**

To prevail on a hostile work environment claim under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYHRL"), Plaintiff must establish that she was subjected to sexual harassment; that the conduct was severe and pervasive; and "'that there is a specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). Even assuming that Plaintiff's allegations amount to a hostile work environment, the alleged conduct cannot be imputed to Initiative or IPG. Under Title VII and the NYSHRL, to impute liability to an employer for the conduct of a non-employee, courts use the same standard as for non-supervisory co-worker harassment.[6] *Summa*, 708 F.3d at 124. Thus, the plaintiff must demonstrate that either: (i) the employer failed to provide a reasonable avenue of complaint; or (ii) the employer knew of the conduct and failed to take appropriate remedial action. *Hsueh v. N.Y. State Dep't of Fin. Servs.*, No. 15 Civ. 3401, 2017 U.S. Dist. LEXIS 135863, at *7 (S.D.N.Y. Aug. 24, 2017). In determining the sufficiency of an employer's response, courts look to whether the response was "'immediate

---

[6] The NYSHRL analysis is largely similar to Title VII requiring the plaintiff to establish that the employer became a party to the action by "encouraging, condoning or approving" the discriminatory actions. *See Matter of Med. Express Ambulance Corp. v. Kirkland*, 79 A.D.3d 886, 887 (2 Dep't 2010) (citations omitted); *Polo v. Xerox Corp.*, No. 10-CV-6288-FPG, 2014 U.S. Dist. LEXIS 129038, at *15 (W.D.N.Y. Jan. 28, 2014).

or timely and appropriate in light of the circumstances, <u>particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior</u>."' *Summa*, 708 F.3d at 124 (emphasis added; citation omitted).  Under the New York City Human Rights Law, N.Y.C. Admin Code § 8-101, *et seq.* ("NYCHRL"), an employer is liable for harassment where the employer knew about the harassing conduct and "acquiesced in such conduct or failed to take immediate and appropriate corrective action."  N.Y.C. Admin Code § 8-107(13)(b)(2).

Clearly, Initiative provided a reasonable avenue of complaint as Plaintiff availed herself of the complaint procedure by raising the matter with HR on her first day back in the office after the incident.  *See Hill v. Frontier Tel. of Rochester, Inc.*, No. 15-CV-6212-FPG, 2018 U.S. Dist. LEXIS 39940, at *18-19 (W.D.N.Y. Mar. 12, 2018).

Additionally, this is a textbook example of the kind of prompt remedial action the law requires.  Regardless of the consequences, Initiative put at risk its own business relationship with its client because it hoped and expected it would do the right thing, and they did.  No reasonable juror could, consistent with Plaintiff's own testimony, possibly find that Initiative failed to take prompt remedial action (essentially a negligence standard) based on the below facts:

- HR conducted and concluded its investigation **in less than 2 days** from when Plaintiff raised the complaint and **within <u>4 business days</u> of the alleged harassment.**  SOF ¶¶ 62, 69, 72, 83.  *See Summa*, 708 F.3d at 125 (investigation within 48 hours of Plaintiff's complaint was immediate).

- HR advised Plaintiff in **less than 2 days** of her complaint and **within 4 business days of the incident** that neither she nor any other Initiative employee would work with Whitehead again.  SOF ¶ 82.  *See Hsueh*, 2017 U.S. Dist. LEXIS 135863 (employer acted appropriately and promptly where the offending coworker was placed on administrative leave and the employer investigated plaintiff's complaint).

- Initiative management (specifically Cronin), regardless of the potential business risk, advised DPSG of the allegations and that Whitehead would not be permitted to work with any Initiative employees within 2 days of the complaint and within 5 business days of the incident.  SOF ¶¶ 62, 69, 72, 84.

- The Initiative Defendants hoped and expected that DPSG would take prompt remedial action with respect to the information provided by Cronin, and they did.  DPSG fired Whitehead within three business days from Plaintiff's complaint to Initiative.  SOF ¶ 86.

- Plaintiff's own deposition testimony was that HR could not have done anything better and that Cronin was 100% supportive.  SOF ¶¶ 77-79, 93-94.

- Initiative gave Plaintiff the option to stay on the DPSG account or transfer accounts and repeatedly checked in with her to see how she was doing for weeks after the complaint.  SOF ¶¶ 87-88, 93, 98.

- HR conducted a training session as a result of the incident.  SOF ¶ 100.  *See Summa*, 708 F.3d 115 (granting summary judgment where defendant investigated each complaint and responded proportionally with remedial action, noting that defendant proactively trained individuals after alleged incidents was further proof of defendant's appropriate response).

- HR issued a warning to its manager for breach of company policy for not immediately reporting the alleged harassment.  SOF ¶ 97.  *Russell v. N.Y. Univ.*, No. 1:15-cv-2185–GHW, 2017 U.S. Dist. LEXIS 111209, at *80 n.12 (S.D.N.Y. July 17, 2017), *aff'd*, 739 F. App'x 28 (2d Cir. 2019) (plaintiff's argument that liability for hostile environment should be imputed to company because supervisor failed to follow company's reporting policies failed because "the relevant legal question is whether [defendant] took reasonable steps after it knew of harassment" not whether it followed its own policies).

- Plaintiff was permitted to work from home the day after the alleged incident and thus never had any contact with the accused again while employed by Initiative.  SOF ¶ 67. *Hill*, 2018 U.S. Dist. LEXIS 39940, at *20-23 (granting summary judgment where the employer ensured after the complaint that the alleged harasser would no longer work with plaintiff).

Second Circuit case law is abundantly clear that the above conduct more than counts as appropriate remedial action.  In fact, courts have consistently granted summary judgment when employers have acted less promptly and less decisively than Initiative did here.  *See Burns v. City of Utica*, 590 F. App'x 44, 48 (2d Cir. 2014) (summary judgment granted when employer suspended the alleged harasser, **nine days** after the employee complained.); *see also Andrus v. Corning, Inc.*, No. 14-CV-6667, 2016 U.S. Dist. LEXIS 131413, at *19-20 (W.D.N.Y. Sept. 26, 2016) (summary judgment granted when employer investigated the complaint and disciplined alleged harasser within **<u>16 days</u>**.).

In determining whether appropriate remedial action was taken, courts look not only at the promptness of an investigation and resultant remedial steps, but also to proactive steps an employer takes to create a better environment for all employees, such as anti-harassment training. *Summa*, 708 F.3d at 125. Here, as in *Summa*, Initiative not only conducted training, but also – regardless of how DPSG chose to address its employee – determined that Whitehead would never work with Initiative's employees again.

Given that the Initiative Defendants ensured that Plaintiff had no further contact with Whitehead following the incident and conducted the investigation within two days, Plaintiff also cannot establish liability against the Initiative Defendants under NYCHRL. *See Bailey v. Brooklyn Hosp. Ctr.*, Index No. 160752/2013, 2017 N.Y. Misc. LEXIS 24, at *2-3 (N.Y. Sup. Ct. Ct. N.Y. Cty. Jan. 4, 2017) (granting summary judgment where the employee made a complaint weeks after the incident, the employer investigated and terminated the harassing supervisor six days after plaintiff's initial report).

Any argument that Grainger's failure to report Whitehead's alleged conduct prevents summary judgment is without merit. The correct line of inquiry is whether Initiative took prompt remedial action, which it indisputably did, including Grainger permitting Plaintiff to work from home on August 30, 2017, so she had no contact with her alleged harasser. SOF ¶¶ 67, 70. (*See, e.g.*, *Summa* where company was found to have taken corrective action even where the coach discouraged Summa from reporting to the University's Public Safety Department because it would have a negative effect on football program); *Curry v. Koch Foods, Inc.*, No. 2:16-cv-02008-SGC, 2019 U.S. Dist. LEXIS 45477, at *38-39 (D.C. Ala. Mar. 20, 2019) ("failure to escalate is insufficient to create a genuine issue as to whether the action the employer did take in response to the complaint was reasonably calculated to prevent further harassment"); *Russell*, 2017 U.S. Dist.

LEXIS 111209, at *80 n.12 (non-compliance with company reporting policy is <u>not</u> a ground for imputation of conduct on hostile environment).   Moreover, Plaintiff specifically told HR that Grainger was trying to "do right by her."  SOF ¶ 92.[7]

Accordingly, because, in Plaintiff's own words, Initiative "handled [the investigation] well," summary judgment on Count I of the Complaint should be granted in the Initiative Defendants' favor.

## II.    Plaintiff's Retaliation Claims Fail as a Matter of Law

To set forth a *prima facie* retaliation claim under Title VII and the NYSHRL, Plaintiff must demonstrate that:  (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse action; and (4) there was a causal connection between the protected activity and the adverse action.[8]  *See Kelly*, 716 F.3d at 14.

Plaintiff cannot meet the third and fourth elements of her *prima facie* case.  Even if she could, the Initiative Defendants can articulate a legitimate, nondiscriminatory reason for its actions and Plaintiff cannot demonstrate that such proffered reason is pretext for retaliation.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).

The NYCHRL "prohibits an employer from engaging in any activity 'reasonably likely to deter a person from engaging in [protected] action,'" but is "not a general civility code" and a plaintiff must demonstrate that the conduct was caused at least in part by retaliatory motives.  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 534 (S.D.N.Y. 2015) (citations omitted).

---

[7] To the extent that Plaintiff will contend that Initiative failed to take appropriate remedial action on the night of the incident with Whitehead, that allegation is unfounded.  Grainger told Whitehead to leave Plaintiff alone, which she felt was a reasonable response that was effective while at the second bar.  *Russell*, 2017 U.S. Dist. LEXIS 111209, at *88 (Title VII hostile work environment claims "do not turn on an absolute duty to stop the harassment").

[8] The standard under the NYSHRL is analyzed using the same framework as Title VII.  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

Plaintiff's retaliation claim against the Initiative Defendants therefore fails under federal, state, and city law.

### a. Plaintiff Did Not Suffer an Adverse Employment Action.

The crux of Plaintiff's retaliation claim is that Cronin was condescending once, criticized her work twice, spoke to her in a stern manner, and told someone not to help her with her deck.[9] SOF ¶¶ 108-09, 119-120.  Criticism, without disciplinary action, however, is not legally "adverse." *Volpe v. N.Y.C. Dep't of Educ.*, 195 F. Supp. 3d 582, 597 (S.D.N.Y. 2016) ("Criticism of an employee in the course of evaluating and correcting her work is not an adverse employment action.") (citing *Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001), *aff'd*, 78 F. App'x 764 (2d Cir. 2003)); *Barounis v. N.Y.C. Police Dep't*, No. 10-civ-2631 (SAS), 2012 U.S. Dist. LEXIS 176477 at *43-49 (S.D.N.Y. Dec. 12, 2012) (granting summary judgment to employer where evidence that defendants called plaintiff a "criminal" and a "thief," told plaintiff he needed to retire or quit, yelled at plaintiff in front of peers, and made a couple of race-related comments failed to allege a materially adverse employment action).

Here, while Plaintiff claims the October 5th Email was legally adverse and points to it as her best evidence of retaliation, even Plaintiff's now husband noted at the time that Cronin is "not responsible for decks" and that the email might not "be bad enough to warrant anything."  SOF ¶¶ 113-14.  In fact, Plaintiff seemed to be of the view that because she filed a complaint, her supervisors were not allowed to give her constructive feedback, but instead should be "on thin ice" because of Whitehead's conduct.  SOF ¶ 116.  Clearly, that is not the law.  While Plaintiff alleges Cronin criticized her, Cronin told her she was talented and continued to thank her for her efforts

---

[9] While Plaintiff's Complaint also alleges that Cronin began to impose unreasonable deadlines in October, Plaintiff admits that Cronin frequently required difficult deadlines on the entire DPSG team throughout her tenure at Initiative. SOF ¶¶ 26-30.  *See Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 196-97 (E.D.N.Y. 2015) (determining increased workload is not an adverse action) (collecting cases).

through the date of her resignation.  SOF ¶ 132-333.  In fact, Cronin thought that Plaintiff was a good worker throughout her tenure at Initiative.  SOF ¶ 177.

Plaintiff also cannot establish that Stopforth's comment "I don't think you want to do that" in response to Plaintiff's hypothetical question about remaining on the DPSG account constitutes an adverse employment action.  SOF ¶¶ 171-72.  Stopforth was acknowledging that he knew that Plaintiff had an issue with Cronin.  Plaintiff acknowledges that she informed Initiative HR prior to meeting with Stopforth that she was interested in exploring other positions because she no longer wanted to work with Cronin.  SOF ¶ 159.  Moreover, Stopforth took no steps to initiate a transfer, or even determine which positions were available, and instead stated that he would not take any action until she confirmed that is what she wanted.  SOF ¶ 175.  Courts have held that *actual transfers* are not adverse.  *See Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 486-87 (S.D.N.Y. 2017) (granting summary judgment on the grounds that transfer was not adverse as it was not "tantamount to a demotion") (collecting cases).  Those cases make clear that Stopforth's comment here likewise is not an adverse action.

Moreover, Stopforth did not provide a specific position to which Plaintiff was allegedly being forced to transfer and thus any claim the position would be adverse is purely speculative. SOF ¶¶ 167, 174.  *See Vazquez v. Southside United Hous. Dev. Fund Corp.*, No. 06-CV-5997, 2009 U.S. Dist. LEXIS 74480, at *37-38 (E.D.N.Y. Aug. 18, 2009) ("an individual is protected 'not from all retaliation, but from retaliation that produces an injury or harm.'") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 U.S. Dist. LEXIS 48875, at *30-31 (S.D.N.Y. Mar. 25, 2019). To the contrary, Plaintiff was explicitly told that she could remain on the DPSG account, or move to another account, at the same title and rate of pay.  SOF ¶ 182-83.  She was of course entitled to

reject those options, but her choice to do so is not something for which the Initiative Defendants are responsible. [10]

### b. There is No Causal Connection Between Plaintiff's Protected Activity and the Alleged Adverse Actions

Even if Plaintiff could show an adverse action, which she clearly cannot, she cannot show a causal connection between her protected activity and the alleged adverse actions for several reasons.

First, there was an intervening event that defeats causation.  The few alleged adverse actions by Cronin occurred on and immediately following October 5, 2017, when Plaintiff failed to provide a presentation deck for Cronin's review related to an important upcoming client presentation.  SOF ¶¶ 103, 106-07.  This undisputed evidence defeats any inference of causation from temporal proximity alone.  S*ee Holmes v. Astor Servs. for Children & Families*, No. 16-CV-2260 (CS), 2017 U.S. Dist. LEXIS 130799, at *23-24 (S.D.N.Y. Aug. 16, 2017) ("an inference of causation is defeated 'if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory [employment action]'") (quoting *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 662 (S.D.N.Y. 2005)).

Second, Cronin's demanding standards and quick deadlines had occurred ever since Cronin began her employment at Initiative and with everyone on the team –these are characteristics of

---

[10] Notably, Plaintiff does not plead constructive discharge.  To the extent she is alleging she was forced to quit, there are no acts to which she can point that establishes that the Initiative Defendants intended for her to resign.  *See Gorman*, 146 F. Supp. 3d at 525 ("'[a]n employee who fails to explore alternative avenues offered by [his] employer before concluding that resignation is the only option cannot make out a claim of constructive discharge.") (citations omitted).  Moreover, dissatisfaction regarding work assignments, unfair criticism, and merely facing difficult working conditions do not create intolerable conditions.  *See Id*. ("constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer.").  For the same reasons as noted above, Plaintiff could not establish a constructive discharge claim under the NYCHRL, which articulates the same standard as Title VII. *See Fusco v. HSBC Bank USA, N.A.*, Index No. 160752/2013, 2018 N.Y. Misc. LEXIS 3204, at *27-28 (N.Y. Sup. Ct. N.Y. Cty. July 23, 2018).  Where a party is "subject to neither an actual nor a constructive discharge," the award of back pay damages is not available.  *Dymskaya v. Orem's Diner of Wilton, Inc.*, No. 3:12-cv-00388 (JAM), 2015 U.S. Dist. LEXIS 28891 at *27-29 (D. Conn. Mar. 10, 2015) (collecting cases).

Cronin's work style completely unrelated to Plaintiff's complaint against Whitehead.  SOF ¶¶ 21-30.   Even  under  the  more  lenient  NYCHRL  standard,  Cronin's  demands  and  allegedly unreasonable deadlines, which, according to Plaintiff, began before Plaintiff's complaint, are not actionable.  *See Jaquez v. N.Y.C. Health & Hosps. Corp.*, No. 14-CV-3393 (AJN), 2016 U.S. Dist. LEXIS 3897, at *35-37 (S.D.N.Y. Jan. 11, 2016) (dismissing plaintiff's NYCHRL claim where criticism  began  before  plaintiff's  complaint  and  defendant  demonstrated  that  the  increased pressure and assignments were due to increased workload).

Third, Plaintiff was treated *more* favorably than others who did not engage in protected activity.  For instance, Thomas (whom Plaintiff alleges Cronin favored) and Haney received formal written warnings as a result of a budgeting issue.  SOF ¶¶ 127, 161.  Grainger was removed from the DPSG account as a result of his continued issues with Cronin and his failure to complete the presentation by October 5, 2017, and ultimately terminated from the agency.  SOF ¶ 131.

Last,  Plaintiff's  own  theory  of  causation  does  not  hold  up.   In  her  Complaint,  Plaintiff disingenuously alleges that Cronin retaliated against because Cronin was angry about a letter Plaintiff's counsel sent to DPSG threatening litigation.  SOF ¶ 113.  The difficulty for Plaintiff is that the letter in question was dated October 6, 2017 - <u>after</u> the allegedly adverse action.  SOF ¶ 122.  Plaintiff did not even provide DPSG's address to her lawyer until <u>after </u>she received the October 5th Email from Cronin.  SOF ¶ 115.  Thus, Plaintiff cannot demonstrate that any alleged adverse action was causally connected to her lawyer's October 6, 2017 letter to DPSG.

Stopforth's  comment  to  Plaintiff  likewise  bears  no  causal  connection  to  her  protected activity.   To  the  contrary – it  was  the  result  of  Plaintiff's  undisputed  statement  that  she  was interested in exploring other opportunities at the Initiative Defendants and potentially moving off the DPSG team.  SOF ¶ 159.  That Stopforth was not involved in underlying complaint against

Whitehead and knew none of the details of it further undermines Plaintiff's claim of causation. SOF¶¶ 101, 142.  And, even if Stopforth's comment could somehow be construed as threatening, at most it was an isolated statement that is insufficient to demonstrate retaliatory animus.  *See Alexander v. Bd. of Educ.*, 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015) ("[I]solated and stray remarks, without more, are insufficient to raise an inference of retaliation."), *aff'd*, 648 F. App'x 118 (2d Cir. 2016) (citation omitted).

Plaintiff, therefore, cannot establish a causal connection between any of the alleged adverse actions and her complaint.

### c.   Initiative Defendants had Legitimate Business Reasons for Their Actions and Plaintiff Cannot Establish Pretext.

Finally, Initiative has articulated legitimate business reasons for Stopforth's and Cronin's actions, and Plaintiff has no evidence of pretext.  Plaintiff tries to establish retaliatory animus based on temporal proximity alone, which is insufficient as a matter of law.  *Tomizawa v. ADT LLC*, No. 13-cv-06366 (MKB)(LB), 2015 U.S. Dist. LEXIS 133649, at *66 (E.D.N.Y. July 17, 2015) (even though plaintiff's complaint was "very close" temporally to the alleged adverse action to establish a *prima facie* case of retaliation, temporal proximity was insufficient to demonstrate pretext).  The undisputed evidence shows that Cronin's criticisms toward Plaintiff were related to client presentations.  SOF ¶¶ 106-07, 111, 122-23.  Plaintiff's disagreement with Cronin's assessment of her work product is insufficient to show that those decisions were a pretext for unlawful retaliation. *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (noting that courts need not determine "whether employment decisions are prudent or fair.").[11]

---

[11] *See also Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73 (2d Cir. 2015) ("Title VII is not an invitation for courts to 'sit as a super-personnel department that reexamines' employers' judgments.") (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014)).

Moreover, as noted above, Plaintiff was not treated less favorably than other employees who did not engage in protected activity.  To the contrary, several individuals complained about Cronin's management style, articulating similar concerns brought by Plaintiff.  SOF ¶¶ 21-36, 38, 40-45.  And Cronin treated Thomas (her alleged favorite) more harshly than Plaintiff by imposing discipline on him for a budget mistake.  SOF ¶¶ 127, 161.  Stopforth also treated Plaintiff *more* favorably than other employees and attempted to take additional steps to retain her after Grainger was removed from the DPSG team.  SOF ¶¶ 138-39.  Plaintiff provides no evidence that Stopforth had an ulterior motive to meet with her and points to no reason that Stopforth would want to remove her from the DPSG team.  SOF ¶ 178.  Thus, Plaintiff has no evidence of pretext and her retaliation claim must be dismissed.

In fact, far from demonstrating pretext, all of the evidence points toward Plaintiff wanting to leave because she believed she was overworked, did not like working for Cronin, wanted to travel and was considering alternative career options.  SOF ¶¶ 185-187.  The very fact that Plaintiff wanted to quit and "stick it to Linda" immediately after the October 5th Email (and even before) and **before** any of the other alleged adverse actions she claims Cronin and Stopforth took against her makes summary dismissal warranted.  SOF ¶¶ 117, 42.

## III.   Plaintiff's Spoliation of Evidence

In March 2018, <u>two months after she commenced this action</u>, Plaintiff obtained a new cell phone, without retaining or backing up her old one, which contained text messages and other communications during the relevant time for this litigation (including the weekend of October 13 when Grainger was moved off the account through the time she resigned), thus depriving the Initiative Defendants of critical evidence concerning the retaliation allegations in the Complaint. SOF ¶¶ 188-89.  A party to a civil action has a duty to preserve evidence or documents in its possession once it receives notice of the relevance of such evidence or that litigation involving the

evidence is likely. *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 426 (2d Cir. 2001). Spoliation of evidence occurs where there is "'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001) (citation omitted).

Here, Plaintiff began sending documents she believed were relevant to her claims to her attorney beginning in September 2017. SOF ¶ 190. She continued to do so in October 2017, before her attorney sent Initiative a letter on October 18, 2017 notifying Initiative of her intent to initiate a litigation against the Initiative Defendants. SOF ¶ 190. Thus, while she still had the old phone, Plaintiff selectively sent her counsel communications with her then boyfriend and documents that she believed were relevant to her case, but failed to provide any text messages or personal instant messages during the absolutely critical period between Grainger's removal from the account and her decision to resign, while both her testimony and documentary evidence make clear those messages existed. SOF ¶¶ 192-199. The Initiative Defendants attempted to recover these messages through an independent vendor, but they were unavailable because Plaintiff did not back them up and no longer has the phone. SOF ¶ 200.

Courts have the inherent power to sanction a party for conduct that abuses the judicial system. *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497-98 (S.D.N.Y. 2016). Plaintiff's failure to preserve relevant evidence after filing this lawsuit, coupled with her selective retention when she was contemplating litigation for months prior, demonstrates intentional wrongdoing sufficient to warrant sanctions, including entry of default judgment. As an alternative to the entry of a default judgment, the Initiative Defendants are entitled to adverse inference instructions that the messages were unfavorable to Plaintiff's claims. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 438 (S.D.N.Y. 2004). As such, the Initiative Defendants request

an adverse inference instruction that Plaintiff's correspondence with Grainger included additional

evidence that it was her intent to resign for reasons unrelated to any alleged retaliation.

## CONCLUSION

Based on the foregoing, the Initiative Defendants respectfully request that the Court:  (i)

grant its motion for summary judgment in its entirety and dismiss Count I and II in Plaintiff's

Complaint with prejudice; (ii) award attorneys' fees and costs incurred in making the instant

motion; and (iii) award any other relief the Court deems to be just and proper.

Dated: June 11, 2019
New York, New York

Respectfully submitted,

By:   */s/ Lauren Malanga Casey*
Ronald M. Green
Lauren Malanga Casey
Maxine A. Adams
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-0077
(212) 351-4500