UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
NANCY MUCCIARONE,

                        Plaintiff,                           18-cv-567 (PKC)

       -against-                             OPINION
                                          <u>AND ORDER</u>
INITIATIVE, INC., INTERPUBLIC GROUP,
JUSTIN WHITEHEAD and DR PEPPER
SNAPPLE GROUP, INC.,

                        Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

            Nancy Mucciarone alleges that in the early morning hours of August 30, 2017, she was sexually assaulted by Justin Whitehead on a Manhattan street in front of Pig & Whistle, a bar where they and others had been drinking.  Mucciarone, then an employee of Initiative, Inc., and Whitehead, then an employee of Dr Pepper Snapple Group, Inc. ("Dr Pepper"), were part of a larger group of employees of both companies who went out to several establishments for drinks after an all-day business meeting.  Mucciarone sues Whitehead and Dr Pepper as well as Initiative, Inc. and its indirect parent, Interpublic Group of Companies, Inc. (collectively, "Initiative").  She asserts claims of battery, assault, and intentional infliction of emotional distress ("IIED") against Whitehead and Dr Pepper as well as negligent supervision and retention against Dr Pepper.  She asserts claims of sexual harassment and retaliation against Initiative under Title VII as well as under the New York State and New York City Human Rights Laws.

            Discovery has closed and Dr Pepper and Initiative now move for summary judgment on all claims against them.  Whitehead also moves for summary judgment on the IIED claim against him.

For reasons that will be explained, the Court will grant defendants' motions for summary judgment and thereby dismiss all claims in this matter except for the assault and battery claims against Whitehead.

I.    The Undisputed Facts Concerning the Events of August 29–30, 2017.

The parties have done a meticulous job of laying out a detailed timeline of the events leading up to Whitehead's alleged assault and battery of Mucciarone, allegations which Whitehead "lacks knowledge or information sufficient to admit or deny."  (Comp. ¶¶ 8–9); (Whitehead Answer ¶¶ 8–9 (Doc. 30)).  While the Court has considered all of the facts raised in support and in opposition to summary judgment, it is not necessary to set them out in this Opinion.  The Court has examined the facts in a light most favorable to Mucciarone because she is the non-movant.  Set forth below are certain of the undisputed facts (unless otherwise indicated).

On August 29, 2017, employees of Dr Pepper met in Manhattan with employees of Dr Pepper's advertising agency, Initiative.  (Doc. 64 ¶ 60).  At the time, Mucciarone was the Associate Director of Communications Design at Initiative.  (Doc. 64 ¶ 3).  Justin Whitehead was one of several Marketing Media Managers at Dr Pepper.  (Doc. 64 ¶¶ 20, 22).  Whitehead and two other Dr Pepper Marketing Media Managers, Elizabeth Eaton and Anastasia Russ, travelled to New York from Dallas for these meetings.  (Doc. 64 ¶¶ 22, 60–62).  After the day's meetings, Mucciarone and her direct boss at Initiative, Nicholas Grainger, attended a happy hour at a bar with Eaton, Russ, Whitehead, and others.  (Doc. 64 ¶ 70).  Whitehead did not say or do anything inappropriate at this bar.  (Doc. 64 ¶ 72).

This group then attended a happy hour at another bar, Rock-and-Reilly's, that was sponsored by a non-party entity.  (Doc. 64 ¶¶ 73, 76).  Whitehead, Eaton, and Russ were the only Dr Pepper employees to attend the Rock-and-Reilly's happy hour.  (Pl.'s Tr. 137:9–20).  Linda

Cronin, who supervised both Grainger and Mucciarone, also was among the Rock-and-Reilly's happy hour attendees. (Doc. 74 ¶ 13). In conversation with Whitehead at Rock-and-Reilly's, Mucciarone "could feel [Whitehead's] eyes fixated on" her, which made her "fe[el] a little bit uncomfortable." (Pl.'s Tr. 106:18–19, 108:4–5). While seated, Whitehead twice placed his hand on Mucciarone's upper thigh, to which Mucciarone responded by pushing his hand off. (Pl.'s Tr. 113:19–114:12). Whitehead also said that Mucciarone was "so beautiful," that he "wish[ed] [he] could be with a girl like [her]," and that "[his] wife and [he] have an open relationship and [he] ha[d] a hotel room in New York tonight." (Pl.'s Tr. 110:5–7, 116:7–9). In response to this behavior, Mucciarone stated that "I wouldn't say that I was blowing him off but I wouldn't say that I was encouraging his behavior." (Pl.'s Tr. 112:23–25). She then called her boyfriend, who encouraged her to leave the happy hour after hearing what had occurred. (Pl.'s Tr. 116:14–18). After this call, Mucciarone engaged in conversation with Grainger, Eaton, and Russ but did not tell them about Whitehead's behavior. (Pl.'s Tr. 118:25–120:12). During this conversation, Whitehead came up from behind Mucciarone and put his arm around her waist. (Pl.'s Tr. 120:18–121:16). Mucciarone moved away so Whitehead was no longer touching her. (Pl.'s Tr. 121:19–21).

Mucciarone then described Whitehead's behavior to Eaton and Russ. (Pl.'s Tr. 123:5–22). Eaton and Russ discouraged Mucciarone from leaving the bar, stating that they "want[ed] to hang out with" her, they "never see" her, and they would "take care of" the situation. (Pl.'s Tr. 125:11–14). Eaton, Russ, and Mucciarone then went to the women's restroom so Mucciarone could call her boyfriend. (Pl.'s Tr. 128:24–129:10). Eaton spoke with Mucciarone's boyfriend, saying that Whitehead was "harmless" and that Eaton and Russ "would take care of her." (Pl.'s Tr. 129:15–18). At 12:15 a.m. (now of August 30th) and while still at

Rock-and-Reilly's, Mucciarone texted her boyfriend to "go to sleep" and that "Elizabeth is still out with us." (Pl.'s Tr. 133:7–24).

At some point after 12:15 a.m., Mucciarone, Eaton, Russ, Whitehead, Grainger, another Initiative employee, and an employee from another entity left Rock-and-Reilly's and walked to Pig & Whistle, another bar. (Pl.'s Tr. 137:25–139:18). Outside of Pig & Whistle, Eaton and Russ decided to return to their hotel. (Pl.'s Tr. 138:4–141:6). Eaton and Russ did not go into Pig & Whistle but saw Whitehead enter with Mucciarone and the others. (Pl.'s Tr. 142:5–143:3). Shortly after entering Pig & Whistle, Granger spoke to Whitehead about his earlier behavior towards Mucciarone, describing it as "really inappropriate" and that it "wasn't cool." (Pl.'s Tr. 157:20–158:6). This conversation triggered a "sobering moment" in Whitehead who "instantly changed" his behavior and apologized to Mucciarone. (Pl.'s Tr. 158:6–25). For the remainder of his time inside Pig & Whistle, Whitehead behaved appropriately. (Doc. 64 ¶ 124).

Around 1 a.m., Whitehead announced that he was leaving and asked Mucciarone to accompany him outside "to point him in the direction of his hotel." (Pl.'s Tr. 161:17–23); (Doc. 64 ¶¶ 126–27). She agreed and, in light of Whitehead's changed behavior, did not feel that she was putting herself at risk by doing so. (Pl.'s Tr. 163:13–21). Outside the bar, Mucciarone alleges that "[a]ll of a sudden [Whitehead] had his hand down my shirt touching my boobs, he had his other hand on my butt like pulling me closer to him and his head was on the side of my neck trying to kiss my neck." (Pl.'s Tr. 164:20–165:4). Mucciarone pushed Whitehead off of her and walked back into the bar without him. (Pl.'s Tr. 166:12–25). No one from Initiative or Dr Pepper witnessed Whitehead's conduct outside the bar. (Pl.'s Tr. 162–170). Mucciarone remained at the bar until about 4:30 a.m. (Doc. 64 ¶ 121).

II.     <u>Summary Judgment Legal Standard</u>.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>Anderson</u>, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." <u>Jaramillo v. Weyerhaeuser Co.</u>, 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." <u>Id.</u> In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 84 (2d Cir. 2004) (quoting <u>Aslanidis v. U.S. Lines, Inc.</u>, 7 F.3d 1067, 1072 (2d Cir. 1993)). A court

"may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). Further, a district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of event presented; these are essential questions for a jury. Id.

    III.    <u>The Claims Against Dr Pepper</u>.

        The assault of Mucciarone occurred in the early morning hours of August 30, 2017, which was the Wednesday before Labor Day weekend. Dr Pepper management learned of Whitehead's inappropriate actions at Rock-and-Reilly's on either Tuesday, September 5 or Wednesday, September 6, the first or second business day after Labor Day weekend. On Thursday, September 7, Initiative provided Dr Pepper management with details of the assault outside Pig & Whistle. Dr Pepper then terminated Whitehead later that same day. Mucciarone brings claims of assault, battery, and IIED against Dr Pepper on a respondeat superior theory of liability. She also asserts a claim of negligent supervision and retention against Dr Pepper. Dr Pepper argues that, under New York law, there is no employer liability for sexual assault by an employee, that the IIED claim is duplicative of and suffers from the same defect as the assault and battery claims, and that the elements of a negligent supervision and retention claim cannot be met. The Court agrees.

        A. Mucciarone's Claims Based Upon the Vicarious Liability of Dr Pepper for the <u>Intentional Torts of Whitehead Fail</u>.

        Mucciarone relies on facts that are largely undisputed but would not permit a reasonable jury to find in her favor against Dr Pepper. She asserts that in the advertising industry

it is common and expected for employees of an advertising agency, such as Initiative, to entertain employees of a client, such as Dr Pepper, by taking them out for meals and drinks. (Pl.'s Tr. 89:10–21, 143:17–144:4); (Armstrong Tr. 19:16–20:4). She notes that Dr Pepper had taken Mucciarone and other Initiative employees out for dinner and drinks on prior occasions. (Doc. 74 ¶ 1). During the night in question, two Dr Pepper employees, Eaton and Russ, stayed at the same hotel as Whitehead and observed and were informed of Whitehead's behavior up to the departure from Rock-and-Reilly's. (Russ Tr. 15:11–21); (Pl.'s Tr. 123:5–125:14, 128:9–129:10). Eaton, Russ, and Whitehead were drunk. (Russ Tr. 25:1–16).

Around 8 a.m. on August 30, Eaton apologized for Whitehead's behavior at Rock-and-Reilly's and Mucciarone informed her via text of Whitehead's assault on the street in front of Pig & Whistle. (Pl.'s Tr. 174:12-176:1). Also on August 30, Eaton, Russ, and Whitehead returned to Dallas, Texas, where Dr Pepper is based. (Russ Tr. 40:6–13); (Doc. 64 ¶ 145). Eaton did not report any incident to anyone at Dr Pepper until September 6.[1] (Doc. 64 at 36 ¶ 53). Eaton did not report the conduct that occurred outside of Pig & Whistle, which she did not witness but was told about by Mucciarone. (Cronin Tr. 44:21–46:12). However, Dr Pepper management learned of the assault from Initiative. (Christopher Tr. 25:15–26:10); (Cronin Tr. 44:3–47:6).

New York has long recognized the liability of the employer for acts of an employee "within the scope of the employee's employment." Rivera v. State, 2019 WL 6255785, at *3 (N.Y. Nov. 25, 2019); see also Higgins v. Watervliet Tpk. & R.R. Co., 46 N.Y. 23, 27 (1871). "In determining whether an employee acted within the scope of employment for purposes of vicarious liability, [New York courts] consider, among other factors, 'the connection between the time, place

---

[1] Though not material to the disposition of the motion, Dr Pepper claims Eaton reported the incident on the morning of September 5, the first business day following Labor Day weekend. (Blackwood Decl. ¶¶ 32–33); (Doc. 57 ¶ 148).

and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated' (i.e., whether it was foreseeable)." <u>Rivera</u>, 2019 WL 6255785, at *3 (quoting <u>Riviello v. Waldron</u>, 47 N.Y.2d 297, 303 (1979)).

The New York Court of Appeals was faced with the question of whether a sexual assault by a male hospital employee of a female hospital patient could reasonably be viewed as within the scope of the employee's employment and concluded that it was not. <u>Judith M. v. Sisters of Charity Hosp.</u>, 93 N.Y.2d 932, 933 (1999). The Court characterized an employee's sexual assault as a departure "from his duties for solely personal motives unrelated to the furtherance of the [employer's] business." <u>Id.</u> Subsequent New York cases have followed the holding of <u>Judith M</u>. <u>See</u> <u>Dia CC. v. Ithaca City Sch. Dist.</u>, 304 A.D.2d 955, 956 (3d Dep't 2003) ("An act of sexual assault by an employee is a clear departure from the scope of employment, committed solely for personal reasons, and unrelated to the furtherance of the employer's business."); <u>McKay v. Healthcare Underwriters Mut. Ins. Co.</u>, 295 A.D.2d 686, 687 (3d Dep't 2002); <u>see also</u> <u>Richardson v. City of New York</u>, 326 Fed. App'x 580, 582 (2d Cir. 2009) (affirming grant of summary judgment dismissing a state law claim of vicarious liability of a municipality for the sexual assault of a supervisee by a probation officer).

Mucciarone's evidence would not permit a reasonable jury to find a basis for vicarious liability on the part of Dr Pepper based upon the tortious conduct of Whitehead. The assault and battery took place on the street after Whitehead left Pig & Whistle, the third bar of the evening. No employee of Dr Pepper witnessed the attack and both of Whitehead's co-workers had previously left for the night, neither having entered Pig & Whistle though they saw Whitehead and

Mucciarone enter the bar. Whitehead's battery of Mucciarone—touching her breasts, her butt, and forcing a kiss upon her neck—did not foster his employer's business and was solely for Whitehead's personal gratification. The fact that other activities of the evening may have fostered Dr Pepper's business interests does not alter the result under New York law. In Judith M, the employee who committed the sexual assault was performing duties within the scope of his employment, bathing a patient, when he committed the sexual assault that the New York Court of Appeals nevertheless concluded, as a matter of law, was not within the scope of his employment.[2] As Whitehead's assault and battery of Mucciarone were actions outside the scope of his employment and undertaken for personal motives, Dr Pepper cannot be vicariously liable for Whitehead's assault and battery. Similarly, Mucciarone's IIED claim is entirely based on the same conduct underlying the assault and battery claims, which, again, is outside the scope of Whitehead's employment and so cannot form the basis for holding Dr Pepper vicariously liable.[3]

Summary judgment will be granted dismissing the claims against Dr Pepper for assault, battery, and intentional infliction of emotional distress.

B. The Negligent Supervision and Retention Claim Against Dr Pepper Fails.

Mucciarone also makes a negligent supervision and retention claim against Dr Pepper. Specifically, Mucciarone alleges that prior to the events at issue, Dr Pepper was aware of prior improper conduct by Whitehead, including "unwelcomed advances on women occurring while Whitehead was ostensibly performing work for Dr Pepper." (Compl. ¶ 72). She further alleges that "Dr Pepper continued to allow Whitehead to utilize his employment position with Dr

---

[2] According to the dissent in the Appellate Division, the improper touching occurred while bathing the patient. Judith M. v. Sisters of Charity Hosp., 249 A.D.2d 890, 890 (1998) (Lawton and Balio, JJ. dissenting).

[3] Alternatively, the IIED claim against Dr Pepper must be dismissed as New York law does not allow IIED claims that fall within the ambit of other traditional tort claims, such as assault and battery. Leonard v. Reinhardt, 799 N.Y.S.2d 118, 119 (2d Dep't 2005); see also infra Part III.

Pepper to be in a position to make unwanted advances on women." (Compl. ¶ 73). A full and fair opportunity for discovery has been afforded and these allegations against Dr Pepper are not supported by the evidence presented. The Court concludes that Mucciarone has not come forward with evidence which if believed would permit a reasonable jury to find in her favor on this claim.

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations omitted) (first citing D'Amico v. Christie, 71 N.Y.2d 76, 87 (1987) and then quoting Kenneth R. v. Roman Catholic Diocese of Brooklyn, 654 N.Y.S.2d 791, 793 (2nd Dep't. 1997)). There is no dispute that Whitehead, the principal tortfeasor, was an employee of Dr Pepper. It is not necessary for this Court to reach the third element, the premises or chattel requirement, because Mucciarone has not come forward with evidence of Dr Pepper's knowledge of Whitehead's propensity for sexual assault sufficient to permit a jury to find in her favor.

"A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.'" Ronessa H. v. City of New York, 957 N.Y.S.2d 188, 190 (2d Dep't 2012) (quoting Bumpus v. N.Y.C. Tr. Auth., 851 N.Y.S.2d 591, 591–92 (2d Dep't 2008)). "There is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee." Kenneth R., 654 N.Y.S.2d at 795 (internal citations omitted); see also

Doe v. Guthrie Clinic, Ltd., 519 Fed. App'x 719, 721 (2d Cir. 2013) (summary order); Jackson v. N.Y. Univ. Downtown Hosp., 893 N.Y.S.2d 235, 237 (2d Dep't 2010). Proof of "a 'culture' of alcohol use at off-premises, after-hours company events" was insufficient to render an employer liable for an employee's assault on a co-worker. Milosevic v. O'Donnell, 934 N.Y.S.2d 375, 376 (1st Dep't 2011).

Whitehead was hired by Dr Pepper in June 2016 upon the recommendation of Russ. (Whitehead Decl. ¶¶ 3–4 (Doc. 55)); (Russ Tr. 19:3–16); (Blackwood Decl. ¶¶ 3–7 (Doc. 53)). Whitehead received and reviewed Dr Pepper's Non-Harassment Policy as well as its Code of Conduct and understood that these policies prohibited discrimination and harassment. (Whitehead Decl. ¶¶ 10–15).

While at Dr Pepper, Whitehead was a Marketing Media Manager like Eaton and Russ, each of whom had responsibility for different brands within Dr Pepper. (Doc. 64 ¶¶ 20, 22). Whitehead's supervisor, Eric Blackwood, states that, prior to the August 29–30, 2017 incident, Whitehead had "no negative performance history or indicators." (Blackwood Decl. ¶ 29). Whitehead never faced any allegations of inappropriate workplace behavior either at Dr Pepper or any prior employer. (Whitehead Decl. ¶¶ 18–19). The Dr Pepper Human Resource representative covering Whitehead's department stated, under penalty of perjury, that she never received a complaint or concern about Whitehead's conduct during his employment at Dr Pepper. (Christopher Decl. ¶ 13). Mucciarone testified that she does not recall any interaction with Whitehead prior to August 29, 2017 that was inappropriate and has no knowledge of Whitehead sexually harassing anyone in the past. (Pl.'s Tr. 70:14–18, 72:5–24; 197:19–198:6).

In endeavoring to raise a triable issue of fact, Mucciarone relies on two circumstances. First, she relies on a prior incident involving Whitehead. On September 6, 2017,

days after Whitehead's sexual assault of Mucciarone, an Initiative employee, Aggie Haney, was interviewed by Danielle Dorter, Senior Vice President of Employee Relations and Legal Compliance at Initiative. (Dorter Tr. 58:5–12). Haney told Dorter about an "odd interaction" with Whitehead in which "he showed up at the restaurant where [Haney] and her boss" were "uninvited and had drinks with them," keeping Haney and her boss there for three hours. (Dorter Tr. 58:18–60:23). This evidence fails to raises a triable issue of fact for at least two reasons: (1) there is no evidence that Dr Pepper knew of this event at any time during Whitehead's tenure; and (2) the event that Haney described to Dorter would not lead a reasonable person to conclude that a sexual assault by Whitehead was reasonably foreseeable. New York law requires proof that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." Kenneth R., 654 N.Y.S.2d at 793–94 (internal citations omitted); see also Doe v. Alsaud, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014) ("The prior misconduct, moreover, must be of the same kind that caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient."). Whitehead's conduct in this circumstance, namely that he joined a meal without invitation and proceeded to drink for three hours, does not bare any relation to, and therefore cannot show a propensity for, sexual assault.

    The second circumstance on which Mucciarone relies is Dr Pepper's purported slowness to act in response to and its tolerance of Whitehead's misdeeds. Whitehead's assault of Mucciarone occurred on August 30 and Eaton, Russ, and Whitehead returned to Dallas, Texas that same day. On either September 5 or 6, Eaton reported to Blackwood that Whitehead had engaged in inappropriate behavior at Rock-and-Reilly's, mentioning that Whitehead had put his arm around Mucciarone. (Blackwood Decl. ¶¶ 32–34). Blackwood reported this information to Lorie Christopher, a Dr Pepper HR employee. (Id. ¶ 36). On Christopher's instruction, Blackwood then

interviewed Whitehead on September 6. (Id. ¶¶ 37–38). During this interview, Whitehead admitted that he was drunk and could not remember much of what occurred on the night in question, but he remembered putting his arm around Mucciarone and that he had been "unwelcomely physical" with her. (Id. ¶ 39); (Whitehead Decl. ¶ 38); (Doc. 64 at ¶ 153). Whitehead was told "his behavior was unacceptable," was given a verbal warning, and was told that the issue would be revisited if Mucciarone or Initiative provided further information. (Blackwood Decl. ¶ 40); (Whitehead Decl. ¶ 39). The next day, September 7, Christopher received an email from Initiative, via the Dr Pepper HR Department, that contained additional details on the incident in question, including that Whitehead "tried to kiss Nancy and then tried to grope, grab her breast." (Christopher Tr. 25:15–26:10, 46:16–24). That same day, Dr Pepper received a call from Linda Cronin at Initiative, relaying the full details of the sexual assault outside Pig & Whistle. (Cronin Tr. 43:16–44:13); (Doc. 65 ¶ 84). Later on September 7, Blackwood confronted Whitehead with this new information and Whitehead could not deny the allegations. (Blackwood Decl. ¶¶ 43–44.) Blackwood then, in the presence of Christopher, immediately terminated Whitehead. (Id. ¶¶ 45–46).

Mucciarone raises a host of challenges to the adequacy of Dr Pepper's response, including that Eaton or Russ should have reported Whitehead's actions sooner, that Eaton or Russ should have provided the details of the assault communicated to them by Mucciarone, and that Whitehead should have been fired sooner than September 7. None of these circumstances bear any causal relationship to the tortious conduct to which Mucciarone was subjected in the early morning hours of August 30 and therefore cannot establish a propensity toward such conduct on the part of Whitehead.

No reasonable jury could find in Mucciarone's favor on her negligent supervision and retention claim against Dr Pepper.

IV.    The Claims Against Initiative.

Mucciarone brings two claims against Initiative:  (1) a hostile work environment, created by sexual harassment and (2) retaliation.  Specifically, she alleges that she remained in the employ of Initiative until mid-October 2017 when she "informed [Initiative] that it had put her in an intolerable situation and she had no choice but to refuse to continue working at Initiative in such an environment."  (Compl. ¶ 39).  Mucciarone claims that, prior to her exit, "[a] reasonable person would consider Plaintiff's working environment to be hostile and abusive" based upon her gender.  (Compl. ¶ 44).  To demonstrate Initiative's liability, she relies on Whitehead's sexual assault and Initiative's "fail[ure] to take remedial action."  (Compl. ¶ 45).  Mucciarone also alleges that she complained of Whitehead's sexual harassment as well as of "retaliatory treatment" by Linda Cronin, her boss, which resulted in "a campaign by Ms. Cronin to berate Plaintiff, attempt to create a false record of Plaintiff's poor performance, and forc[e] Plaintiff out of her position on the Dr Pepper account."  (Compl. ¶¶ 49, 51).  Both the hostile work environment and the retaliation claims are asserted under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

Upon the facts presented in the summary judgment record after a full opportunity for discovery, no reasonable jury could find that Mucciarone was subjected to a hostile work environment by Initiative or that she suffered retaliatory actions by Initiative.  Summary judgment will be granted to Initiative on these claims.

A.    The Events of August 29–30 and Their Immediate Aftermath.

It is undisputed that Mucciarone began as a freelancer at Initiative in December 2016.  (Pl.'s Tr. 31:18–32:9, 286:6–9).  Mucciarone was friends with Nicholas Grainger and Aggie

14

Haney before joining Initiative. (Pl.'s Tr. 32:10–33:6, 151:4–154:25). She became a full-time employee in March 2017 and worked primarily on the Dr Pepper account. (Pl.'s Tr. 31:18–32:6, 38:20–39:25). Grainger was promoted to "Director" in 2017 and Cronin was hired in May 2017. (Pl.'s Tr. 38:14–19); (Cronin Tr. 8:10–11). Grainger reported to David Stopforth, Chief Communication Design Officer, as well as to Cronin. (Dorter Tr. 80:10–17).

As noted, Grainger, Whitehead, Mucciarone, and others went to Pig & Whistle sometime after midnight on August 30. No Initiative employee witnessed Whitehead's sexual assault of Mucciarone outside Pig & Whistle. (Pl.'s Tr. 162–170). After the assault occurred, Mucciarone told Grainger what had happened and she remained at the bar until 4:30 a.m., which was after Grainger had left. (Pl.'s Tr. 168:19–170:17).

Grainger gave Mucciarone permission to work from home during the day of August 30 and, on that evening, Mucciarone left New York City for Labor Day weekend. (Pl.'s Tr. 174:3–9; 185:3–186:22, 319:15–23). Initiative's New York office was closed September 1, 2017 through September 4, 2017. (Dorter Decl. ¶ 4). Based on what Mucciarone told him, Grainger could have reported the Whitehead incident to Initiative HR on August 30 or 31 but did not do so. (Pl.'s Tr. 221:6–222:5). After Mucciarone reported the incident on September 5, she was encouraged to work remotely and Initiative immediately commenced an investigation. (Pl.'s Tr. 187:15–188:10, 413:17–414:2); (Dorter Tr. 44:13–45:10, 98:4–99:7). After being informed of the incident that same day, Cronin was described by Mucciarone as "very supportive," "motherly," and "really great in situations like this." (Pl.'s Tr. 322:19–323:8; 326:18–328:7). By September 6, HR concluded its investigation, met with Mucciarone, and informed her that Whitehead would not be permitted to have further contact with her or other Initiative employees. (Pl.'s Tr. 329:17–331:22). On September 7, Cronin called Dr Pepper to relay the results of the Initiative investigation,

including a description of the sexual assault outside Pig & Whistle, and request that Whitehead no longer work with Initiative employees. (Cronin Tr. 43:16–44:13); (Doc. 65 ¶ 84). Initiative HR also emailed Dr Pepper a detailed description of Whitehead's sexual assault. (Christopher Tr. 25:15–26:10, 46:16–24). On September 8, Initiative informed Mucciarone that Dr Pepper had terminated Whitehead's employment. (Pl.'s Tr. 333:12–20).

When asked at her deposition if "there [was] anything that you think HR could have done better or faster in response to your complaint to Jessica Torres Soto on September 5th of 2017," Mucciarone answered, "No. I think they handled it well." (Pl.'s Tr. 333:20–25). Mucciarone also does not dispute that Initiative has "robust policies against harassment in the workplace" that offer reporting procedures. (Doc. 65 ¶ 18).

On September 8, Granger apologized to Mucciarone via email for not reporting the Whitehead incident to Initiative HR before her return to the office on September 5. (Pl.'s Tr. 335:12–336:3). Granger received a written warning on September 14 for his failure to report the incident and was subsequently required to attend a "Respect in the Workplace" training by October 2017. (Dorter Tr. 123:3–25); (Malanga Decl. Ex. U (Doc. 62-21)). Initiative's HR Department also conducted an in-person anti-harassment training to remind employees of their obligation to report inappropriate conduct. (Dorter Decl. ¶ 5). Also on September 8, Mucciarone informed HR that she would like to remain on the Dr Pepper team working with Grainger. (Dorter Tr. 128:12–28); (Pl.'s Tr. 336:23–337:5).

B. Work on the Mid-October Presentation and Mucciarone's Resignation.

Mucciarone described Linda Cronin's reaction to her decision to report Whitehead's sexual assault to HR as "[v]ery supportive." (Pl.'s Tr. 321:18–25). Cronin told Mucciarone to "take any and all the time [she] need[ed]" and that Cronin was "here to talk when [she] need[ed] to talk." (Pl.'s Tr. 322:24–223:9). Around this time, Cronin was preparing for an

October presentation to Dr Pepper senior management in Dallas on the media plan for 2018, a project that Initiative's Dr Pepper team had been working on for months. (Pl.'s Tr. 346:3–349:8, 366:3–369:3). At her deposition, Mucciarone expressed the following view of Cronin:

> She was never clear in her expectations. She would sort of fall off the face of the earth when you needed her. She often prioritized meetings with . . . sales reps. The more junior people on the team are meant to cover. I guess overall I felt like—I believe the majority of the team felt that she just didn't know how to prioritize and she didn't know how to communicate about prioritization.

(Pl.'s Tr. 310:9–17).

Prior to the events of August 29–30, Grainger emailed Mucciarone that he did not trust Cronin. (Pl.'s Tr. 313:6–19). When asked why Grainger did not trust Cronin, Mucciarone responded "I think the overall feeling on the team was that Linda was bringing in her own people and wanted to get rid of the rest of us." (Pl.'s Tr. 313:20–314:5). Indeed, as early as July 2017, Initiative management was aware of its Dr Pepper team's dissatisfaction with Cronin's management style and Cronin's own frustration with gaining the respect of her team. (Dorter Tr. 39:10–40:22, 170:11–171:20); (Dorter Ex. A).

By October 3, Mucciarone had grown frustrated with her situation at Initiative, messaging her boyfriend: "I am so over this I don't want to do any of this anymore." (Pl.'s Tr. 393:20–394:8). On October 4 and in advance of a scheduled October 9 call with Dr Pepper, Mucciarone sent Cronin a draft of the October Dr Pepper presentation, which contained incomplete sections that Mucciarone believed Cronin would finish. (Pl.'s Tr. 345:22–348:25). On October 5, Cronin asked Mucciarone and Grainger, who was out on vacation, to complete the presentation and stated, among other things, that her "job was not to put presentations together." (Pl.'s Tr. 349:2–353:7); (Malanga Decl. Ex. K (Doc. 62-11)). Mucciarone felt that this October 5 email was "condescending" and "patronizing." (Pl.'s Tr. 349:2–353:7). On Friday October 6, Cronin

asked if Mucciarone needed assistance to complete the presentation. (Pl.'s Tr. 356:2–359:21). That same day, Cronin "verbally abused" Mucciarone over the draft presentation in front of the Initiative team and then later asked Mucciarone to send what work she had completed. (Pl.'s Tr. 356:2–359:21). Mucciarone sent Cronin the incomplete presentation. (Pl.'s Tr. 356:2–359:21). Lacking a complete presentation, Cronin canceled the Monday October 9 client presentation. (Pl.'s Tr. 357:17–21).

Later on October 9, Cronin met with Stopforth and other Initiative managers to discuss the Dr Pepper team. (Dorter Tr. 146:10–149:12). As a result of the failure to complete the draft presentation in time for the October 9 call and his friction with Cronin, Initiative management decided to remove Grainger from the Dr Pepper team. (Dorter Tr. 149:19–150:20); (Stopforth Tr. 64:13–64:16). On October 13, Stopforth informed Grainger that he was off the Dr Pepper team and gave him the opportunity to look for a role on a different Initiative team. (Stopforth Tr. 29:21–30:12, 63:10–64:16). Also, on October 13, Stopforth attempted to schedule a meeting with Mucciarone because he knew that she was close with Grainger. (Dorter Tr. 150:21–151:6); (Stopforth Tr. 29:21–30:12). Mucciarone was out of the office on that day and also requested to meet with HR prior to meeting with Stopforth, so the Stopforth meeting was postponed. (Pl.'s Tr. 407:7–25).

During the weekend of October 14, the Initiative Dr Pepper team was working to finalize the presentation. (Pl.'s Tr. 364:19–368:17). Mucciarone alleges that Cronin made "unreasonable work demands on her that weekend," (Compl. ¶ 32), but Mucciarone did not respond to these work emails until Sunday night as she was out of town and did not resume work on the presentation until the morning of Monday October 16. (Pl.'s Tr. 368:5–370:2). On October 16, Mucciarone met with HR, during which she indicated that she was interested in exploring a

different client account within Initiative. (Pl.'s Tr. 411:21–412:24, 423:23–424:10). On October 17, Mucciarone met with Stopforth, whom Mucciarone felt had a "very harsh and very cold" tone during the meeting. (Pl.'s Tr. 421:9–423:9). Stopforth discussed positions on other teams within Initiative for Mucciarone and, when asked if she could remain on the Dr Pepper team, Stopforth replied "I don't think you want to do that." (Pl.'s Tr. 421:9–423:9); (Stopforth Tr. 39:5–23). At her deposition, Mucciarone stated that she was interested in exploring other teams, but her preference was stay on Dr Pepper and have Cronin change her behavior. (Pl.'s Tr. 423:10–424:15). At the meeting's conclusion, Stopforth told Mucciarone to think about her preferred choice. (Pl.'s Tr. 421:9–423:9). That evening, Stopforth sent Mucciarone an email following-up on their meeting. (Stopforth Tr. 49:11–50:8).

Mucciarone did not go to work the following day, October 18, and resigned from her position at Initiative via email that afternoon. (Doc. 65 ¶¶ 180, 184); (Pl.'s Tr. 430:25–431:6).

C. Whitehead's Sexual Harassment Did Not Create a Hostile Work Environment for Mucciarone at Initiative.

i. Title VII and New York State Human Rights Law.

A Title VII hostile work environment claim requires a plaintiff to "make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer."[4] Summa v. Hofstra Univ., 708 F.3d 115, 123–24 (2d Cir. 2013) (quoting Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009)). In regards to the conduct of a non-employee, "'the employer will be held

---

[4] "Hostile work environment claims under both Title VII and the [New York State Human Rights Law] are governed by the same standard." Summa, 708 F.3d at 123–24 (citing Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006)).

liable only for its own negligence,' and the plaintiff must demonstrate that the employer 'failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" Id. (quoting Duch, 588 F.3d at 762). "In determining the appropriateness of an employer's response, [the Court] look[s] to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the harasser's] behavior.'" Id. (quoting Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111 (8th Cir. 1997) (third alternation in original)).

Mucciarone has not adduced facts sufficient for a reasonable jury to impute Whitehead's sexual harassment and assault to Initiative. Whitehead was not an employee of Initiative but of its client, Dr Pepper, and, thus, was not someone over whom Initiative could exercise meaningful control. Therefore, Mucciarone must demonstrate that Initiative failed to provide a reasonable avenue for complaint or that Initiative failed to take appropriate remedial action in response to knowledge of the harassment.

Initiative provided a reasonable avenue for the sexual assault complaint at issue in this case as Initiative maintained a reporting system for such complaints via its HR department. Mucciarone in fact took advantage of this system on her first day back in the office following the incident. As such, Mucciarone cannot adduce facts upon which a reasonable jury could find that Initiative lacked a reasonable avenue for complaints. See Duch, 588 F.3d 757, 763 (2d Cir. 2009); Russell v. N.Y. Univ., No. 15-cv-2185 (GHW), 2017 WL 3049534, at *28 (S.D.N.Y. July 17, 2017), aff'd, 739 Fed. App'x 28 (2d Cir. 2018).

Mucciarone also fails to adduce facts demonstrating that Initiative failed to take appropriate remedial action, as evaluated on a negligence standard, upon learning of the alleged

harassment. Upon receiving Mucciarone's complaint on September 5, Initiative's response was in fact appropriate and timely. That same day, which was its third business day after the assault, Initiative HR began an investigation of Mucciarone's complaint. By the next day, September 6, Initiative finished its investigation, concluding that Mucciarone had been assaulted and resolving that Whitehead would no longer be permitted to work with any Initiative employee. Initiative HR also met with Mucciarone to inform her of the findings. The following day, September 7, Cronin called Dr Pepper, Whitehead's employer, to provide the details of Initiative's investigation, including the details of Whitehead's sexual assault of Mucciarone outside Pig & Whistle. Initiative HR also emailed a counterpart in Dr Pepper's HR department a detailed description of the sexual assault. On September 8, Initiative was informed that Dr Pepper had terminated Whitehead and promptly informed Mucciarone of that fact.

In sum, within three business days of Mucciarone's complaint and ten days (including a holiday weekend) of the actual assault, Initiative investigated the allegations, implemented remedial action (barring Whitehead from working with Initiative employees), and relayed details of the allegations to Whitehead's employer, who terminated him. Initiative's response to Mucciarone's complaint was timely and, in the context of the limited control exercised over Whitehead, appropriate. Summa, 708 F.3d at 125 (finding an employer's response to be appropriate when complaints were dealt with in a matter of days and resulted in proportional remedial action). Indeed, Mucciarone stated Initiative's HR could not have done anything better response to her complaint and that they handled it well. (Pl.'s Tr. 333:21–24). As such, Mucciarone has not adduced facts upon which a reasonable jury could find that Initiative failed to provide a reasonable avenue for complaint or failed to take appropriate remedial action.

Mucciarone maintains that Initiative, through Grainger, knew of Whitehead's conduct as it was occurring and failed to take appropriate remedial action by intervening to stop the conduct and by failing to report Whitehead's actions to HR before Mucciarone did so on September 5.[5] (Doc. 63 at 23–24). However, these arguments are insufficient to establish a hostile work environment claim. First, Grainger's failure to report Whitehead's conduct to Initiative HR prior to Mucciarone's complaint is ultimately irrelevant as Initiative, based on Mucciarone's complaint, took timely and appropriate remedial action within five business days of the incident. Mucciarone was not materially affected by Grainger's failure to report. Summa, 708 F.3d at 125 (granting summary judgment to defendant employer on a hostile work environment claim despite an employee's failure to report an incident prior to the victim's own complaint). Further, Mucciarone fails to provide legal support for the proposition that the failure to obey an internal code of conduct by an employee, who was later disciplined for this failure, is sufficient grounds to impute a hostile work environment to the employer. Russell, 2017 WL 3049534, at *28.

Second, Mucciarone does not argue that Grainger should have prevented the sexual assault outside of Pig & Whistle as the undisputed facts show that no party, including Mucciarone, could have anticipated that a sexual assault would occur when Mucciarone escorted Whitehead outside the bar. Mucciarone cannot demonstrate that Grainger should have known a sexual assault was impending and so cannot impute liability to Initiative for this action.

Instead, Mucciarone argues that, as Grainger knew of and should have intervened to halt Whitehead's harassing conduct at Rock-and-Reilly's, Initiative failed to take appropriate

---

[5] In response to Initiative's summary judgment motion, Mucciarone has failed to come forward with facts demonstrating that, in the course of the events on August 29 and 30, Cronin became aware of any sexually abusive actions by Whitehead directed toward Mucciarone. Mucciarone's unsworn brief asserts that Cronin witnessed Whitehead drunk at Rock-and-Reilly's but did nothing to intervene. (Doc. 63 at 23). Even if true, this shows that Initiative's Cronin knew that Dr Pepper's Whitehead was drunk but not that he posed a threat of sexually assaulting Mucciarone.

remedial action. Assuming that Grainger knew of Whitehead's harassment while it was occurring at Rock-and-Reilly's, Mucciarone still cannot show that Grainger did not take remedial action that appropriate in light of his level of control over Whitehead. Mucciarone alleges that Grainger heard some of Whitehead's comments at Rock-and-Reilly's as they were made, but did not intervene and instead told Mucciarone to "just go with it." (Pl.'s Tr. 114:13–115:25). However, later in the evening, Grainger specifically chastised Whitehead about his prior behavior, which he called "inappropriate," a remedy which "instantly changed" Whitehead's behavior and caused Whitehead to apologize to Mucciarone. After this apology, Mucciarone felt that Whitehead's harassment would no longer continue and was more at ease around Whitehead for the remainder of the night. (Pl.'s Tr. 157:20–159:8, 163:13–164:7). While Grainger did not intervene to stop the inappropriate comments as they occurred, he did take remedial action that same night to ensure that such conduct did not reoccur. Further, the action Grainger took was appropriate in light of the limited control he exercised over Whitehead, who was not his subordinate or colleague.

Mucciarone cannot maintain a claim for a hostile work environment under either Title VII or the New York State Human Rights Law.

ii.  New York City Human Rights Law.

The New York City Human Rights Law ("NYCHRL") is not construed coextensively with Title VII or the New York State Human Rights Law. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108–09 (2d Cir. 2013); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277–79 (2d Cir. 2009). In particular, the NYCHRL loosens the stricture requiring severe or pervasive harassment for a hostile work environment claim, instead mandating only that the alleged conduct not be a "petty slight or trivial inconvenience." Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 80 (1st Dep't 2009). "[T]he NYCHRL imposes liability on the employer in three instances: (1) where the offending employee 'exercised managerial or

supervisory responsibility' . . . ; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action'; and (3) where the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet 'failed to exercise reasonable diligence to prevent [it].'" Zakrzewska v. New Sch., 14 N.Y.3d 469, 479 (2010); see also N.Y.C. Admin. Code § 8-107(13)(b). The NYCHRL eliminated the requirement that the claimed hostile work environment be severe and pervasive, but it did not expand the scope of employer or supervisor liability for the actions of a non-employee. Judge Oetkin of this district has applied the Second Circuit's Title VII standard for non-employees to evaluate liability for harassment by a non-employee. Swiderski v. Urban Outfitters, Inc., No. 14-cv-6307 (JPO), 2017 WL 6502221, at *7 (S.D.N.Y. Dec. 18, 2017) ("With respect to customer harassment, it is well established in this circuit that courts 'imput[e] employer liability for harassment by non-employees according to the same standards for non-supervisory co-workers, with the qualification that [they] will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.'" (quoting Summa, 708 F.3d at 124)).

Initiative's summary judgment motion challenges the imputation of liability to it based upon the actions of Dr Pepper's Whitehead. The standards for evaluating the actions of Initiative in the Title VII context apply with equal force to the NYCHRL claim. For the same reasons as articulated above, Mucciarone has failed to adduce facts upon which a reasonable jury could impute liability to Initiative for Whitehead's sexual harassment and so cannot maintain a hostile work environment claim under the NYCHRL.

D.  Mucciarone Cannot Show Retaliation By Initiative.

Mucciarone brings a claim of retaliation under Title VII, New York State Human Rights Law, and NYCHRL, alleging that, as a result of her complaint to HR about Whitehead's conduct, Initiative undertook adverse employment actions against her.

i.  Title VII and New York State Human Rights Law.

"The burden-shifting framework laid out in McDonnell Douglas governs retaliation claims under both Title VII and the NYSHRL."  Summa, 708 F.3d at 125 (citing Schiano, 445 F.3d at 609 (internal citations omitted)).  "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  Id. (quoting Schiano, 445 F.3d at 608).  Plaintiff's prima facie burden for establishing retaliation is minimal. Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."  Summa, 708 F.3d at 125 (quoting Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer demonstrates a legitimate, non-discriminatory reason, then '[t]he burden shifts . . . back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'"  Id. (quoting Raniola, 243 F.3d at 625).

a.  Adverse Employment Action.

Mucciarone pleads that she suffered adverse employment actions in retaliation for her filing of a complaint related to Whitehead's sexual assault.  Specifically, Mucciarone argues that she suffered two forms of adverse employment actions.  First, Mucciarone asserts that her boss Cronin subjected her to retaliatory treatment, including by sending a condescending email,

being "verbally abusive" during a meeting, withholding the assistance of team members, and making unrealistic work demands. Second, Mucciarone maintains that Initiative intended to remove her from the Dr Pepper account, pointing to the Stopforth meeting as evidence. Neither claim is sufficient to establish that Initiative took adverse employment action against Mucciarone and, therefore, her retaliation claim fails.

"To constitute an adverse employment action in violation of Title VII, a change in working conditions must be 'materially adverse.'" Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002) (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "A materially adverse change 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities' and 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Galabya, 202 F.3d at 640).

Accepting Mucciarone's description of Cronin's verbal abuse in a meeting, condescending October 5 email, and other similar conduct, Mucciarone has failed to demonstrate that these incidents constitute adverse employment actions. These actions reflect criticism of Mucciarone's work but, without any other consequences, do not constitute adverse employment action. Fletcher v. ABM Bldg. Value, 775 Fed. App'x 8, 14 (2d Cir. 2019) (summary order) ("In addition, [plaintiff's] disciplinary write ups were not adverse employment actions because they were only notices and did not result in disciplinary action." (citing Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002))); see also Volpe v. N.Y.C. Dep't of Educ., 195 F. Supp. 3d 582, 597 (S.D.N.Y. 2016) ("Criticism of an employee in the course of evaluating and correcting her

work is not an adverse employment action. A negative evaluation letter can be considered adverse, but only where there is an accompanying adverse result such as demotion, diminution of wages, or other tangible loss." (internal citations omitted)).

Cronin's work demands on a weekend night and denial of team member assistance at most amount to an alternation of job responsibilities but not adverse employment action. Also, there has been no showing that Mucciarone was singled out for a disproportionately heavy workload inconsistent with her job responsibilities. Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 190–91 (E.D.N.Y. 2015) (finding that an increased workload was not an adverse employment action and collecting such cases); Delgado v. Triborough Bridge & Tunnel Auth., 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) ("While an increased workload is considered only a mere alteration of job responsibilities, a workload heavily disproportionate to those similarly situated has been held to be an example of an adverse action." (citing Feingold v. New York, 366 F.3d 138, 153 (2d Cir. 2004))); Hardial v. Emblemhealth, Inc., No. 14-cv-4968, 2016 WL 3693750, at *12 (E.D.N.Y. July 7, 2016).

Taken collectively, minor incidents may amount to a hostile work environment that can satisfy the requirement of an adverse employment action. Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004) ("With respect to hostile work environments, we have stated that '[o]ur precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.'" (quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)). However, the actions alleged by Mucciarone, which at most took place from September 5, 2017 to October 18, 2017, were neither severe enough nor occurred over such an extended period of time as to become pervasive and so do not amount to adverse employment action. Id. ("But '[i]ncidents that are relatively minor and infrequent will not meet the standard'

27

for a discriminatorily hostile environment.  In our view, the incidents alleged here were both minor and infrequent; there is nothing in this record that resembles the 'pattern of nearly constant harassment' in <u>Phillips</u> nor any one incident that is particularly severe." (quoting <u>Phillips</u>, 278 F.3d at 108–09)); <u>Phillips</u>, 278 F.3d at 110 (upholding a verdict finding retaliation based on a number of minor incidents, including the "failure to provide [plaintiff] with an adequate bullet-proof vest," as when viewed "collectively over a period of several years [a jury] reasonably could find that they rise to the level of actionable harm").

In response to Initiative's summary judgment motion, Mucciarone has failed to come forward with evidence of a transfer or a termination that would amount to an adverse employment action.  The evidence shows that Mucciarone had not been transferred or terminated before her voluntary resignation on October 18, 2017.  Initiative had not reached a decision on whether to transfer Mucciarone from one internal team to another and was still soliciting feedback from Mucciarone on such an option.  Even if an internal transfer had been authorized by Initiative, and it had not been, transfers are not per se adverse employment actions.  <u>Fletcher</u>, 775 Fed. App'x at 13 (finding that a transfer which did not result in a change in title, salary, or responsibilities was not an adverse employment action (citing <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997))).

Mucciarone voluntarily resigned from her position at Initiative and the limited evidence she has produced, such as Stopforth's "very harsh and very cold" tone during a meeting, is insufficient to demonstrate the intolerable work environment necessary to plead constructive termination.  <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151–52 (2d Cir. 2003) ("An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.  We have explained

that working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" (first citing <u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 161 (2d Cir. 1998) and then quoting <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89, 92 (2d Cir. 1996))).

Mucciarone cannot establish the element of an adverse employment action for a retaliation claim.

      b.   The Causal Connection Between the Adverse Employment Action and the <u>Protected Activity</u>.

Mucciarone similarly has failed to come forward with evidence, which if believed, would permit a reasonable jury to find a causal connection between her alleged adverse employment actions and her complaint of sexual assault against Whitehead. Mucciarone points to the timing and sequence of events as well as the importance of the Dr Pepper account to Initiative as evidence of a causal connection between her complaint and the alleged adverse employment action. But the conclusion she seeks to draw is not supported by the evidence she has presented.

The requisite causal connection between adverse employment action and a protected activity may be demonstrated "indirectly by showing that the protected activity was closely followed by the retaliation, or directly by showing evidence of retaliatory animus." <u>Holmes v. Astor Servs. for Children & Families</u>, No. 16-cv-2260 (CS), 2017 WL 3535296, at *6 (S.D.N.Y. Aug. 16, 2017) (citing <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993)); <u>see</u> <u>also</u> <u>Summa</u>, 708 F.3d at 127–28 ("[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (quoting <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001))). Temporal proximity of the protected activity and the subsequent adverse employment action may alone be enough to establish a prima facie case. <u>El Sayed v. Hilton Hotels</u>

Corp., 627 F.3d 931, 933 (2d Cir. 2010). However, the causal connection cannot be established "if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (citing Adeniji v. Admin. for Children Services, NYC, 43 F.Supp.2d 407, 433 (S.D.N.Y. 1999)); see also Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998) (finding that intervening causal events severed a connection between the protected activity and the alleged adverse employment actions); Holmes, 2017 WL 3535296, at *8.

In this case, the timing and sequence of events does not support Mucciarone's contention that the alleged adverse employment actions resulted from the filing of Mucciarone's sexual assault complaint with Initiative arising out of Whitehead's actions and the failure of Granger to report the incident. Mucciarone was assaulted by Whitehead in the early morning hours of August 30, 2017 and filed her complaint with Initiative HR on September 5, 2017. However, Cronin's allegedly retaliatory behavior, i.e. an abrasive and demanding management style, predated the sexual assault. As early as July 2017, Initiative management was aware of problems with Cronin's management style, eventually going as far as to hire a management coach to help Cronin improve her interactions with her team. (Dorter Tr. 39:10–40:22, 170:11–171:20); (Cronin Tr. 21:6–23:10). Problems with the relationship between Mucciarone and Cronin existed early in Cronin's tenure. (Cronin Tr. 18:1–19). For instance, on August 24, 2017, Mucciarone wrote "I think the overall feeling on the team was that Linda was bringing in her own people and wanted to get rid of the rest of us." (Pl.'s Tr. 313:20–314:5).

Actions that predate the occurrence of the protected activity cannot form the required causal connection. Young v. Westchester Cty. Dep't of Soc. Servs., 57 Fed. App'x 492, 495 (2d Cir. 2003) (summary order) ("[W]here the adverse action was already ongoing at the time

of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation." (citing <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001))); <u>see also</u> <u>McAllister v. Queens Borough Pub. Library</u>, 309 Fed. App'x 457, 459 (2d Cir. 2009) (summary order) (finding a failure to state a retaliation claim where the alleged adverse employment action occurred prior to the protected activity (citing <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002))); <u>Holmes</u>, 2017 WL 3535296, at *7 ("Because these allegedly retaliatory events all occurred before Plaintiff engaged in any protected activity, no causal connection can be established between them and her complaint of discrimination."). The adverse employment actions alleged by Mucciarone, specifically Cronin's management style, predate her complaint to HR so cannot establish a prima facie case of retaliation.

Mucciarone's narrative of events is not indicative of any retaliatory animus by Initiative or Cronin. After receiving Mucciarone's complaint on September 5 and completing its investigation by September 6, Initiative informed Dr Pepper of the details of Mucciarone's assault on September 7 and also demanded that Whitehead no longer work with Initiative personnel. (Cronin Tr. 43:16–44:13); (Doc. 65 ¶ 84). Mucciarone herself reported satisfaction with Initiative's response to her complaint. (Pl.'s Tr. 333:20–25). Mucciarone also reported that Cronin's personal conduct toward her improved after her complaint about Whitehead, describing Cronin as "very supportive," "motherly," and "really great in situations like this." (Pl.'s Tr. 322:19–323:8; 326:18–328:7).

The alleged adverse employment actions began to reoccur in early October 2017, approximately a month after Mucciarone's complaint was filed. However, the specific actions cited by Mucciarone, i.e., Cronin's condescending October 5 email, Cronin's October 6 verbal

abuse at a team meeting, Cronin's denial of assistance, and Cronin's weekend work request, occurred in conjunction with an intervening event, namely Mucciarone's failure to send a complete draft of the Dr Pepper presentation to Cronin on October 4. The failure to complete assigned work tasks represents an intervening event that may severe a presumed temporal link between adverse employment action and a protected activity. <u>Gubitosi</u>, 154 F.3d at 33. Cronin's behavior, however distasteful, is consistent with Cronin's style of managing people and her perception of failings in Mucciarone's performance. Mucciarone has failed to come forward with evidence that any action by Initiative was undertaken in response to her complaints of Whitehead's actions and Granger's failure to report immediately.

Further, though Mucciarone is the only person alleged to have filed a sexual assault complaint, she was not the only person subjected to Cronin's abrasive and demanding management style. In fact, Cronin's curt, gruff, or insensitive actions were not targeted solely at Mucciarone but instead affected the entire Dr Pepper Initiative team. Indeed, a primary reason for Grainger's removal from the Dr Pepper team was his dissatisfaction with Cronin's management. (Dorter Tr. 149:19–150:20); (Stopforth Tr. 64:13–64:16). Additionally, as Mucciarone points out in her brief, at least five other employees complained about Cronin's behavior, none of whom are alleged to have filed sexual assault complaints. (Doc. 63 at 30); (Doc. 65 at 57 ¶ 97). The ubiquity of complaints about Cronin's management style indicates a lack of a causal connection between Cronin's behavior and Mucciarone's complaint to HR and others about Whitehead's actions and Granger's failure to immediately report these actions.

Viewed in totality, no reasonable jury could conclude that there was a causal connection between the alleged adverse employment actions and Mucciarone's complaints arising out of the events of August 29–30.

* * *

Mucciarone has failed to adduce facts upon which a reasonable jury could find retaliation under Title VII or the New York State Human Rights Law and so these claims will be dismissed.

    ii.    <u>New York City Human Rights Law</u>.

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." <u>Mihalik</u>, 715 F.3d at 112 (first citing <u>Albunio v. City of New York</u>, 16 N.Y.3d 472, 479 (2011) and then citing <u>Williams v. N.Y.C. Hous. Auth.</u>, 872 N.Y.S.2d 27, 33–34 (1st Dep't 2009)); <u>see also</u> N.Y.C. Admin. Code § 8-107(7). "Although the NYCHRL's retaliation provision is broader than at least some federal anti-discrimination laws, a plaintiff bringing a retaliation claim under the NYCHRL still must adduce admissible evidence that retaliation was at least a partial motivating factor." <u>Forrester v. Corizon Health, Inc.</u>, 752 Fed. App'x 64, 66 (2d Cir. 2018) (summary order) (first citing <u>Mihalik</u>, 715 F.3d at 113, 116 and then citing <u>Williams</u>, 872 N.Y.S.2d at 33–35).

As described above, Mucciarone has failed to adduce facts that would permit a reasonable jury to conclude that she was subjected to any adverse employment action by Initiative or that there was a causal connection between any action that Initiative did take (e.g. Cronin's job performance criticisms or the meeting with Stopforth) and any protected activity in which she engaged. Initiative's motion for summary judgment dismissing Mucciarone's claim of retaliation under the NYCHRL will be granted.

V.     The Claims Against Whitehead.

Mucciarone brings three claims against Whitehead:  assault, battery, and IIED (intentional infliction of emotional distress).  White moves for summary judgment only on the IIED claim, arguing that, under New York law, this claim is subsumed within the assault and battery claims and therefore cannot be maintained as a separate claim for relief.  The Court concludes that, as a matter of law, Whitehead is entitled to summary judgment on Mucciarone's IIED claim because this claim is entirely subsumed by the assault and battery claims.

New York law does not permit an IIED claim to stand when this claim falls within the ambit of other traditional tort claims, e.g. assault and battery.  Leonard v. Reinhardt, 799 N.Y.S.2d 118, 119 (2d Dep't 2005) ("Here, the cause of action alleging intentional infliction of emotional distress should have been dismissed as duplicative of the causes of action alleging malicious prosecution and assault and battery." (citing Fischer v. Maloney, 43 N.Y.2d 553, 558 (1978)); Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 159 (2d Cir. 2014) (stating "that a claim for IIED may not be sustainable 'where the conduct complained of falls well within the ambit of other traditional tort liability.'" (quoting Fischer, 43 N.Y.2d at 557–58)); Caravalho v. City of New York, No. 13-cv-4174 (PKC), 2016 WL 1274575, at *23 (S.D.N.Y. Mar. 31, 2016) (dismissing an IIED claim as "entirely subsumed by [plaintiff's] common law assault and battery claim"); Centeno v. City of New York, No. 16-cv-2393 (VSB), 2019 WL 1382093, at *9–10 (S.D.N.Y. Mar. 27, 2019) (stating that "the general consensus among courts in this district [is] that where an IIED claim is predicated on the very same conduct underlying a plaintiff's other tort claims, dismissal is appropriate" and dismissing an IIED as subsumed by assault and battery claims).

Mucciarone does not base her IIED claim on any conduct falling beyond the scope of her assault and battery claims.  Specifically, Mucciarone claims that she suffered "severe

emotional distress," (Compl. ¶ 57), as a result of Whitehead's unwanted touching.  However, this immediate apprehension of harmful or offensive conduct and non-consensual touching are the same actions that form the basis for Mucciarone's assault and battery claims.  Further, the facts of this case do not provide an alternative basis, such as an employment relationship between Mucciarone and Whitehead, a pervasive pattern of sexual harassment of Mucciarone by Whitehead, or other tortious conduct by Whitehead, for the IIED claim.  <u>Caravalho</u>, 2016 WL 1274575, at *23 ("There are no allegations that [defendant] engaged in any other potentially tortious conduct against [plaintiff], for example verbal conduct, which is not subsumed by [plaintiff's] assault and battery or excessive force claims.").  Therefore, the Court grants Whitehead summary judgment on Mucciarone's IIED claim.

CONCLUSION

Defendants' motions for summary judgment are GRANTED.  The Clerk is directed to terminate these motions.  (Docs. 50, 51, 58).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
            April 10, 2020